William E. Thomson, Jr. (SBN 47195)
wthomson@brookskushman.com
BROOKS KUSHMAN P.C.
601 South Figueroa Street, Suite 2080
Los Angeles, California 90017
Telephone:  (213) 622-3003
Facsimile:  (213) 622- 3053

Mark A. Cantor (*Pro Hac Vice*)
Chanille Carswell (*Pro Hac Vice*)
BROOKS KUSHMAN P.C.
1000 Town Center, 22nd Floor
Southfield, Michigan 48075-1238
Telephone:  (248) 358-4400
Facsimile:  (248) 358-3351

Thomas M. O'Leary
ROPERS MAJESKI KOHN & BENTLEY PC
515 South Flower Street, Suite 1100
Los Angeles, California 90071-2213
Telephone: (213) 312-2000
Facsimile:  (213) 312-2001

Attorneys for Defendant and
Third Party-Defendant
Joymax Trading, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIGHTON COLLECTIBLES, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>RK TEXAS LEATHER MFG., INC., et al,<br><br>        Defendants.<br><br>RELATED THIRD-PARTY ACTION. | Case No. 3:10-CV-0419-CAB (WVG)<br>Honorable Cathy Ann Bencivengo<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT JOYMAX TRADING, INC.'S *DAUBERT* MOTION TO EXCLUDE THE SURVEYS AND TESTIMONY OF GARY FRAZIER, PH.D.**<br><br>[Concurrently filed with Notice of and Motion, Declaration of Chanille Carswell and Proposed Order]<br>    Date:  August 23, 2012<br>    Time:  2:30 p.m.<br>    Courtroom:  2 |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................1

II.  ARGUMENTS ......................................................................................4

  A.   Fundamentally Flawed Surveys Which Are Neither Reliable
       Nor Relevant Must Be Excluded ...............................................4

     1.   The *Daubert* Standard ......................................................4

     2.   Gatekeeping Is Not A Rubberstamp .................................5

  B.   Dr. Frazier's Likelihood Of Confusion Survey Is Fundamentally Flawed ...............7

     1.   Dr. Frazier's Likelihood of Confusion Survey Methodology ......................7

     2.   The Improperly Suggestive Stimulus Renders The Survey
          Results Completely Unreliable As A Measure Of The
          Likelihood Of Confusion ..................................................9

     3.   Failure To Include A Control Also Renders The Results Unreliable .........12

     4.   Dr. Frazier's Survey Also Failed To Replicate Market
          Conditions And Was Leading ..........................................13

  C.   Dr. Frazier's Brand Impact Survey Is Fundamentally Flawed ...............15

     1.   Dr. Frazier's Brand Impact Survey Methodology........................15

     2.   The Lead Question Is Ambiguous .....................................17

     3.   Participants Were Given Incomplete Information .....................18

     4.   Whether Participants Have Seen Knockoffs Is Irrelevant...........18

  D.   Dr. Frazier Should Not Be Allowed To Opine As To Point-Of-Sale Confusion .....19

  E.   Dr. Frazier Should Not Be Allowed To Offer Unsupported Testimony
       And Conclusion................................................................20

III. CONCLUSION ................................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

4

*Clicks Billiard, Inc. v. Sixshooters, Inc.*
 251 F.3d 1252 (9th Cir. 2002)...............................................................2

5

6

*Daubert v. Merrell Dow Pharmaceuticals*
 509 U.S. 579 (1993) ...............................................................1, 4, 5, 18

7

*Daubert v. Merrell Dow Pharmaceuticals*
 43 F.3d 1311, 1318 n. 10 (9th Cir. 1995)...............................................4, 5

8

9

*Elsayed Mukhtar v. California State University Hayward*
 299 F.3d 1053 (9th Cir. 2002)...............................................................5

10

11

*Fortune Dynamic, Inc. v. Victoria's Secret Store Brand Management, Inc.*
 618 F.3d 1025 (9th Cir. 2010)...............................................................5

12

13

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*
 826 F.2d 837 (9th Cir. 1987)................................................................20

14

*General Motors Corp. v. Keystone Automotive Industries, Inc.*
 453 F.3d 351 (6th Cir. 2006)................................................................19

15

16

*Georgia-Pacific Consumer Product LP v. Myers Supply, Inc.*
 2009 WL 2192721 (W.D. Ark. 2009) ...............................................13

17

18

*Government Employees Insurance Company v. Google*
 2005 WL 1903128 (E.D. Va. 2005)...............................................9

19

20

*HI Limited Partnership v. Winghouse of Florida, Inc.*
 2004 WL 5486964 (M.D. Fla. 2004) ...............................................5

21

*Kumho Tire Company, Ltc. v. Carmichael*
 526 U.S. 137 (1999)...............................................................4

22

23

*Medisim Ltd. v. BestMed LLC*
 2012 WL 718041 (S.D. N.Y. March 6, 2012) ...............................................19

24

25

*National Football League Properties, Inc. v. Prostyle, Inc.*
 57 F.Supp.2d 665 (E.D. Wis. 1999)...............................................13

26

*Rambus Inc. v. Hynix Semiconductor Inc.*
 254 F.R.D. 597 (N.D. Cal. 2008)...............................................21

27

28

*Scott Fetzer Co. v. House of Vacuums Inc.*
 381 F.3d 477 (5th Cir. 2004)...............................................5, 6

*Simon & Schuster, Inc. v. Dove Audio, Inc.*
    970 F.Supp. 279 (S.D. N.Y. 1997) ...................................................17

*Simon Property Group L.P. v. mySimon, Inc.*
    104 F.Supp.2d 1033 (S.D. Ind. 2000) .............................5, 6, 10, 14

*Stilwell v. Smith & Nephew, Inc.*
    482 F.3d 1187 (9th Cir. 2007) ............................................................4

*Stop Staring! Designs v. Tatyana, LLC*
    Case No. CV09-2014 ........................................................................21

*Sunbeam Corp. v. Equity Industries Corp.*
    635 F.Supp. 625 (E.D. Va. 1986) ....................................................10

*Thoip v. Walt Disney Co.*
    690 F.Supp.2d 218 (S.D. N.Y. 2010) ....................................5, 6, 11

*Viterbo v. Dow Chemical Co.*
    826 F.2d 420 (5th Cir. 1987) ....................................................21, 22

*Wells Fargo & Co. v. Whenu.com, Inc.*
    293 F.Supp.2d 734 (E.D. Mich. 2003) ..............................................2

*YKK Corp. v. Jungwoo Zipper Co., Ltd.*
    213 F.Supp.2d 1195 (C.D. Cal. 2002) .............................................14

**RULES**

Fed. R. Evid. 403 .................................................................................6

Fed. R. Evid. 702 .....................................................................4, 21, 22

**MISCELLANEOUS**

6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition*
    §32:170 (4th ed. 2003) ......................................................11, 14, 19

Shari S. Diamond, *Reference Guide On Survey Research, In Reference
    Manual on Scientific Evidence* (1994) ........................................12, 17

# I.   **INTRODUCTION**

Plaintiff Brighton Collectibles, Inc.'s ("Brighton") expert witness, Gary Frazier, Ph.D., designed and conducted two surveys pertaining to likelihood of confusion and brand harm which are so grossly flawed that the results are completely unreliable and, therefore, cannot aid and indeed may mislead jurors with regard to any issue they must resolve.   Therefore, Defendant Joymax Trading, Inc. ("Joymax") hereby moves to exclude both surveys and Dr. Frazier's related opinion testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).   Joymax also moves to exclude opinions proffered by Dr. Frazier which are outside the scope of his testing and expertise and which, in many instances, merely regurgitate Brighton's attorneys' self-serving claims.

Brighton alleges trade dress infringement against Joymax and other named Defendants, claiming that there is a likelihood of confusion between Defendants' handbags, which are primarily made of plastic and sell for an average retail price of less than $50, and Brighton's leather handbags, which sell for over $200 and are only sold in Brighton Collectibles stores and through specialty or boutique retailers.   Notably, Brighton does not allege that Defendants' handbags infringe upon the trade dress of any particular Brighton handbag.   Rather, Brighton alleges that certain handbags sold by Defendants infringe upon a so-called "Brighton Look," which consists of a virtually limitless number of combinations of common handbag features.   Specifically, in its Second Amended Complaint, Brighton says that its trade dress consists of any sculpted silver heart, in conjunction with two or more of the following:

> (i) leather embossed to resemble exotic materials, such as crocodile, alligator, snake and lizard; (ii) filigreed, silver ornamentation; (iii) a silver heart dangling from a leather strap; (iv) cowhide or brocaded fabrics, and/or (v) additional sculpted silver hearts.

Dkt. No. 87 at ¶36.[1]

---

[1] Brighton's description of its trade dress is a moving target.   As is discussed more fully in K&L Import's Motion for Partial Summary Judgment, Brighton and its employees have described the Brighton Look with at least four variations in this and other lawsuits.   *See* Dkt. No. 144 at pp. 7-9.

There is no evidence that any consumer has ever actually confused Defendants' handbags with Brighton handbags.  So, Brighton attempts to meet its burden to prove likelihood of confusion[2] by proffering two surveys designed and executed by Dr. Frazier, which purportedly measured likelihood of confusion and the impact of Defendants' products on the Brighton brand.  However, there are fundamental flaws in each survey which render them unreliable.

First, and most significantly, the likelihood of confusion survey was overtly suggestive.  That is, Dr. Frazier designed the survey so that participants were first shown four Brighton bags which contained several of the claimed trade dress elements, including sculpted silver hearts.  Two of the Brighton bags were also two-toned in color (red and black).  Immediately after viewing the Brighton bags, participants were shown four non-Brighton bags and asked which bags, if any, in the second array were made by the same company that manufactured the first array.  **However, Defendants' bag was the <u>only</u> one of the four non-Brighton bags which had silver hearts and a two-toned coloring, just like the Brighton bags.**  <u>None</u> of the other non-Brighton bags included heart ornamentation of any kind and each was all black in color.  Not surprisingly, 89% of the participants chose the Defendants' bag and most cited the hearts and color as the main reasons for doing so.  Dr. Frazier admitted that he deliberately did not include other bags with hearts and that he selected ones which were "highly different and distinct" from the Brighton bags.  By doing so, he violated the most basic principles of legitimate survey design and reduced it to a slanted matching game.  There is no way to know whether the participants were actually confused or merely chose the handbag which "matched" the Brighton bags.

The survey also suffers from a second fundamental flaw, it did not include a control, which is the means by which surveyors gauge whether responses are indicative of the thing being tested, *e.g.*, confusion, or the influence of other factors (such as pre-existing beliefs or flawed questions).  *See Wells Fargo & Co. v. Whenu.com, Inc.*, 293 F.Supp.2d 734, 768 (E.D. Mich. 2003).  Including a control was particularly necessary in this case because it would have exposed the inherent bias in Dr. Frazier's survey design and provided a more reliable indicator of the extent to which the

---

[2] *See Clicks Billiard, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2002) (noting that a plaintiff must prove, among other things, likelihood of confusion).

1  participants were actually confused as opposed to merely choosing the handbag which matched the

2  Brighton bags.

3       These defects alone render Dr. Frazier's survey results unreliable as an indicator of the

4  likelihood of confusion.  However, there are additional defects which further compromise the

5  integrity of the results.  Specifically, (1) Dr. Frazier failed to present the test products in a manner

6  which mimicked the way in which a consumer would typically encounter them, *i.e.*, the survey

7  failed to replicate actual market conditions, and (2) the survey was leading in its overall design and

8  with respect to certain of the test questions.

9       Dr. Frazier's second, brand impact, survey was also flawed in multiple ways which render it

10  completely unreliable, namely:  (1) the key question was ambiguous; (2) Dr. Frazier did not provide

11  participants with the relevant information which would typically inform a consumer's perceptions;

12  and (3) the findings regarding the number of participants who have seen alleged "Brighton

13  knockoffs" in public shed no light on whether Joymax's product caused harm to the Brighton brand

14  because Dr. Frazier failed to ask any follow-up questions specific to Joymax or any of the

15  Defendants.

16       Lastly, even if Dr. Frazier's surveys are deemed admissible, certain of his anticipated

17  testimony should be limited or excluded.  That is, Dr. Frazier admits that his likelihood of confusion

18  survey was only designed to test post-purchase confusion, not point-of-sale confusion.

19  Consequently, opinions offered in his report as to point-of-sale confusion and harm should be

20  excluded and he should not be allowed to opine on those issues at trial.  Further, the numerous

21  opinions offered in Dr. Frazier's report which have no evidentiary support and merely parrot

22  Brighton's allegations regarding the alleged strength of its brand are improper and should be

23  excluded inasmuch as they are not based on any "scientific, technical or other specialized

24  knowledge," which will aid jurors.

25       In short, both surveys suffer from multiple serious defects such that the data gathered and

26  the opinions drawn therefrom are not sufficiently reliable or relevant to aid jurors in understanding

27  the evidence or determining any of the facts in issue.  Indeed, the surveys are so flawed that the

28  probative value, if any, is substantially outweighed by the danger that it will mislead the jury and

cause unfair prejudice, confusion of the issues and a waste of time.  Also, notwithstanding the flawed surveys, all opinions asserted by Dr. Frazier which are outside the scope of his testing and lack evidentiary support should be excluded.

## II.   ARGUMENTS

**A.   Fundamentally Flawed Surveys Which Are Neither Reliable Nor Relevant Must Be Excluded**

### 1.   The *Daubert* Standard

The admissibility of expert testimony is governed by Fed. R. Evid. 702 and the principles set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, *supra*.  Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* Court held that Rule 702 requires a trial court to act as a "gatekeeper" with respect to expert testimony to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S at 597.[3]  "A court may exclude testimony that falls short of achieving either end."  *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).  The burden of establishing that expert testimony is admissible is on the proponent. *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1318 n. 10 (9th Cir. 1995) ("*Daubert II*").

*Daubert* set forth a non-exhaustive list of factors for a court to consider to determine whether expert testimony is sufficiently reliable to be admitted into evidence:

> (1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community.

---

[3] *See also Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert* to "technical or other specialized knowledge" and not just scientific knowledge).

1   *Elsayed Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002)

2   (citing *Daubert*, 509 U.S. at 593-94).   A trial court has broad latitude in determining whether an

3   expert's testimony is reliable.  *Id.*  "The test for reliability . . . 'is not the correctness of the expert's

4   conclusions but the soundness of his methodology.'"  *Stilwell*, 482 F.3d at 1192 (*quoting Daubert*

5   *II*, 43 F.3d at 1318) (footnote omitted).  And, relevant expert testimony is that which is "helpful"

6   and "logically advances a material aspect of the proposing party's case."  *Id*; *Daubert II*, 43 F.3d

7   1315.

8        **2.   <u>Gatekeeping Is Not a Rubberstamp</u>**

9        Carrying out the gatekeeping function "is vital to ensure accurate and unbiased decision-

10   making by the trier of fact."  *Elsayed*, 299 F.3d at 1063.  It is also "particularly important

11   considering the aura of authority experts often exude, which can lead juries to give more weight to

12   their testimony."  *Id.* (footnote omitted).

13        Exercise of the gatekeeping obligation is crucial with respect to an expert's proffer of survey

14   evidence given that poorly or erroneously crafted surveys can manifest in grossly misleading (and

15   self-serving) results.   Consequently, only surveys which are "conducted according to accepted

16   principles" are admissible.  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management,*

17   *Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (citation omitted).

18        Furthermore, while it is the majority rule among the circuits that "technical inadequacies" in

19   a survey go to weight and not admissibility, it is also the majority rule that surveys with serious,

20   fundamental flaws must be excluded.  *Id.  See also Scott Fetzer Co. v. House of Vacuums Inc.*, 381

21   F.3d 477, 488 (5th Cir. 2004) (survey excluded because it failed to provide probative evidence of

22   confusion due to an improper universe); *Thoip v. Walt Disney Co.*, 690 F.Supp.2d 218, 231

23   (S.D.N.Y. 2010) (survey excluded where it failed to replicate actual marketplace conditions and

24   failed to use an adequate control); *HI Limited Partnership v. Winghouse of Florida, Inc.*, 2004 WL

25   5486964, *8 (M.D. Fla. 2004) (survey excluded because an improper universe (which excluded

26   women) "reflect[ed] a patently flawed methodology striking at the very heart of the survey's

27   validity."); *Simon Property Group L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1039 (S.D. Ind.

28

2000) (survey excluded where it was leading, suggestive, lacked an adequate control and failed to replicate actual marketplace conditions).

Courts have recognized that it is imperative for a trial court to closely scrutinize survey evidence and make the distinction between minor technical flaws and those that fundamentally compromise the integrity of the survey, otherwise the gatekeeping obligation would be reduced to a mere rubberstamp:

> **The court need not and should not respond reflexively to every criticism by saying it merely "goes to the weight" of the survey rather than its admissibility. If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial.**

*Simon Property Group*, 104 F.Supp.2d at 1039 (emphasis added).   The Fifth Circuit, likewise, stated:

> **In some cases . . . serious flaws in a survey will make any reliance on that survey unreasonable. . . . Otherwise, any survey, no matter how tendentious, would force the parties to trial.**  Thus, although minor methodological flaws will affect weight rather than admissibility, a survey can be "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion."  *Universal* [*City Studios, Inc. v. Nintendo Co., Ltd.*], 746 F.2d [112, 118 (2nd Cir. 1984)].

*Scott Fetzer Co.*, 381 F.3d at 488 (internal citation omitted; emphasis added).

A survey can and should be "excluded under Rule 702 when it is invalid or unreliable, and/or under Rule 403 when it is likely to be insufficiently probative, unfairly prejudicial, misleading, confusing or a waste of time." *Thoip*, 690 F.Supp.2d at 231 (footnote omitted).[4]  This is particularly true when a jury trial is contemplated because "[t]he court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time-consuming . . . when it offers essentially nothing of real probative value." *Simon Property Group*, 104 F.Supp.2d at 1039.  *See also Thoip*, 690 F.Supp.2d at 231

---

[4] Fed. R. Evid. 403 states:  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

6

("Where . . . a trademark action contemplates a jury trial rather than a bench trial, the court should scrutinize survey evidence with particular care.").

**B.     Dr. Frazier's Likelihood of Confusion Survey Is Fundamentally Flawed**

Dr. Frazier's likelihood of confusion survey is flawed in numerous respects.  However, two defects are glaringly contrary to the basic principles necessary to ensure the integrity of survey results—(1) the stimulus shown to participants was improperly suggestive, and (2) Dr. Frazier failed to use a control.  The survey also failed to replicate actual market conditions and was leading.

**1.     Dr. Frazier's Likelihood of Confusion Survey Methodology**

Purportedly to assess the likelihood of confusion between Brighton bags bearing the so-called "Brighton Look" and Texas Leather[5] handbags, Dr. Frazier surveyed 383 female participants in malls in four cities -- Atlanta, Dallas, Los Angeles and Tampa.  Carswell Decl. ¶2, Exh. A, Frazier Report at ¶11.  Participants who qualified for the survey after being asked a series of screening questions, were then shown and allowed to physically inspect (but not open) an array of four Brighton handbags.  *Id.* .at ¶12, 15.  Notably, although Dr. Frazier testified that his intent was "primarily" to test for *post-purchase* confusion, participants were asked to examine the Brighton bags as if they were shopping in a store (at the *point-of-sale*).  Carswell Decl. ¶2, Exh. A at ¶15; Carswell Decl. ¶3, Exh. B, Frazier Dep. at pp. 88:20 – 89:13, 90:1-9.  <u>**All of the Brighton bags had sculpted silver heart ornamentation, two were all black in color, and two were two-toned (red and black).**</u>  Carswell Decl. ¶2, Exh. A(7), A1-A4.  Participants were told that all four handbags were made by the same manufacturer, but the Brighton name was concealed on each bag.  Carswell Decl. ¶2, Exh. A at ¶15.

Participants were then taken to a different table and shown four non-Brighton handbags that they were not allowed to touch or handle and they were told to view them "as though you saw someone else carrying them on the street."  Carswell Decl. ¶2, Exh. A at ¶15; Carswell Decl. ¶2,

---

[5] RK Texas Leather Mfg. Inc. ("Texas Leather") is the lead Defendant in this action.  Dr. Frazier used an accused Texas Leather handbag in his testing.  Because Texas Leather purchased its accused handbags from all but one of the remaining Defendants, including Joymax, Plaintiff imputes the results of Dr. Frazier's testing to all of the other Defendants who sold accused handbags to Texas Leather.

Exh. A(4), p. 1.[6]  This second array included one bag each from Texas Leather, Wilson Leather, Hillard & Hanson and Jones New York with the brand names concealed.  Carswell Decl. ¶2, Exh. A at ¶15.  **The Texas Leather bag was the <u>only</u> one which had silver heart ornamentation and was two-toned in color.**  Carswell Decl. ¶2, Exh. A(7), B1-B4.  **All of the other non-Brighton bags were all black and <u>none</u> had any heart ornamentation.**  *Id.*  So, as shown in the below Atlanta array, **in each city only the Brighton and Texas Leather handbags included heart ornamentation and two-toned coloring:**



| *Brighton* | **Other** | **Other** | **Other** | *Texas Leather* |
|---|---|---|---|---|

Carswell Decl. ¶2, Exh. A(7), A1 and B1-B4.  *See also* Carswell Decl. ¶2, Exh. A(7) for individual photos and Carswell Decl. ¶4, Exh. C for the comparative arrays in each city.  Inexplicably, Dr. Frazier testified that the omission of other non-Brighton bags with hearts was deliberate, and that he "specifically selected bags that [he] felt [had] trade dress [which was] *highly different and distinct from Brighton products.*"  Carswell Decl. ¶3, Exh. B at pp. 137:14 – 138:6 (emphasis added).

        After each participant finished examining the bags, she was asked two of three questions:

    1.    Which handbag or handbags, if any, do you think are made, sponsored or endorsed by the same company as the first set of handbags?

    2.    What is it about that handbag that makes you say that it is made, sponsored or endorsed by the same company as the first set of handbags?  Any other reasons?

    3.    What is it about the handbags that make you say that they are not made, sponsored or endorsed by the same company as the first set of handbags?  Any other reason?

Carswell Decl. ¶2, Exh. A(4), pp. 2-3.

---

[6] To avoid confusion, reference to attachments to Dr. Frazier's report will be cited as Carswell Decl. ¶2, Exh. A (insert Frazier Exhibit no).  For example, a cite to "A(4)" refers to Exhibit A of the undersigned's brief and Exhibit 4 of Dr. Frazier's report.

Not surprisingly, 89% (339) of the participants chose the Texas Leather bag as being made, sponsored or endorsed by the same company that made the Brighton bags.  Carswell Decl. ¶2, Exh. A at ¶17.  Also not surprising, the two primary reasons given for the association were the heart ornamentation (87%) and the color (51%), as opposed to only 12% who mentioned the overall look or style and 4% who mentioned Brighton by name.  *Id.* at ¶19.

### 2. The Improperly Suggestive Stimulus Renders The Survey Results Completely Unreliable As A Measure Of The Likelihood Of Confusion

The glaringly suggestive comparative arrays of handbags shown to survey participants produced a "demand effect" which biased the results such that the survey results are completely unreliable.  "A demand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants."  *Government Employees Insurance Company v. Google*, 2005 WL 1903128, *6 (E.D. Va. 2005).  That is precisely what occurred in this case.

Survey expert Hal Poret noted that "the lineup of four [non-Brighton] bags was <u>highly leading</u> in that only the Texas Leather bag had a heart, making the lineup akin to an improper police lineup in which one member blatantly stands out as the only one that matches a key feature of the suspect."  Carswell Decl. ¶5, Exh. D, Rebuttal Report of Hal Poret at p. 7 (emphasis added).[7]  The suggestive and leading nature of the array makes it impossible to know whether the results reflect actual confusion:

> As with the faulty police lineup, there is no way to know whether the Texas Leather handbag was selected due to genuine confusion or whether the respondent assumed from the survey that one item in the lineup must be the right answer and simply picked the one item with a key common feature (a heart) in order to make a "match."
>
> * * *

---

[7] Mr. Poret was retained by Defendants to conduct a secondary meaning survey.  He also reviewed and prepared a Rebuttal to Dr. Frazier's report.  Mr. Poret has "personally designed, supervised, and implemented over 400 surveys measuring perception, opinion, and behavior," over 150 of which "have concerned consumer perception and opinion regarding trademarks and trade dress."  Carswell Decl. ¶5, Exh. D at p. 3.  Mr. Poret has been accepted as an expert in survey research on numerous occasions in federal courts and other administrative tribunals.  *Id*

> In the absence of another bag with a heart, it would have been fairly obvious to respondents that the Texas Leather bag stood out as the best "match" with the Brighton products, regardless of whether they were actually confused.

*Id.* at p. 14.  Mr. Poret further noted that the high number of participants who referenced the heart as the reason for associating it with the Brighton bags (87%) "tend[s] to confirm that respondents were mainly just matching the Texas Leather bag to the Brighton products because they all have a heart on it rather than because of genuine overall confusion."  *Id.*

A "faulty lineup" analogy was also used by the Court in *Sunbeam Corp. v. Equity Industries Corp.*, 635 F.Supp. 625 (E.D. Va. 1986), in its rejection of a similarly suggestive survey array.  In *Sunbeam*, the products at issue were compact food processors.  Plaintiff's expert conducted a likelihood of confusion survey where participants were shown two photo arrays.  635 F.Supp. at 634.  The first array included the accused product, which was a compact food processor, and four full-sized food processors which had "noticeable feeding chute[s] or 'chimney[s]' extending out of the mixing bowl," a feature that the accused product did not have.  *Id*.  The second photo array included two compact food processors, one of which was the plaintiff's, and neither had a chimney.  *Id*.  The second compact food processor, which was not the plaintiff's product, was a different color and shape than plaintiff's product and the accused product.  *Id*.  The remaining three food processors in the second array were full-sized, each with a chimney.  *Id*.  In response to the question, "Which, if any, of these food processors are the same as the food processors pictured in the [first] photographs I showed you?," 28% of the participants selected the plaintiff's product.  *Id*.

The *Sunbeam* Court, however, rejected the survey results as unreliable to establish likelihood of confusion, likening the accused product in the first photo array to "a bearded man in a lineup with four clean-shaven men."  *Id*.  The Court stated that it was "natural" under the circumstances for a significant percentage of participants to confuse the accused product with the plaintiff's product.  *Id*.  Further, the Court stated that **"[w]hen a survey question begs its answer it is not a true indicator of the likelihood of consumer confusion."**  *Id*. (emphasis added).

In *Simon Property Group L.P. v. mySimon, Inc.*, *supra*, the district court rejected proposed print and television surveys purportedly designed to test confusion between the parties' respective

"Simon" fictional characters where the accused product was the only one in the array related at all to the name "Simon":

> **The print and television surveys suffer from two fundamental and related flaws. First, they are obviously highly suggestive and leading. In fact, they are so suggestive and leading that it is astonishing [Plaintiff] is even proposing them.** In both versions of the survey, the respondent is shown advertisements from different companies, including [Defendant's company] mySimon. The interviewer then shows the respondent the www.simon.com and www.mysimon.com addresses and asks if he or she would use these addresses to access the websites of any of the companies portrayed in the advertisements he or she saw. **None of the other advertisements have any connection with the name "Simon." The "correct" answer is perfectly obvious as long as the respondent remembers the names of the advertised companies.**
>
> **These survey formats therefore test nothing more than the memory and common sense of a respondent which show nothing probative or relevant about possible consumer confusion.**

104 F.Supp.2d at 1051 (emphasis added; footnote omitted).[8]

Likewise in *Thoip v. Walt Disney Company, supra*, the Court excluded a likelihood of confusion survey regarding allegedly infringing t-shirts in part because in the comparative array the accused product was clearly more similar to the plaintiff's product than any other shirt in the array. 788 F.Supp.2d at 183. The Court described the survey as "slanted" and stated that it "test[ed] nothing more than the memory and common sense of a respondent." *Id.*

So it is here. Dr. Frazier reduced the survey to a matching game in which he effectively lead the participants to the most obvious match. This does not comport with sound methodology and is blatantly improper. *See* 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* §32:170 (4th ed. 2003) (hereinafter "McCarthy") ("A professional survey expert will use standard procedures to ensure that the survey was administered in such a manner as to minimize error and bias."). It is also impossible, because of the suggestiveness of the survey, to know to what extent, if any, participants were actually confused. Dr. Frazier's likelihood of confusion survey should be excluded for this reason alone.

---

[8] The other advertisements were for Lycos.com, the United States Marine Corps and General Motors. *Simon Property Group*, 104 F.Supp. 2d at 1050.

**3.**    **Failure To Include A Control Also Renders The Results Unreliable**

The second fundamental flaw in Dr. Frazier's survey is the fact that it did not include a control.  It is well-settled that a survey control group or question is critical "to adjust for so-called 'background noise,' *i.e.*, extrinsic factors, pre-existing beliefs, general confusion or other factors, other than the stimulus at issue, that contribute to a survey's results." *Wells Fargo,* 293 F.Supp.2d at 768.  *See also* Shari S. Diamond, *Reference Guide On Survey Research*, *in Reference Manual on Scientific Evidence*, pp. 256-260 (1994) (hereinafter "Reference Guide").

"The control group 'functions as a baseline and provides a measure of the degree to which respondents are likely to give an answer . . . not as a result of the [thing at issue], but because of other factors, such as the survey's questions, the survey's procedures . . . or some other potential influence on a respondent's answer such as a pre-existing beliefs.'" *Wells Fargo*, 293 F.Supp.2d at 768-9 (*quoting Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 129 F.Supp.2d 351, 365 n.10 (D.N.J. 2000)).  "'By adding an appropriate control group, the survey expert can test exactly the influence of the stimulus.'" *Id.* at p. 769 (*quoting* 5 McCarthy §32:187).  Indeed, "[a] survey with an imperfect control group generally provides better information than a survey with no control group at all."  Reference Guide at p. 258.

Mr. Poret opined that a control group was particularly important in this case given the suggestive nature of the survey discussed above and would have likely further exposed the egregious flaw in its design:

> In a survey such as the Frazier confusion survey, there is a high risk that the survey design and questions are leading respondents to make a connection between handbags that they would not have made under actual marketplace conditions. . . . To control for such noise, a separate Control Group is needed.  In the absence of a Control Group, the survey is fatally flawed because there is no way to tell whether the Test Group result has any reliability or should be dismissed as the product of a leading survey design.
>
> **[A] proper Control would have involved interviewing a separate group of respondents and replacing the Texas Leather bag with another bag that contains a heart but has an overall look that is not confusingly similar.  This would have measured the tendency of the survey to lead respondents to pick out a bag from the lineup containing a heart even if the bag is not actually confusingly similar.  Since 87% of the supposedly confused respondents pointed to the heart as a reason, a control needed to also contain a heart to ensure it was the overall trade dress and not merely a heart that caused the products to be**

12

**connected.**  For example, if in the lineup shown to the Control Group the Texas Leather bag had been replaced by a bag that did not have an overall similar look but did have a heart and most respondents still picked this bag out of a lineup as coming from the same company as the Brighton products, this would have demonstrated that the survey is not showing genuine trade dress confusion – it is merely leading respondents to pick the best match regardless of whether it's [sic] overall look is confusingly similar.  **The absence of such a control is a fatal flaw, as there is no way to reliably conclude that the "confusion" result shown in the survey is not entirely noise.**

Carswell Decl. ¶5, Exh. D at pp. 16-17 (emphasis added).

Numerous courts have, indeed, found the lack of a control to be a fatal flaw which warranted exclusion (or disregard) of the survey.  *See for example Wells Fargo*, 293 F.Supp.2d at 769; *Georgia-Pacific Consumer Product LP v. Myers Supply, Inc.*, 2009 WL 2192721, *8 (W.D. Ark. 2009); *National Football League Properties, Inc. v. Prostyle, Inc.*, 57 F.Supp.2d 665, 668-670 (E.D. Wis. 1999).

In his deposition, Dr. Frazier implies that the three other non-Brighton handbags in the second array operated as controls.  Carswell Decl. ¶3, Exh. B at p. 137:14 – 138:10.  However, Mr. Poret pointed out that the three other bags in the array could not serve as valid controls:

Given that the Texas Leather bag obviously stood out of the lineup as the only one with a heart, the likelihood that respondents would pick the other bags was greatly reduced.  Accordingly, the rates at which respondents picked the other bags cannot reflect the level of survey noise.

Carswell Decl. ¶5, Exh. D at p. 17.

The omission of a valid control in Dr. Frazier's survey is also a fundamental flaw which alone warrants exclusion of the survey in its entirety.

**4.     Dr. Frazier's Survey Also Failed To Replicate Market Conditions And Was Leading**

Dr. Frazier's likelihood of confusion survey suffers from numerous other deficiencies.  That is, although the survey purportedly tested post-sale confusion, it was leading and failed to sufficiently replicate actual marketplace conditions to produce reliable post-sale confusion results.

The closer a survey mirrors actual marketplace conditions, the more reliable the results:

[M]ost often, a survey is designed to prove the state of mind of a prospective purchaser.  Therefore, the closer the survey methods mirror the situation in which the

13

ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.

McCarthy at §32:163 (footnote omitted).  *See also YKK Corp. v. Jungwoo Zipper Co., Ltd,* 213 F.Supp.2d 1195, 1203 (C.D. Cal. 2002) ("While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey replicates the real world setting which can create an instance of actual confusion.") (*quoting* McCarthy at §23:17); *Simon Property Group*, 104 F.Supp.2d at 1038 ("[A] survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace."). Also, "in framing survey questions, one must resist the temptation to lead responses to a desired end or to 'help' the witness to reach the 'correct' answer." *Id.* at §32:173.

Dr. Frazier's survey design failed to embrace these basic tenets in a number of ways.  First, it is unlikely that a consumer who saw a Texas Leather bag on the street in a post-sale situation would have recently viewed an array of Brighton products.  Carswell Decl. ¶5, Exh. D at p. 12. Therefore, Mr. Poret states "it was highly artificial and leading to first show respondents a lineup of Brighton products."  *Id.*  He further states that priming participants in this way increased the likelihood of an association between Brighton and Texas Leather:

> In the real world it is extremely unlikely that someone seeing a Texas Leather bag carried by another woman would have been recently reviewing Brighton products. This clearly exaggerated the likelihood that the Texas Leather bag would be connected to Brighton in the survey.

*Id*.

Second, "the selection of four products that <u>all</u> embody the alleged trade dress was improperly leading."  *Id.*  "By showing respondents four products of similar style and telling them that they all come from one company, the survey is artificially training respondents to assume that products of that style are from that company."  *Id.*  "This is not a fair reflection of marketplace reality . . . . [because] Brighton makes handbags and other products in a large variety of styles."  *Id*.

Third, the selection of Brighton bags which are no longer available for purchase, is contrary to actual marketplace conditions.  "If the survey is intended to simulate a consumer becoming exposed to Brighton's trade dress, it should have been shown products that an actual consumer is likely to encounter in the marketplace."  *Id.* at p. 13.

14

Fourth, Dr. Frazier covered the Brighton name on each bag although consumer confusion would likely be influenced by the presence or absence of a brand name.  *Id*.  "Preventing respondents from seeing the names on the Brighton products took the survey out of any real world context, as the actual likelihood of confusing a Texas Leather product with Brighton would certainly be influenced by the fact that the name Brighton appears on Brighton products but does not appear[] on the Texas Leather product."  *Id*.

Lastly, the leading nature of the second array was exacerbated by the leading question asking "Which handbag or handbags, if any" in the second array was made, sponsored or endorsed by the company which sells the first array (the Brighton bags).  *Id* at p. 14.  "The immediate emphasis on the phrase <u>which handbag or handbags</u> strongly suggests that at least one of the handbags in the lineup <u>is</u> from the same company as the first four products and that respondents should point it out," and including "if any" only minimally reduces the severity of this flaw.  *Id*. at 14-15 n. 7.

These numerous additional defects reveal that the survey overall was poorly designed and (along with the aforementioned fundamental flaws) so undermines its reliability on the question of likelihood of confusion that it would not aid jurors in assessing the viability of Brighton's trade dress claim.

## C.   <u>Dr. Frazier's Brand Impact Survey Is Fundamentally Flawed</u>

Dr. Frazier's second survey was purportedly designed to test the harm to the Brighton brand from so-called "knockoff" bags in general, and Texas Leather's bags in particular.  Carswell Decl. ¶2, Exh. A at ¶7.  However, it is also so fundamentally flawed that it is not a reliable indicator of whether the Brighton brand has been harmed by the Texas Leather bags or, indeed, at all.

### 1.    <u>Dr. Frazier's Brand Impact Survey Methodology</u>

Dr. Frazier conducted a nationwide internet survey of 408 female consumers who had purchased a Brighton product in the past.  *Id*. at ¶¶34, 36.  Participants were first shown a photo of three Brighton handbags and one accessory, and then a second photo of three accused Texas Leather handbags and two accused accessories.  *Id*. at ¶38. *See photos at* Carswell Decl. ¶2, Exh.

15

A(9).  The participants were informed that the bags and accessories in the second photo were not Brighton bags and were asked three questions:

> 1.     If you knew that less expensive handbags, such as the ones pictured here [in the second photo], were being sold, would you be any less likely to buy an authentic Brighton product?
>
> 2.     If you would be less likely to buy an authentic Brighton product, which of the following answers characterizes your feelings the best?
>
> > *I wouldn't buy Brighton.
> > *I would reduce my buying of Brighton by 1 to 25% per year.
> > *I would reduce my buying of Brighton by 26 to 50% per year.
> > *I would reduce my buying of Brighton by 51 to 75% per year.
> > *I would reduce my buying of Brighton by more than 75% per year.
> > *I don't know.
>
> 3.     Do you believe you have seen Brighton knockoffs in public?

Carswell Decl. ¶2, Exh. A at ¶38; Exh. A(9).

In response to the first question, 23% (93) responded "yes," and 16% (65) responded "I don't know."  Carswell Decl. ¶2, Exh. A at ¶41.  Participants responded as follows to the remaining questions:

- Less likely to purchase Brighton products      -      23%
- Likely percentage of reduced purchases

|  |  |  |
|---|---|---|
| 1 – 25% | - | 19% |
| 26 – 50% | - | 25% |
| 51 – 75% | - | 17% |
| 76% + | - | 11% |

- Have seen Brighton knockoffs in public      -      41%

*Id.* at ¶¶42-43.

Based upon these results, Dr. Frazier opines that the responses to the first two questions show that (a) knockoffs are harmful to the Brighton brand; and (b) "[f]or an appreciable percentage of consumers, the sale of knockoffs causes such negative feelings that they will stop buying the authentic brand altogether, or severely reduce future purchases of the authentic brand."  *Id.* at ¶¶41-42.  He further opines that the response to the third question demonstrates that the sale of Texas

16

Leather bags caused actual harm to Brighton.  *Id.* at ¶43.  For the reasons discussed more fully below, however, one could not from the questions posed reliably or reasonably interpret the responses as Dr. Frazier suggests.

### 2.   The Lead Question Is Ambiguous

Ambiguous questions can be fatal to a survey:

> **When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses** if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question. **If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey.**

Reference Guide at p. 248 (emphasis added).  *See also Simon & Schuster, Inc. v. Dove Audio, Inc.,* 970 F.Supp. 279, 298 (S.D.N.Y. 1997) (significantly reducing the weight given to a survey because of ambiguity in the wording of the key question).

Here, the first question posed to the participants, "If you knew that less expensive handbags, such as the ones pictured here [in the second photo], were being sold, would you be any less likely to buy an authentic Brighton product?," is hopelessly ambiguous because a "yes" response could have nothing to do with the participant's feelings towards the Brighton brand.  That is, while Dr. Frazier interpreted "yes" responses to mean that the participants were less likely to buy a Brighton product because alleged knockoffs caused negative feelings towards Brighton products, Mr. Poret points out that it is at least equally likely that a "yes" response meant that participants would prefer a less expensive alternative.  Carswell Decl. ¶3, Exh. B at p. 165:11-23; Carswell Decl. ¶5, Exh. D at p. 19.  Mr. Poret explains that:

> When the question asks respondents if they would be less likely to buy a Brighton product if they knew about the less expensive non-authentic products, it seems to be asking whether the respondents would still buy Brighton or choose to buy the less expensive product.  If this is how respondents viewed the question, their answers certainly do not indicate harm to the Brighton brand.  They merely indicate that the availability of less expensive options will cause Brighton to lose some sales.

Carswell Decl. ¶5, Exh. D at p. 19 (footnote omitted).

The ambiguity could have been easily remedied with a follow-up "Why" question, which "could have revealed whether respondents would be less likely to buy Brighton products because the value of the Brighton brand had been diminished in their eyes or because they would simply

17

1  rather buy a less expensive alternative." *Id.* at p. 20.  Absent such clarification, however, there is no

2  way to know the extent to which "yes" responses reflected a negative impact on the Brighton brand.

3  Therefore, the survey results are neither reliable nor relevant within the meaning of *Daubert*.

4          **3.**        **Participants Were Given Incomplete Information**

5          "The survey also failed to reliably test the impact of the Texas Leather products on

6  consumers because respondents were not given the type of information that would inform a real

7  consumer's perceptions or decisions."  Carswell Decl. ¶5, Exh. D at p. 20.  Participants were only

8  told that the Texas Leather bags were less expensive.  Carswell Decl. ¶2, Exh. A(9).  However, Dr.

9  Frazier did not define "less expensive."  *Id*; Carswell Decl. ¶3, Exh. B at p. 63:11-19.  He also did

10  not provide participants with information regarding the price of the Texas Leather bags, where the

11  bags were sold, and there was no way for participants to assess the quality of the bags from a

12  photo—all factors which "would be central to a consumer's perception of the bags and decision

13  regarding what to purchase."  Carswell Decl. ¶3, Exh. B at pp. 166:20 – 168:6; Carswell Decl. ¶5,

14  Exh. D at p. 20.  Indeed, Dr. Frazier acknowledges that a consumer's perception of a brand can be

15  informed by price, quality and where the products are sold.  Carswell Decl. ¶3, Exh. B at p. 166:10-

16  19.  This defect further undermines the reliability of the survey results.

17          **4.**        **Whether Participants Have Seen Knockoffs Is Irrelevant**

18          In the third question, Dr. Frazier asked participants, "Do you believe you have seen Brighton

19  knockoffs in public?" and concluded that positive responses show that *Texas Leather bags* harmed

20  the Brighton brand.  Carswell Decl. ¶2, Exh. A(9).

21          **It is glaringly obvious that there is no basis for Dr. Frazier's conclusion inasmuch as**

22  **Brighton has sued dozens of companies over the years for alleged infringement of the same**

23  **trade dress, yet no time frame was included in Dr. Frazier's question and the participants**

24  **were <u>not</u> asked if they had seen Texas Leather bags in particular.**  Therefore, there is no way to

25  know how many, if any, of the alleged knockoffs that the participants saw were Texas Leather bags.

26  Moreover, even generally speaking, "the fact that consumers have <u>seen</u> 'knockoffs' does not prove

27  harm to Brighton."  Carswell Decl. ¶5, Exh. D at p. 21.  Despite Dr. Frazier's claimed expertise in

28  marketing and survey design, only explanation he offered for his failure to probe further to assess

1   the extent to which the positive responses actually related to Texas Leather bags was that he "didn't

2   want to."  Carswell Decl. ¶3, Exh. B at pp. 17: 7-24; 168:7-25; 208:6-8.

3        In short, because Dr. Frazier posed a vague question which could only elicit vague

4   responses, the responses to the third question sheds no light on whether Brighton has been harmed

5   at all or by Texas Leather bags in particular.  *See Id.*  ("[T]he survey is of no value in assessing

6   whether the particular defendants in this case have caused any such harm.").

7        Again, like the likelihood of confusion survey, these multiple defects reveal a poorly

8   designed survey which renders the results unreliable and useless to jurors on the issue of brand

9   impact.  Therefore, Dr. Frazier's brand impact survey should also be excluded in its entirety.

10  **D.    Dr. Frazier Should Not Be Allowed To Opine As To Point-of-Sale Confusion**

11       Even if Dr. Frazier's likelihood of confusion survey is deemed admissible, he should not be

12  permitted at trial to opine as to whether there is a likelihood of "point-of-sale" confusion because he

13  admits that his survey was primarily designed to test for *post-purchase* confusion.  Carswell Decl.

14  ¶3, Exh. B at pp. 88:20 – 89:13, 90:1-9.  Also, in any event, Mr. Poret points out that Dr. Frazier's

15  survey could not reliably measure point-of-sale confusion because: (1) it asked respondents to view

16  Texas Leather bags as if seeing them on the street; (2) the Brighton name was concealed;[9] (3)

17  participants were not allowed to pick up or otherwise closely examine the Texas Leather bags;[10] (4)

18  it failed to inform participants of the price of the Texas Leather bags or where it was sold; and (5) a

19  point-of-sale confusion survey focuses on prospective purchasers of the accused product, but Dr.

20  Frazier's survey universe was limited to women who purchase handbags of $50 or more, which

21  would eliminate prospective purchasers of Texas Leather products, which averaged $50 or less.

22  Carswell Decl. ¶5, Exh. D at pp. 6, 10-11; McCarthy at §23:5; *General Motors Corp. v. Keystone*

23  *Automotive Industries, Inc.*, 453 F.3d 351, 355 (6th Cir. 2006) ("Likelihood of confusion at the point

24  of sale involves a purchaser's confusion as to a product's origin or sponsorship occurring at the time

25  of purchase.");  *Medisim Ltd. v. BestMed LLC*, 2012 WL 718041, *13 (S.D.N.Y. March 6, 2012)

26

27

28  [9] Dr. Frazier acknowledged that a Brighton consumer who purchases a handbag would not cover the
    Brighton name.  Carswell Decl. ¶3, Exh. B at p. 92:14-21.

1  ("[A] survey purporting to determine whether there is a likelihood of consumer confusion at the

2  point of sale must survey potential purchasers.")

3      "For all of these reasons, [Dr. Frazier's] survey is not relevant to whether a consumer might

4  be confused in the context of a *purchase*."  Carswell Decl. ¶5, Exh. D at p. 11 (emphasis added).

5  **E.  Dr. Frazier Should Not Be Allowed To**
   **Offer Unsupported Testimony And Conclusions**

6

7      In his report, Dr. Frazier opines generally about the importance and value of a brand.

8  Carswell Decl. ¶2, Exh. A at ¶¶21-23.  Either with no citation or citation to Brighton's website,

9  Second Amended Complaint or Brighton discovery responses, Dr. Frazier then goes on to make

10  numerous historical references about Brighton and assertions regarding the quality of Brighton

11  products and the strength of the Brighton brand.  *Id.* at ¶¶24-28.  He then concludes from the

12  foregoing "that Brighton has established a distinct, source-identifying image and look for its

13  products" and that "the Brighton name and the 'Brighton look' have become well known among

14  consumers of higher-end handbags."  *Id.* at ¶28.

15      First, however, Dr. Frazier's conclusion amounts to a claim that Brighton has attained

16  secondary meaning in the so-called Brighton Look, although he did not conduct a survey or other

17  analysis which supports such a conclusion.  Carswell Decl. ¶3, Exh. B at p. 24:2-9 ("[M]y opinions

18  here are not on secondary meaning."); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837,

19  843 (9th Cir. 1987) ("The trade dress of a product or service attains secondary meaning when the

20  purchasing public associates the dress with a particular source.").  In fact, the secondary meaning

21  survey conducted by Defendants overwhelmingly demonstrates otherwise—showing that only 8.1%

22  of survey participants associated the Brighton trade dress with Brighton.  Carswell Decl. ¶6, Exh. E,

23  Poret Secondary Meaning Survey Report at p. 11.  There is no evidence in the record which refutes

24  Defendants' survey results.  Therefore, allowing Dr. Frazier to offer these conclusions at trial would

25  merely be a back-door way for Brighton to claim secondary meaning without any evidentiary

26  support.

27
28  ---
   [10] Dr. Frazier acknowledged that in order to validly judge point-of-sale confusion, survey
   participants should be allowed to touch the product that they might purchase.  Carswell Decl. ¶3,
   Exh. B at pp. 91:23 – 92:2.

Second, the sole source for Dr. Frazier's assertions regarding the strength of the Brighton brand in the marketplace appears to be Brighton. There is no evidence that Dr. Frazier's claims are based on scientific or other specialized knowledge. Therefore, Dr. Frazier's assertions are improper and inadmissible. *See* Fed. R. Evid. 702; *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 606 (N.D. Cal. 2008) ("An expert's opinion must apply a reliable methodology to reach a helpful conclusion based on some expertise or specialized knowledge."); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("If an [expert] opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed. R. Evid. 403.")

Notably, similarly unsupported opinions were recently rejected by the Central District of California in *Stop Staring! Designs v. Tatyana, LLC,* Case No. CV09-2014, where the court granted a motion in limine to exclude portions of Dr. Frazier's testimony stating: "Frazier's testimony as to 'Advantages to the Defendants,' (¶¶37-47), and 'Damages to the Stop Staring! Business,' (¶¶48-54), are totally lacking in supporting methodology and are basically a regurgitation of Plaintiff's argument. Frazier cites Plaintiff's witnesses for various alleged bad acts by Defendants and states Plaintiff's desired conclusions without any apparent analysis or application of expertise." Carswell Decl. ¶7, Exh. F, Minute Order (August 11, 2011) at pp. 2-3.

The same can be said of Dr. Frazier's assertions here. Therefore, Joymax specifically requests that Dr. Frazier be precluded from offering the following testimony:

- "The Brighton brand has been in business for more than 20 years and *during this time has achieved a nationwide reputation for style and quality.* It is only the major accessories line that offers the customer a coordinated look through a wide line of similarly styled products." Carswell Decl. ¶2, Exh. A at ¶24.

- "*Brighton consistently projects an image of high quality and specialty product status* through careful management of its marketing activities. For example, *Brighton prides itself on the 'Brighton Difference" which refers to the high quality and authenticity of its products and the distinctiveness of its designs.*" *Id.* at ¶25.

- "Having its own stores allows Brighton to display and promote a large number of Brighton products in one location where consumers can see the coordinated line of products. *This reinforces the unique overall look of Brighton products* and also encourages cross-selling across items." *Id.*

- "I also understand that Brighton has made extensive use of its brand name and trade dress *to clearly communicate a distinctive style and design to consumers*." *Id.* at ¶26.

- "*Brighton is well-known in the industry and amongst consumers. Companies, including defendants, have attempted to imitate and/or copy Brighton designs, particularly Brighton designs that fit within the trade dress in issue in this case*." *Id.* at ¶27.

- "*Thus, I conclude that Brighton has established a distinct, source-identifying image and look for its products. . . . [A]nd the Brighton name and the 'Brighton look' have become well known among consumers of higher-end handbags*." *Id.* at ¶ 28.

Joymax also requests that Dr. Frazier be precluded from opining that there has been point-of-sale confusion between the Brighton and Texas Leather bags. In his report, Dr. Frazier states that "some consumers were likely misled into thinking that they purchased a Brighton made, sponsored, or endorsed handbag when they in fact purchased a Texas Leather handbag. . . . Thus, these consumers would have purchased a Brighton handbag but for the presence of the infringing handbag by Texas Leather." Carswell Decl. ¶2, Exh. A at ¶30. However, as discussed above, Dr. Frazier's survey was primarily designed to test *post-purchase* confusion, and it was in fact inadequate to measure point-of-sale confusion. Therefore, Dr. Frazier's aforementioned assertions regarding point-of-sale confusion are unsupported and inadmissible. *See* Fed. R. Evid. 702; *Viterbo*, 826 F.2d at 422. Therefore, Joymax specifically requests that Dr. Frazier be precluded from offering the above-cited assertions.

### III.   CONCLUSION

For the aforementioned reasons, Defendant Joymax Trading, Inc. respectfully requests that the Court exclude Dr. Gary Frazier's likelihood of confusion and brand impact surveys and related opinions in their entirety or, alternatively, exclude certain portions of his anticipated testimony.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

Dated:  July 6, 2012

/s/ Chanille Carswell
Mark A. Cantor (*Pro Hac Vice*)
Chanille Carswell (*Pro Hac Vice*)
1000 Town Center, 22nd Floor
Southfield, Michigan 48075-1238
Tel: (248) 358-4400 / Fax: (248) 358-3351

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

William E. Thomson, Jr. (SBN 47195)
wthomson@brookskushman.com
601 South Figueroa Street, Suite 2080
Los Angeles, California 90017
Tel: (213) 622-3003 / Fax: (213) 622- 3053

Thomas M. O'Leary
ROPERS MAJESKI KOHN & BENTLEY PC
515 South Flower Street, Suite 1100
Los Angeles, California 90071-2213
Tel: (213) 312-2000 / Fax: (213) 312-2001

*Attorneys for Defendant and*
*Third-Party Defendant*
*Joymax Trading, Inc.*

23

1

2

## CERTIFICATE OF ELECTRONIC SERVICE

3

4     I hereby certify that on  July 6, 2012 , I electronically filed the foregoing document with the
Clerk of the Court for the Central District of California using the ECF System which will send
5     notification to the following registered participants of the ECF System as listed on the Court's
Notice of Electronic Filing: Mark A. Cantor, Chanille Carswell, Matthew L. Green, Timothy J.
6     Halloran, Lawrence Heller, Lawrence E. Heller, Dan N. MacLemore, James F. Monagle, Thomas
M. O'Leary, John K. Park, Chong H. Roh, Peter W. Ross, Benjamin D. Scheibe, David Swift,
7     William E. Thomson, Jr., Kent M. Walker, Keith J. Wesley, Steven W. Winton.

8     I also certify that I have mailed by United States Postal Service the paper to the following
non-participants in the ECF System:   NONE.

9

10                                          Respectfully submitted,

11                                          **BROOKS KUSHMAN P.C.**

12                                          /s/ Chanille Carswell
                                            Mark A. Cantor (*Pro Hac Vice*)
13                                          Chanille Carswell (*Pro Hac Vice*)
                                            1000 Town Center, 22nd Floor
14                                          Southfield, Michigan 48075-1238
                                            Tel: (248) 358-4400 / Fax: (248) 358-3351
15                                               *Attorneys for Defendant and Third-Party*
16                                               *Defendant Joymax Trading, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28