KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
DAVID W. SWIFT (SBN 235033)
*dswift@kwikalaw.com*
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for NHW, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIGHTON COLLECTIBLES, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>RK TEXAS LEATHER MFG., INC., a Texas corporation; K&L IMPORTS, INC., a California corporation; NHW, INC., a Texas corporation; YK TRADING, INC., a Texas corporation; JCNY, a New Jersey corporation; JOY MAX TRADING, INC., a California corporation; AIF CORPORATION, a Texas corporation; and DOES 1 through 10,<br><br>Defendants. | Case No. 10-CV-00419-CAB-WVG<br><br>**SUPPLEMENTAL DECLARATION OF DAVID W. SWIFT IN SUPPORT OF DEFENDANT NHW'S MOTION FOR SUMMARY ADJUDICATION AS TO PLAINTIFF'S LOST PROFIT DAMAGES**<br><br>[REPLY TO MOTION FOR SUMMARY ADJUDICATION FILED CONCURRENTLY HEREWITH]<br><br>Hearing Date:   August 23, 2012<br>Hearing Time:   2:30 p.m.<br>Hearing Room:   12<br><br>The Hon. Cathy Ann Bencivengo |
| AND RELATED THIRD PARTY ACTION. | |

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## DECLARATION OF DAVID SWIFT

I, David Swift, declare as follows:

1.      I am an attorney duly admitted to practice before this Court.  I am an attorney with Kinsella Weitzman Iser Kump & Aldisert LLP, attorneys of record for Defendant NHW, Inc. ("NHW").  If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.

2.      Attached hereto as Exhibit A is a true and correct copy of excerpts of the deposition of Plaintiff's expert, Dr. Robert Wunderlich

3.      Attached hereto as Exhibit B is a true and correct copy of a transcription of the Ninth Circuit oral argument in *Brighton Collectibles, Inc. v. Coldwater Creek, Inc.*, Nos. 09-55624, 09-56038, before Judges McKeown, Fletcher W., and Clifton that took place on January 13, 2011 in Pasadena, California.  It is my understanding that the parties settled the action for a confidential amount prior to the Ninth Circuit issuing an opinion on the matter.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Executed September 28, 2012, in Santa Monica, California.


___/s/ David Swift_____
David W. Swift

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

# EXHIBIT A

Robert Wunderlich, Ph.D.                     May 10, 2012

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BRIGHTON COLLECTIBLES, INC.,
a Delaware corporation,

           Plaintiff,

      vs.                        CASE NO. 10CV0419-AJB-WVG

RK TEXAS LEATHER MFG., INC.,
d/b/a TEXAS LEATHER
MANUFACTURING, a Texas
corporation; K&L IMPORTS,
INC., a California
corporation, et al.,

           Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF

ROBERT WUNDERLICH, Ph.D.


May 10, 2012

9:15 a.m.


515 South Flower Street
Suite 1100
Los Angeles, California


Dawn Schetne, CSR No. 5140




Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1    look at my first report.

2        Q.  I will tell you, to save you time, that my

3    understanding is that it incorporates the copyright and

4    the trade dress.  I'm not sure about the trademark.

5        A.  Well, it's in a schedule in my report.  You

6    know, there's several defendants here.  I certainly

7    haven't memorized all of my tables.

8        Q.  Well, before you do that, because I don't think

9    it's necessary, let me ask the question this way:  Do

10   you know whether the sales of the Brighton products that

11   embodied the copyrights, trademarks, trade dress which

12   were allegedly infringed upon went up or down or

13   remained the same from the time before the alleged

14   infringing period to the time when the alleged

15   infringement began?

16       A.  I haven't looked at that.

17       Q.  You haven't looked at that.  Do you know

18   whether Brighton's gross sales went up or down from the

19   time -- well, let's ask it differently.  Do you know

20   whether Brighton's gross sales of all products went up

21   or down during the allegedly infringing periods?

22       A.  There is a schedule that addresses that.

23       Q.  Let's take a look at that one.

24       A.  My C series of schedules --

25       Q.  Are we still on Exhibit 2000, the April 23rd



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
CORPORATE SOLUTIONS

Robert Wunderlich, Ph.D.                                    May 10, 2012

117

1   think you have to look -- and I haven't tried to do this

2   quantitatively, but more closely at the particular

3   circumstances.

4       Q.   Okay.  And in your rather lengthy answer to

5   that, you used the word "could" I think three or four

6   times.  You really don't know, but it's a possibility,

7   is what you're testifying to; correct?

8       A.   I'm testifying that it possibly could affect

9   the consumers differently if the products were being

10  offered through an upscale store.

11      Q.   And as far as a woman who might see an

12  allegedly infringing bag, do you differentiate between

13  the type of woman who might see it, such as a woman that

14  comes from a household that makes $300,000 a year as

15  opposed to one that comes from a household that makes

16  $25,000 a year, or a homeless woman?

17      A.   I'm not differentiating.

18      Q.   Okay.  Did you do any sort of valuation

19  analysis -- well, in the context of goodwill, do you

20  understand what a valuation analysis is?

21      A.   Yes.

22      Q.   Okay.  And would it be like you're assigning a

23  value to Brighton's goodwill in its damaged state, and

24  then you compare it to an evaluation had there been no

25  infringement?  Would that be a correct definition?



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Robert Wunderlich, Ph.D.                                    May 10, 2012

118

1        A.   One could conceivably in some cases calculate a

2   diminution in value, yes.

3        Q.   Have you done that for your report?

4        A.   No.

5        Q.   Is it common to do that sort of a thing?

6             MR. MONAGLE:   I'm -- go ahead.   I'm sorry.

7             MR. HELLER:   Yeah, the word common is not a

8   good one, if that's where you were going.

9             MR. MONAGLE:   I missed the question a couple

10  questions back, but don't worry about it.   Sorry.

11            MR. HELLER:   Okay.   You know, why don't we take

12  a break.   Does that sound good?   A lunch break.   Does

13  that work, Peter, if we can disturb you from your --

14            MR. ROSS:   I'm too busy.

15            MR. MacLEMORE:   He's playing Angry Birds.

16            MR. HELLER:   Let's go off the record.

17            THE VIDEO OPERATOR:   We're off the record at

18  12:05 P.M.

19                        *  *  *

20                    LUNCHEON RECESS

21                        *  *  *

22            THE VIDEO OPERATOR:   We're back on the record

23  at 1:14 P.M.

24  BY MR. HELLER:

25       Q.   Good afternoon, Mr. Wunderlich.   Would you



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Robert Wunderlich, Ph.D.                              May 10, 2012

197

1    are different numbers for the different categories.

2        Q.  So you've used the 2.06 units per transaction

3    and applied it to the 60 percent of sales of Brighton

4    product sold through boutiques?

5        A.  At the wholesale level.  Well, yes, 60 percent

6    of Brighton wholesale sales that subsequently are sold

7    through boutiques, I have applied that same factor.

8        Q.  Did you do any calculations to what are

9    normally called corrective advertising?

10       A.  I've looked at the amount of advertising --

11   marketing and advertising expenditures by Brighton, but

12   I have not done a -- so I've added those up, but I

13   haven't expressed a corrective advertising opinion.

14       Q.  Do you know what corrective advertising is?

15       A.  Generally speaking, yes.

16       Q.  Have you ever been told that Brighton incurred

17   costs for corrective advertising?

18       A.  Have I ever been told that?  I don't think one

19   way or the other.  Not one way or the other.

20       Q.  Have you ever heard the term girlfriend

21   marketing?

22       A.  Say that again.

23       Q.  Have you ever heard the term girlfriend

24   marketing?

25       A.  Not specifically.  I mean, I guess I could



ESQUIRE
CORPORATE SOLUTIONS

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

# EXHIBIT B

# In The Matter Of:

## *BRIGHTON COLLECTIBLES, INC.*
### *v.*
## *COLDWATER CREEK, INC.*

---

## *ARGUMENT, ORAL  - Vol. 1*
### *January 13, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

IN THE

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————

Nos. 09-55624 & 09-56038 (Consolidated)

———————

BRIGHTON COLLECTIBLES, INC.,

Plaintiff-Appellee,

v.

COLDWATER CREEK, INC.,

Defendant-Appellant.

———————

On Appeal from the United States District Court
for the Southern District of California
Case No. 06-CV-1848-H(POR)
District Judge Marilyn L. Huff

ORAL ARGUMENT

JANUARY 13, 2011

HELD BEFORE:

JUDGE M. MARGARET McKEOWN, PRESIDING

JUDGE WILLIAM A. FLETCHER

JUDGE RICHARD R. CLIFTON

TRANSCRIBED BY:  MELANIE M. FAULCONER

CSR No. 6420

ORAL   ARGUMENT - 1/13/2011

```
  1                   PASADENA, CALIFORNIA

  2                   JANUARY 13, 2011

  3                   ORAL ARGUMENT

  4

  5                      ---0---

  6

  7         CATHERINE E. STETSON, ESQ.:  Thank you, your

  8    Honors.  Good morning, and may it please the Court.  My

  9    name is Cate Stetson, representing Coldwater Creek.

 10         Can I set aside five minutes for rebuttal,

 11    please?

 12         JUDGE McKEOWN, PRESIDING:  Yes.  You have a clock

 13    there, and I'll also try to look and help you.

 14         CATHERINE E. STETSON, ESQ.:  Okay.  Thank you.

 15         We've raised a number of issues in our

 16    briefing, but in the time we have this morning, I'd like

 17    to focus on what I think are the three predominant legal

 18    issues.

 19         Issue Number One, of course, is the thin

 20    copyright question, whether the Court erred when it

 21    instructed the jury that the jury need only find

 22    substantial similarity.

 23         Issue Number Two of law is the trade dress

 24    question, which is whether the Court committed error

 25    when it instructed the jury that it could find -- for
```

ORAL  ARGUMENT - 1/13/2011

```
 1    the defendant on the trade dress question if it found

 2    secondary meaning without separately instructing the

 3    jury that if the trade dress is generic, there is no

 4    protection full stop.

 5         The third issue, of course, is damages, which

 6    is whether this expert for Brighton correctly put in

 7    front of the jury relevant data and supported his

 8    theories of damages with substantial evidence so that

 9    the jury in a lost profits case could have some clarity

10    and satisfaction that the damages it awarded were

11    actually within some reasonable approximation of

12    damages.

13         So taking it from the top on the copyright

14    issue, it's the law of this Court -- Harper House and

15    Apple and Mattel -- that unoriginal elements of a work

16    are not protectable.

17         So the question in this case is, when you have

18    a silver heart design where all of the individual

19    component pieces of that heart themselves are concededly

20    not original and not protectable, what you have then is

21    what this Court calls a "thin copyright."

22         The copyright exists.  The work certainly is

23    protectable.  There was a Brighton designer who designed

24    this heart and there was a copyright conferred on -- on

25    Brighton for this heart.
```

ORAL   ARGUMENT - 1/13/2011

```
 1              But the question is, outside of that particular

 2    selection or assembly of elements, how far does the

 3    copyright extend?

 4              And what Harper House and Apple and to a

 5    certain extent Satava versus Lowry teach, it teaches

 6    that in order for another work, another silver

 7    decorative heart to infringe, that silver heart has to

 8    look virtually identical to the heart that has the

 9    copyright protection.

10    JUDGE McKEOWN, PRESIDING:  Well, I think it really

11    depends on how you read Apple and these other cases

12    because, as I read them, the question is, if you have

13    unprotectable elements in and of themselves but you put

14    them together and you have a compilation, then you have

15    to figure out, well, with that compilation how many

16    different ways might one do that?  Is there just one

17    way, like the Skye vodka bottle or something like that,

18    a tile or something, some of the other cases the Court

19    has looked or there are multiple ways?

20              So it's not simply because you have

21    unprotectable elements that are put together doesn't

22    mean you move to the virtual identical -- identity

23    standard.

24              So I'd appreciate your response to the argument

25    of Brighton, which is, "Well, there's" -- they use the
```

ORAL   ARGUMENT - 1/13/2011

```
 1    "gazillion" because it's been used in one of the

 2    cases --

 3        CATHERINE E. STETSON, ESQ.:  Right, right.

 4        JUDGE McKEOWN, PRESIDING:  -- "there's a gazillion

 5    ways you can -- can make these fanciful hearts and

 6    doodads and other things that go with them."

 7            So what is your response to that?

 8        CATHERINE E. STETSON, ESQ.:  Well, my response is,

 9    I think Brighton is overreading Mattel.  The "gazillion"

10    phrase comes from Mattel (unintelligible), and what

11    Mattel relied on for this -- this notion of the breadth

12    or narrowness of "protectability" was Page 1139 of

13    Apple.  And I commend it to you specifically because

14    this is what the Apple Court says:

15            "When the range and protectable and

16        unauthorized expression is narrow, the

17        appropriate standard for elicit copying is

18        virtual identity."

19            So we're talking about circumstances where the

20    range of "protectable expression" -- and this is

21    unprotectable -- is narrow.

22            How many different ways can this expression,

23    this combination be carried out?  The standard is

24    virtual identity.

25            There is a little bit of --
```

ORAL  ARGUMENT - 1/13/2011

```
 1      JUDGE FLETCHER:  Why do you say that there's a
 2   limited number of ways?
 3          I mean, given you've got a heart shape, but it
 4   seems to me there are lots of things you can do with a
 5   heart shape.
 6          Why is a heart shape different from a doll
 7   face, for example?
 8      CATHERINE E. STETSON, ESQ.:  Uh-huh.
 9          There are certainly a number of different
10   things you can do with a heart shape.
11          And if you look at record excerpts 236 and 237,
12   this is the conversation that Coldwater's counsel had
13   with the designer of the Brighton heart.  And what she
14   says I think is -- is telling and very instructive on
15   the legal issue here, which is, "This is my heart.  I
16   designed it."
17          There have been elements of roping and flower
18   buds and scrolls all throughout silver design for, you
19   know, decades if not hundreds of years. In fact, you
20   know, in design generally these elements are common.
21          If you look over to the left, you see roping on
22   the plaster.  If you look above your head, you see
23   scrolls.  If you look to the right, you see chevrons.
24          What the designer of the Brighton heart did was
25   to take all those elements and put it together.  That's
```

ORAL   ARGUMENT - 1/13/2011

1       her work.

2              But it is only copyrightable to the extent that

3       if someone comes along and makes a heart that is

4       virtually identical to that heart, then copyright is

5       infringed.

6          JUDGE FLETCHER:  What does -- what does vir- --

7              I mean, I'm sympathetic to your argument.  I

8       mean, we're -- we're having to do things in words.  But

9       in fact we're talking about something visual.

10         CATHERINE E. STETSON, ESQ.:  Right, right.

11         JUDGE FLETCHER:  And to what extent can we kind of

12      cut passed the words to the underlying purpose of these

13      tests, which I think in this context really is, "Does

14      someone looking at one heart think that he or she is

15      really looking at the same heart when she's actually --

16      he or she is actually look at the other one?"

17         CATHERINE E. STETSON, ESQ.:  Sure.

18         JUDGE FLETCHER:  And if you put things side by side,

19      okay, one has little dots and the other one has ropes.

20         CATHERINE E. STETSON, ESQ.:  Right, right.

21         JUDGE FLETCHER:  The chevron shape in the middle of

22      the heart is a little different from one to the next.  I

23      understand that.

24              Virtually identical doesn't quite capture the

25      notion of, is the average or even the attentive viewer

ORAL  ARGUMENT - 1/13/2011

```
 1    seeing one without the other the other one immediately
 2    to the side going to be confused?
 3         CATHERINE E. STETSON, ESQ.:  Uh-huh.
 4             It's true just starting from your comment about
 5    words having sort of a limited function.  I think
 6    that's --
 7         JUDGE FLETCHER:  When we're dealing with -- in the
 8    end we're dealing with something visual.  Yeah.
 9         CATHERINE E. STETSON, ESQ.:  True.  And I'd
10    emphasize too that it's difficult even on this paper
11    record to appreciate what even Brighton's heart designer
12    and the chief marketing officer conceded were
13    differences between these two hearts.
14             You have at record excerpts 271 a concession by
15    Brighton's chief marketing officer that these two hearts
16    are not identical.
17         JUDGE FLETCHER:  Of course they're not.  Of course
18    they're not identical.
19         JUDGE McKEOWN, PRESIDING:  If that were the symbol
20    or if that were the standard, you might have had a
21    different -- might have had a different result --
22         CATHERINE E. STETSON, ESQ.:  Yes.
23         JUDGE McKEOWN, PRESIDING:  -- as far as their
24    identical.
25         CATHERINE E. STETSON, ESQ.:  I think that's right.
```

ORAL   ARGUMENT  -  1/13/2011

1           And just as an aside, I know this Court was --

2      was interested in discussing the harmless error question

3      with respect to civil jury instructions.

4           On -- on either jury instruction that is the

5      main focus of these arguments, either on thin copyright

6      or on trade dress, which we can discuss later on, it

7      plainly was not harmless error in part because of that

8      very testimony.  In certain --

9      JUDGE McKEOWN, PRESIDING:  Apart -- apart from the

10     general cases that talk about the thin copyright, the

11     virtual identicality, is there any case that you can

12     think of that most closely approximates this

13     amalgamation that is the heart in this case?

14     CATHERINE E. STETSON, ESQ.:  I think the best case,

15     your Honor, is actually the very thorough Walker &

16     Zanger case out of the Northern District of California.

17     You tend to -- I'm choosing that because I think it is a

18     very detailed recitation of this Court's precedence.

19     It's relatively recent.  It's from 2007.  It has to do

20     with tile, which your Honor mentioned earlier.  And what

21     it concluded on the copyright right issue -- it's

22     actually instructive on both copyright and trade dress,

23     but on the copyright right issue what it said was, there

24     is with respect to a few of these tile designs, not all

25     of them, some modicum of originality that was brought

ORAL   ARGUMENT - 1/13/2011

```
1    into a sort of public domain or common tile design, but

2    the copyright is thin because it only extends to protect

3    that originality.

4          That I think is the most apropos comparison to

5    a product design.

6      JUDGE McKEOWN, PRESIDING:  But of course on

7    copyright law, originality doesn't have the same meaning

8    that it does, for example, in patent law.

9      CATHERINE E. STETSON, ESQ.:  True.

10     JUDGE McKEOWN, PRESIDING:  "Originality" means "I

11   didn't copy it from him."

12     CATHERINE E. STETSON, ESQ.:  Right.  Something --

13   something that grew out of an idea.

14     JUDGE McKEOWN, PRESIDING:  As opposed to that "I

15   dreamed up something so totally unusual that no one else

16   had dreamed it up."

17          I mean, you don't need that kind of originality

18   in copyright.

19     CATHERINE E. STETSON, ESQ.:  Correct.

20     JUDGE McKEOWN, PRESIDING:  So that's why again the

21   words -- sometimes we run into the problems with the

22   words when we're really talking about visual

23   depictions.

24          So it is original in -- in terms of what was

25   put together.  The question is -- because it was not
```

ORAL   ARGUMENT - 1/13/2011

```
 1    copied from another source directly, the question then
 2    is, the degree of protection, you know, from -- from
 3    virtual to substantial.
 4          CATHERINE E. STETSON, ESQ.:  Right.
 5          JUDGE McKEOWN, PRESIDING:  And I guess I'm looking
 6    for some other products or designs that might fall in
 7    this category.
 8          CATHERINE E. STETSON, ESQ.:  Sure.
 9             Well, in addition to the tile design out of
10    Walker & Zanger, you have some rug designs in the
11    Tufenkian case out of the Second Circuit.
12             But I think probably most apropos to the
13    compilation question we're confronting here is Harper
14    House in addition to Apple, which we've discussed a
15    little bit, but Harper House is the case involving an
16    organizer, and what the Ninth Circuit concluded was that
17    in a case where you have standing alone unoriginal
18    elements -- and, Judge McKeown, you're certainly right
19    that "unoriginal" means something different in copyright
20    law than it does in patent.  It doesn't have to be new
21    or novel -- but when you have unoriginal elements, the
22    assemblage of those elements, the compilation is what --
23    is what is protectable and is the only thing that is
24    protectable.
25             What the Brighton silver heart designer here
```

ORAL   ARGUMENT - 1/13/2011

1    created was a protectable design, but it was only

2    protectable as to her design.  As she says in her

3    testimony, "This is my heart.  I put it together."

4         The fact that other people have used roping or

5    chevron or flower buds or scrolls or dots or hearts is

6    irrelevant because it's her design that's copyrighted.

7         But the flip side of that, it's only her design

8    that's copyrighted.

9         And the reason I'm going back to your question,

10   Judge Fletcher, about the -- the -- the reasons behind

11   this kind of constraint that they put on visual design,

12   I think the Court's earlier precedence and those from

13   the Second Circuit, which appears to be, you know, the

14   the hotbed of its own copyright litigation, the reason

15   for this has to do with the notion that particularly

16   when you're talking about design of products and you're

17   talking about a copyright or a trade dress, which can be

18   forever, you want to be very careful not to 'fence off'

19   from other designs, other innovations, even competition

20   the core elements of any particular industry or trade.

21        The fact that this heart was made out of

22   elements that are common in this industry, common in

23   silversmithing is itself too broad an idea for them to

24   'fence off' anything other than the heart that Brighton

25   designed.

ORAL   ARGUMENT - 1/13/2011

1          JUDGE McKEOWN, PRESIDING:   Could you move on to the

2     trade dress issue and the jury instruction referencing

3     "generic"?

4          CATHERINE E. STETSON, ESQ.:   Sure.

5               The jury instruction referencing generic, the

6     reason it was faulty has to do with -- with what the

7     instruction did not say.   And this is at record excerpt

8     117, and here's what the judge instructed:

9               "A generic mark or trade dress without

10          secondary meaning does not receive trademark

11          protection."

12              And then there's a an example of a "generic"

13     word, which of course is hard, as you said, Judge

14     Fletcher, to translate over to visual protection.

15              "A product design is generic if it is

16          so common that it cannot be identified with a

17          particular source.   A claim of trade dress for

18          a product design requires proof of secondary

19          meaning."

20              And that was legal error.

21              What the Court should have instructed the jury

22     and what Coldwater Creek sought for the jury to be

23     instructed was that a generic trade dress does not

24     receive protection full stop.

25              Now, here again we run into some -- some

ORAL   ARGUMENT - 1/13/2011

1    different strains of nomenclature when it comes to the

2    question "What is generic?" in trade dress.

3            When you have of a trademark, when you have a

4    word it's relatively easy to explain, and the Court

5    explained to this jury what a generic word is.  You

6    can't trademark the word "hamburger" because it's too

7    generic.

8            With "trade dress" the question is a little bit

9    different, and the question as -- courts have explored

10   this issue and have described it is, "Are you trying in

11   your claim of trade dress elements to" -- again I'll use

12   the phrase -- "'fence off' too many things to your own

13   intellectual property protection?"

14           So here if you look at our record excerpts,

15   there is a description in the response to

16   interrogatories about what exactly were the elements of

17   trade dress that Brighton is claiming.

18           And the elements of trade dress were a silver

19   heart in conjunction with two or more of the following

20   elements, including cowhide or leather or brocade or

21   other silver hearts.  At various points in the trial,

22   you had Brighton witnesses talking about how the trade

23   dress also had to do with black or brown leather or

24   braiding.

25           But at the bottom there are -- there are two

ORAL   ARGUMENT - 1/13/2011

```
1     separate issues here.  The first on the jury

2     instruction, your Honor, is none of that collection or

3     assemblage of elements gave the jury any close

4     instruction on what exactly the trade dress was that was

5     claimed, and the elements themselves -- getting back to

6     the generic point -- are utterly common in this

7     industry: leather, brocade, braiding, colors, if you

8     want to throw that in, which didn't appear to be part of

9     the trade dress except in a couple witness' testimony,

10    silver --

11         JUDGE McKEOWN, PRESIDING:  I wouldn't go with

12    colors, whether they argued it, but of course we know

13    that those can be descriptive; they can acquire

14    secondary meaning.

15         CATHERINE E. STETSON, ESQ.:  True.  Yes.

16         JUDGE McKEOWN, PRESIDING:  So I don't think that

17    those are unprotectable in the trademark world.

18              I guess my -- my problem, which I will also

19    discuss with Brighton's counsel, is the suggestion that

20    in the jury instruction that you can have secondary

21    meaning on top of a generic mark or a generic trade

22    dress, which I think -- speaking only for myself not the

23    panel, but I think that misstates the law both from the

24    Supreme Court and the Ninth Circuit.

25              The question I have is, "Well, then what?"
```

ORAL ARGUMENT - 1/13/2011

```
 1    because looking at the closing arguments, and even
 2    trying to parse through the testimony, it didn't seem
 3    that it was really argued, "Well, look.  This really is
 4    generic, so don't even go there, Jury."  And so I'm
 5    wondering if it might be harmless error in the scheme of
 6    things --
 7         CATHERINE E. STETSON, ESQ.:  Well --
 8         JUDGE McKEOWN, PRESIDING:  -- even assume -- let's
 9    just assume that the jury instructions legally misstate
10    --
11         CATHERINE E. STETSON, ESQ.:  Sure.
12         JUDGE McKEOWN, PRESIDING:  -- and were in error --
13         CATHERINE E. STETSON, ESQ.:  And -- and I do agree
14    with you, Judge McKeown, that -- that when it comes to
15    the instruction from this Court and the Supreme Court,
16    it's simply not the case that you can leapfrog over a
17    generic misdetermination, find secondary meaning and
18    rescue a generic trade dress.
19              But as for harmless error, you know, the jury
20    was not instructed on whether or not this trade dress
21    was generic.
22              And what do you have in the record are
23    persistent attempts, I would say, by Coldwater's counsel
24    to establish with each of the witnesses who spoke about
25    trade dress what exactly the contours of this trade
```

1    dress were and how they were limited.

2          And if the jury had been instructed on

3    "genericness" and the lawyer had been permitted to

4    argue "genericness" as a -- as a threshold cutoff to any

5    further discussion of secondary meaning or customer

6    confusion, I think you would likely have had a very

7    different outcome.

8          That of course isn't even the standard.

9          Under the two cases that your order cited,

10   Gambini and Kennedy, both of which dealt with the

11   harmless error and civil jury instructions, the question

12   is, if there is any evidence to support the notion, the

13   jury could have found your way, if you're the aggrieved

14   party asking for an instruction you didn't get.

15          Now, in Kennedy --

16   JUDGE McKEOWN, PRESIDING:  What if -- could -- could

17   this -- let's assume it's in error and you're just

18   walking down this path.  Could this Court determine that

19   as a matter of law the trade dress is not generic and

20   therefore that it's a harmless instruction?

21   CATHERINE E. STETSON, ESQ.:  Your Honor, I think the

22   question of whether something is or is not generic is

23   something that should be put to the jury.

24   JUDGE McKEOWN, PRESIDING:  I mean, usually --

25   CATHERINE E. STETSON, ESQ.:  It can be --

ORAL   ARGUMENT - 1/13/2011

```
 1        JUDGE McKEOWN, PRESIDING:  It's usually a question

 2   of --

 3        CATHERINE E. STETSON, ESQ.:  Right.

 4        JUDGE McKEOWN, PRESIDING:  -- fact.  But you can

 5   still have summary judgment on things that are questions

 6   of fact where there's --

 7        CATHERINE E. STETSON, ESQ.:  Exactly.

 8        JUDGE McKEOWN, PRESIDING:  -- where you make a

 9   le- -- like, "Here's all the facts.  What's the legal

10   judgment?"

11        CATHERINE E. STETSON, ESQ.:  You're certainly right

12   that you can even in a fact question have summary

13   judgment granted.

14             But I would submit that in this case where the

15   Court went off the rails in the jury instructions, it

16   would be important to send that issue back for either

17   the Court, in the first instance, which you will

18   remember granted summary judgment only in part on the

19   copyright and trade dress issues here, concluding that

20   the rest of it needed to be sent to the jury.

21        JUDGE McKEOWN, PRESIDING:  Well, let me ask you a

22   related question.

23             Let's just assume that the damage was upheld

24   and then it went -- and -- and let's assume it went back

25   on the generic question or I guess it would be the trade
```

ORAL   ARGUMENT - 1/13/2011

1   dress question, and let's say the jury -- and it said,

2   "You know, you can't have generic trade dress, but if

3   you show that you're at least descriptive or above" --

4       CATHERINE E. STETSON, ESQ.:  Right.

5       JUDGE McKEOWN, PRESIDING:  -- "and you get secondary

6   meaning, you're -- you're in the pink and you can keep

7   going" and the jury came out in favor of Brighton.

8           Would you need to have another damages trial or

9   would you -- would you be able -- if there were no error

10  in the damages stick with the damages?

11      CATHERINE E. STETSON, ESQ.:  Assuming -- assuming

12  the exact path that you set out, which is that the same

13  trade dress is -- is in play, which of course is a

14  difficult question to assume because the contours of the

15  trade dress are ill-defined, and the same therefore

16  number of products are in play, you probably could not

17  take away some increment of damages based on that

18  subsequent verdict from the way that you've laid it

19  out.

20          But let me on that point get quickly to the

21  damages issue because I know I'm running out of my

22  time.

23          The damages issue I think is -- is most plainly

24  brought forward by Brighton's expert Wunderlich's own

25  testimony, and you can find it at excerpts of record 274

ORAL  ARGUMENT - 1/13/2011

1    to about 286, and I want to focus you on two particular

2    strains of argument that Mr. Wunderlich offers.  One of

3    them has to do what I'll call the "lost sale" theory,

4    which is for every Coldwater sale Brighton lost a sale.

5    And you can find that most plainly at record excerpts

6    276 and 278, Brighton lost 115,000 opportunities to sell

7    its products.

8            That is the data predicate for what Brighton is

9    now describing as its "actual damages" theory, which is

10   what Brighton calls its "lost customer" theory, which is

11   because Coldwater was selling less expensive bags,

12   certain Brighton customers walked away from Brighton

13   never to return again.

14           The problem is that both in his expert

15   testimony and in counsel's closing argument the basis

16   for that theory was the Coldwater sales, the 115,000

17   Coldwater sales that led in turn to this 1.7 multiplier

18   that we discuss in our brief that led in turn to a

19   damages award.

20           Now, the problem is, as this Court has pointed

21   out in the Polar Bear Productions case and the Murphy

22   Tugboat case before that and several others, it's

23   certainly the case that you don't need to show lost

24   profits -- you can't -- with any mathematical

25   certainty.

ORAL  ARGUMENT - 1/13/2011

```
 1            But what you do need to show under Polar Bear
 2      Productions is that the calculation was based on
 3      relevant data and supported by substantial evidence.
 4            The problem here is that essentially the expert
 5      was supporting one theory with data drawn from another.
 6            So just by way of analogy, if you want to find
 7      out, you know, the total amount of tuition paid to USC,
 8      you don't start by asking how many students there are at
 9      UCLA.  That's in essence the problem.
10      JUDGE FLETCHER:  Could you narrow the analogy by
11      telling me precisely what his mistake was?  Because I'm
12      not sure I understand it yet.
13      CATHERINE E. STETSON, ESQ.:  Sure.
14            His mistake was in importing the Coldwater
15      sales, the 115,000 Coldwater sales as a predicate for --
16      JUDGE FLETCHER:  What do you mean --
17      CATHERINE E. STETSON, ESQ.:  -- Brighton's --
18      JUDGE FLETCHER:  What do you mean by "predicate"?
19      CATHERINE E. STETSON, ESQ.:  If you look at Page 276
20      to 278 where he gets into his theory exactly, what he
21      describes is that he's taking this number as what he
22      calls "a convenient assumption" --
23      JUDGE FLETCHER:  Yeah.
24      CATHERINE E. STETSON, ESQ.:  -- a 1-to-1
25      correspondence between Coldwater sales and Brighton's.
```

ORAL   ARGUMENT - 1/13/2011

```
1    But then he starts playing with that number a little
2    bit.  He says, "Well, on the other side of my theory,
3    the 'lost Brighton customer' theory, if you take this
4    number and you divide it by" -- he says -- "6 or 7, you
5    get 20,000 Brighton customers."
6          And that certainly seems like a good estimate
7    for customers who would have walked away from
8    Brighton.
9       JUDGE FLETCHER:  Let me -- let me cut to the chase,
10   if I may.
11         As I read your brief, you were saying this
12   1-to-1 theory didn't make any sense because the price of
13   the Brighton product was so much more than the price of
14   the Coldwater product, and to assume that if someone
15   buys a Coldwater product purse that that same person
16   would have bought a Coldwater purse is ridiculous, which
17   I think is quite right.
18         But that wasn't his theory.  His theory was,
19   "This is a knock-off.  People buy Brighton products in
20   part because it's special.  And if they see people
21   walking around with purses that are very similar and
22   easily confused that can be bought very cheaply, the fun
23   or pleasure of having bought an expensive product
24   disappears and so the sales fall off."
25         So those are two very different theories.
```

ORAL  ARGUMENT - 1/13/2011

1      CATHERINE E. STETSON, ESQ.:  They are.  But that's

2   the problem with Dr. Wunderlich's data is that in order

3   to support your -- your theory, you're exactly right,

4   the "lost customer" theory --

5      JUDGE FLETCHER:  I don't -- I don't have -- I don't

6   have a theory.

7      CATHERINE E. STETSON, ESQ.:  Well, the theory you're

8   describing, I should say, the "lost customer" theory.

9      JUDGE FLETCHER:  Right.

10      CATHERINE E. STETSON, ESQ.:  What Wunderlich did was

11   to take the Coldwater sales as a predicate for his "lost

12   customer" theory.

13          Now, there's other ways to do that.

14          If you look at a lot of the damages cases, the

15   lost profits cases that are cited in Brighton's own

16   brief, you will find, you know, in essence a recipe for

17   how to establish lost profits.  You look at market

18   data.  You look at comparable products.  You look at --

19   depending on the sort of case you're talking about, you

20   look at other types of forecasts.  You look at consumer

21   purchasing data.

22          The problem was that if you examined

23   Wunderlich's testimony, he was borrowing data from that

24   "lost sales" theory, the -- the, you know, for every

25   lost Coldwat- -- for every Coldwater sale Brighton lost

ORAL   ARGUMENT - 1/13/2011

```
 1    a sale, which (unintelligible) his claim, and he's using

 2    that as the starting point --

 3        JUDGE FLETCHER:  But --

 4        CATHERINE E. STETSON, ESQ.:  -- for his "lost

 5    profits" theory.

 6        JUDGE FLETCHER:  But I don't read his testimony as

 7    saying, "The lost sales are because of the sale of the

 8    Coldwater product" in the sense that that this customer

 9    would have bought Brighton if that customer had had

10    available side by side a Brighton and a Coldwater.

11    I just don't think he's saying that.

12        CATHERINE E. STETSON, ESQ.:  No.  I don't think --

13        JUDGE FLETCHER:  The question -- the question is,

14    does he have enough basis for figuring that this is the

15    number that -- of lost sales by Brighton based upon, as

16    it were, the diminution of the brand value?

17        CATHERINE E. STETSON, ESQ.:  And that is exactly the

18    question, your Honor.

19            And what we're saying -- what we argue in our

20    brief and I'm suggesting to you here is that if you --

21    if you take as the starting point from -- from the old

22    Supreme Court Bigelow case, from this Court's Polar Bear

23    Productions case that you need relevant data to support

24    a lost profits issue, you can't draw that data from

25    another theory and start massaging it and importing it
```

ORAL   ARGUMENT - 1/13/2011

1     into your theory.

2            There were other ways that --

3     JUDGE McKEOWN, PRESIDING:  That is the question.

4            Your bottom line is that you think that the

5     data he's using is the wrong base --

6     CATHERINE E. STETSON, ESQ.:  Yes.

7     JUDGE McKEOWN, PRESIDING:  -- for the theory that he

8     adopted?

9     CATHERINE E. STETSON, ESQ.:  Yes.  I mean, it goes

10    back to my, you know, relatively simple but I think

11    apropos UCLA/USC analogy.

12           If you're out to calculate a cer- -- monetize a

13    certain element of UCLA's tuition, you don't start with

14    USC's undergraduate student base.

15           So too here.

16           If you're out to monetize a -- or -- or even

17    approach a reasonable estimate, which is all this

18    Court's precedence demand, of Brighton's lost profits.

19    You don't start by estimating Coldwater sales.

20           You estimate exactly what, your Honor, Judge

21    Fletcher was talking about.  You ask yourself, "Based on

22    market data, based on statistics of Brighton's sales of

23    these products, based on comparable industries" -- and

24    these are all ideas that I'm pulling from lost profits

25    cases of the past -- "what can I demonstrate, I,

ORAL   ARGUMENT - 1/13/2011

1      Brighton's expert, about the diminution in sales at

2      Brighton because of Coldwater's -- because of

3      Coldwater's infringement on trade dress?"

4           JUDGE McKEOWN, PRESIDING:  All right.  I think we'll

5      hear from Mr. Ross now.

6           CATHERINE E. STETSON, ESQ.:  Very good.  Thank you.

7           JUDGE McKEOWN, PRESIDING:  You've ended your time.

8                (Pause in proceeding.)

9           PETER ROSS, ESQ.:  Good morning, your Honors.  Peter

10     Ross for the Respondent Brighton.

11               I'm going to start out with the genericness

12     issue.

13               The Wal-Mart -- in the Wal-Mart case, the U.S.

14     Supreme Court discussed the requirements for proving

15     that product design trade dress is protectable, and the

16     Court concluded that the plaintiff in such case must

17     prove secondary meaning.  The U.S. Supreme Court didn't

18     discuss "genericness" as an additional requirement.

19          JUDGE McKEOWN, PRESIDING:  No.  What the -- what I

20     think the Wal-Mart case and the others say is you

21     don't -- with product design, you no longer can get

22     yourself in that upper category of trademark

23     hierarchy --

24          PETER ROSS, ESQ.:  Yes.

25          JUDGE McKEOWN, PRESIDING:  -- but instead you must

ORAL   ARGUMENT - 1/13/2011

1    prove secondary meaning.  But they did nothing to take

2    away what at least I have understood for many years to

3    be the bottom line, which is you can't have a trademark

4    on something that's generic.

5         So I don't know if that our difference in view

6    comes in a difference in reading Wal-Mart or you have

7    another case that says you can put secondary meaning on

8    top of a generic mark or a trade dress and still get a

9    protectable item.

10   PETER ROSS, ESQ.:  I understand what your Honor is

11   saying, and this is my response.

12        I think that given what the U.S. Supreme Court

13   said in Wal-Mart and thinking logically about what

14   "genericness" is, there's no need for an extra

15   requirement of genericness.  It would be superfluous.

16        A generic product is by definition one that's

17   incapable of acquiring secondary meaning.

18        A plain baseball bat with no markings on it at

19   all, whose bat is it?

20        A white shirt like the one I'm wearing with a

21   collar and a single pocket on the breast and cuffs and

22   buttons, whose shirt is it?

23        A leather handbag without a single

24   embellishment on it, who made it?

25        No one would know.  It's generic and it can't

ORAL ARGUMENT - 1/13/2011

 1    possibly acquire a secondary meaning.  We don't really

 2    need --

 3        JUDGE McKEOWN, PRESIDING:  But here's -- see, now

 4    you're saying what I think I'm saying, but that's

 5    different what you started with.

 6            Here's the jury instruction that bothers me:

 7            "A generic mark without secondary meaning

 8        does not receive trademark protection."

 9            So what that says to me is, if you can get

10    secondary meaning, even if you have a generic mark, then

11    you get trademark protection.

12            So that specific statement that found its way

13    into the jury instructions is a fairly critical

14    situation.  I know there was some discussion about it.

15    You see that in the record.

16            But why isn't that a legal error?

17        PETER ROSS, ESQ.:  I understand the Court's point on

18    that.  That -- that statement itself is confusing.

19            The rest of the -- the rest of the instruction

20    goes on to accurately describe "genericness," and I

21    think that no jury would be capable of finding secondary

22    meaning were they faced with a generic product or

23    generic trade dress.

24        JUDGE McKEOWN, PRESIDING:  Well, the problem is it

25    says -- it tells them they can do that.  It says, you

ORAL   ARGUMENT - 1/13/2011

 1    know, "You need secondary meaning if you have generic

 2    mark," and then it tells you what generic design is and

 3    then it tells that if you have trade dress in your

 4    design, you need secondary meaning," so basically tells

 5    them, you know, "Now you go to the secondary meaning

 6    instructions and see if they pan out."

 7         PETER ROSS, ESQ.:  I think as a matter of logic, the

 8    jury simply could not have found secondary meaning if it

 9    really found there was a generic trade dress.

10              But let me talk about harmless error.

11              The lessons of the Gambini and Kennedy cases

12    seem to be that the failure to give an instruction or an

13    instruction given is harmless error where no real

14    reasonable jury could have found for the other side had

15    the instruction properly been given.

16              Here I don't think any reasonable jury could

17    have found for Coldwater, even had a different

18    instruction on "genericness" been given.

19              Brighton's trade dress bags are clearly not

20    generic.  We can look at them and see.  They're highly

21    embellished.  They have a distinctive brocaded fabric on

22    them.  They have embossed letter trim.  They have

23    sculpted silver hearts and braided handles.  Just not a

24    generic item as a matter of law.

25              To answer --

ORAL   ARGUMENT - 1/13/2011

1     JUDGE McKEOWN, PRESIDING:  How did this -- how did

2     this get in there?

3     PETER ROSS, ESQ.:  Well --

4     JUDGE McKEOWN, PRESIDING:  I mean, I tried to figure

5     that out.

6     PETER ROSS, ESQ.:  I think that that instruction got

7     in there because Coldwater was requesting that the Court

8     say something about "genericness," and the Court was

9     having a hard time reconciling that request with the

10    Wal-Mart case in the absence of any generic requirement,

11    so the Court crafted an instruction.  And while it was

12    being crafted, Coldwater actually never spoke up and

13    said anything about it one way or another.

14    JUDGE FLETCHER:  So the actual drafting of inserting

15    "generic mark" into Instruction 19 was done by the

16    judge?

17    PETER ROSS, ESQ.:  By the judge in open court.

18    JUDGE FLETCHER:  And there was no objection by

19    Coldwater?

20    PETER ROSS, ESQ.:  That's -- that's my

21    recollection.  I believe that's what we say in our

22    papers.

23    JUDGE FLETCHER:  Yeah.  Well, I guess --

24    JUDGE McKEOWN, PRESIDING:  There could be a problem.

25    JUDGE FLETCHER:  -- if your recollection is wrong --

ORAL   ARGUMENT - 1/13/2011

1      JUDGE McKEOWN, PRESIDING:  Yeah.

2      JUDGE FLETCHER:  -- we'll hear about it.

3      JUDGE McKEOWN, PRESIDING:  I guess when I read that,

4  I thought that they were asking for a statement, "We

5  want to have the jury -- make sure that it's not

6  generic."

7          And then my problem here, as I read, Judge Huff

8  was, you know, a very capable judge.  It somehow seemed

9  to get crosswise with the Wal-Mart case in some way and

10  then came up with this.  And I was trying to go through

11  the transcript trying to figure out how this was really

12  happening in the -- in the jury instruction conference.

13          So it just seemed like this -- what Coldwater

14  asked for were generic -- what they asserted, the

15  offense of genericness, and they said that you should

16  have the burden of showing that your trade dress is

17  non-generic, so they wanted an instruction to that

18  effect, sort of a baseline instruction before you get to

19  secondary meaning.

20          But the Court didn't give that, so they -- I

21  mean, they -- I guess the Court sent all the

22  instructions they asked for that were assumed to be

23  objections.  Right?  Is that how -- I mean, that's how I

24  read the transcript.

25      PETER ROSS, ESQ.:  Yes.

ORAL   ARGUMENT - 1/13/2011

1          JUDGE McKEOWN, PRESIDING:  You didn't have to object

2     to get everything you asked for that didn't get given as

3     an objection?

4          PETER ROSS, ESQ.:  Yeah.  So the way it worked is

5     this, my understanding.

6               They were requesting the genericness

7     instruction.  Judge Huff, who is a very careful and good

8     Judge, was sitting there in open court and started to

9     draft this thing.  There was colloquy between Brighton's

10    counsel and the judge, Coldwater's counsel doesn't

11    object, and this instruction is settled upon and given.

12              And we describe that in our Respondent's brief,

13    and in their reply, Coldwater says, "Yes, but we

14    objected because we proposed other genericness

15    instructions that were not given."

16              So, as I would analyze that, their objections

17    were to not giving the other instructions, but no

18    objection was raised to this instruction, which was

19    crafted --

20         JUDGE McKEOWN, PRESIDING:  What about --

21         PETER ROSS, ESQ.:  -- in court.

22         JUDGE McKEOWN, PRESIDING:  One of the questions --

23    you know, usually "genericness" is a factual issue.  So

24    if this instruction is wrong, just assume for talking

25    purposes that this instruction is a legal error, and

1   normally "genericness" is a factual issue, why wouldn't

2   the jury have to go back and determine that?

3        PETER ROSS, ESQ.:  Because of what I was saying just

4   a moment ago, which is that I think we can all look at

5   it and say, "This is a highly embellished bag and it's

6   certainly not generic," whatever else one may think of

7   it.  It's very distinctive.  And it's just I -- in

8   comparison to my white shirt, in comparison to a

9   baseball bat with nothing on it, in comparison to a

10  plain leather bag with two leather handles --

11       JUDGE FLETCHER:  Well --

12       PETER ROSS, ESQ.:  -- that would be generic.

13       JUDGE McKEOWN, PRESIDING:  Where would you place --

14  in your view, where in the trademark hierarchy do you

15  place the Brighton compilation?

16       PETER ROSS, ESQ.:  Oh.  Well, given Wal-Mart, we

17  really don't have much of a hierarchy, but --

18       JUDGE McKEOWN, PRESIDING:  So it would be

19  descriptive at best?

20       PETER ROSS, ESQ.:  I think that's -- well, that

21  doesn't even --

22       JUDGE McKEOWN, PRESIDING:  I know you don't want it

23  to be generic/generic.

24       PETER ROSS, ESQ.:  No.  It doesn't even apply

25  really, descriptive.  I mean, if we were using that

ORAL  ARGUMENT - 1/13/2011

```
 1    real -- that -- that hierarchy, it is inherently

 2    distinctive.  That's how people recognize it.

 3            The -- Coldwater itself was asking its

 4    designers to come up --

 5    JUDGE McKEOWN, PRESIDING:  Now you're -- now you're

 6    merging that with secondary meaning, aren't you?

 7    PETER ROSS, ESQ.:  Well, no.

 8            Coldwater itself was asking its designers to

 9    come up with a bag with a "Brightony" look.

10            People -- there was testimony from Monica

11    Bolin, who is the retail store owner in Michigan and she

12    was selling a knock-off line and people came in everyday

13    and said, "Is that -- isn't that Brighton?  Are you

14    selling Brighton?"

15            There was testimony that people saw their ads

16    and thought, "Why is Brighton selling their bags now in

17    Coldwater Creek's catalogs?"

18            All these things show that -- that the trade

19    dress is distinctive, that it really is something people

20    can look at and say, "Hey, that's a Brighton bag."

21            To give another analogy, the plain leather bag

22    with nothing on it, two leather handles, that's generic,

23    but you just add some crosshatching quilt pattern and a

24    metal link handle on it, and people are going to

25    recognize that as a Chanel bag.  I've now created a
```

ORAL  ARGUMENT - 1/13/2011

1     Chanel bag.  It's clearly not generic any more just by

2     adding the quilting and a metallic chain link handle.

3     It's embellished.  People can recognize it.

4            In their own market, Brighton sells 300, $400

5     million a year of product.  And people love it.  They

6     collect it.  On average the testimony was, a Brighton

7     customer owns about 10 to 12 Brighton accessories.

8            JUDGE McKEOWN, PRESIDING:  And they buy, what, 1.7

9     things when they come in or --

10           PETER ROSS, ESQ.:  They come into the store, data

11    shows that they buy 1.7 things every time they make a

12    transaction.

13           So it's distinctive.  And I don't think there's

14    any question about that.  And I think the summary

15    judgment analogy is a good one.  We can all look at

16    these bags and say, whatever they are, they might not be

17    your taste, but they're certainly not generic.

18           JUDGE FLETCHER:  Yeah.  I mean, I have to say, I'm

19    not an expert in bags or purses, but it's hard for me

20    actually to see any bag that's actually on the market as

21    generic.  Having a very simple bag with no embellishment

22    is in fact a design choice, and it would out -- it would

23    stand out in the market as well.  I mean, I have trouble

24    understanding that it's very likely that any bag being

25    sold would in fact be generic.

ORAL   ARGUMENT - 1/13/2011

```
 1        PETER ROSS, ESQ.:  That -- that could well be the
 2   case.
 3             It's funny that I am a handbag expert at this
 4   point in my life.
 5             (Laughter.)
 6        JUDGE McKEOWN, PRESIDING:  I bet.
 7        PETER ROSS, ESQ.:  But I --
 8        JUDGE McKEOWN, PRESIDING:  (Unintelligible) --
 9        PETER ROSS, ESQ.:  But there was -- there was --
10        JUDGE McKEOWN, PRESIDING:  -- a Brighton handbag.
11        PETER ROSS, ESQ.:  There was one other question that
12   Judge Fletcher asked I believe earlier, which is if the
13   case is remanded for a determination as to whether the
14   bags are generic --
15        JUDGE FLETCHER:  That was McKeown.
16        JUDGE McKEOWN, PRESIDING:  Yeah.
17        JUDGE FLETCHER:  Yeah.
18        PETER ROSS, ESQ.:  Oh, okay.
19        JUDGE FLETCHER:  Generic judgment.
20        JUDGE McKEOWN, PRESIDING:  But we do look alike.
21        JUDGE FLETCHER:  Yeah.  Right.
22        PETER ROSS, ESQ.:  I'm sorry.
23        JUDGE McKEOWN, PRESIDING:  We wear the same -- we do
24   have a generic dress, I would say.
25        PETER ROSS, ESQ.:  Would there be any reason to
```

ORAL   ARGUMENT - 1/13/2011

1    retry the damages?

2            And I don't think there would be any reason.

3    If the jury decides this bag or these bags are generic,

4    which I find impossible to believe, then no damages

5    exist and the case is wiped out on trade dress.

6            And if the jury determines that the bags are

7    not generic, which would have to be the result, the

8    damages have already been determined from these very

9    bags, and we don't have to retry that case either.

10            Oh.

11        JUDGE McKEOWN, PRESIDING:  Do you want talk about

12    the damages?

13        PETER ROSS, ESQ.:  Okay.

14            In my view the damages depend on whether we

15    really believe in the Story Parchment case.  It's a 1931

16    Supreme Court case, but it's never been questioned or

17    overturned.  And basically it says that the fact of

18    damage must be proven with reasonable certainty, and if

19    the fact of damage is proven, then the amount can be

20    left to the reasonable estimation of the jury.  And the

21    U.S. Supreme Court notes --

22        JUDGE FLETCHER:  Yeah.  But that's just gets us

23    started.  Okay.  So --

24        PETER ROSS, ESQ.:  Yeah.

25        JUDGE FLETCHER:  -- what's a reasonable estimation

ORAL   ARGUMENT - 1/13/2011

1    and what's a reasonable basis for the Brighton expert to

2    have informed the jury as to what his estimate was?

3         PETER ROSS, ESQ.:  Okay.

4         JUDGE FLETCHER:  And -- and I do -- and I am

5    somewhat sympathetic to the argument from the other

6    side, that it's hard to figure out the damage to the

7    brand as a kind of 1-to-1, for every bag sold by

8    Coldwater that is a violation, that cost from the sale

9    of one bag of their own.  I mean, that's -- that might

10   be right, but it might be right only because it's a

11   coincidence.

12        PETER ROSS, ESQ.:  Okay.  Let me address that.

13             But before I do, I'm just going to say one more

14   sentence about Story Parchment, which is that the Court

15   stated that its holding was particularly applicable in

16   antitrust, copyright and trademark where damages are

17   hard to pin down.

18        JUDGE FLETCHER:  Sure.

19        PETER ROSS, ESQ.:  So here we have the fact of

20   damages.

21             Their expert admits that our expert says that

22   their expert Ellen Goldstein-Lynch said that where you

23   have the sale of cheap knock-offs, those harm sales of

24   the authentic brand.  So essentially if we have cheap

25   knock-offs being sold.  The experts on both sides agree

ORAL   ARGUMENT – 1/13/2011

```
 1    there is the --

 2         JUDGE FLETCHER:  Sure.

 3         PETER ROSS, ESQ.:  -- fact of damage.

 4         JUDGE FLETCHER:  Sure, sure.

 5         PETER ROSS, ESQ.:  So what did the jury have to go

 6    on to reasonably estimate the amount of damages?

 7              They were given, among other things, the

 8    following evidence: that these knock-offs appeared in

 9    120 million catalogs distributed throughout the

10    United States and in hundreds of retail stores across

11    the country; that by Coldwater's estimate over 50

12    million Americans saw these knock-offs.  That's one out

13    of every five adults in this country.

14         JUDGE FLETCHER:  Saw these knock-offs either in the

15    flesh, as it were, or in the catalog?

16         PETER ROSS, ESQ.:  Yeah.

17         JUDGE FLETCHER:  Did not necessarily see the real

18    item?

19         PETER ROSS, ESQ.:  That's right.  You know, but a

20    huge number of people saw these knock-offs.  This is a

21    big, powerful company, and they were out there using

22    their entire marketing power to show these knock-offs to

23    the country, and they did a good job of it.

24              Brighton has over 2 million customers, and on

25    average they buy 10 to 12 Brighton accessories apiece,
```

ORAL   ARGUMENT - 1/13/2011

 1    unless something happens to turn them off.

 2         So given all that, the jury found that 13,000

 3    Brighton customers would be affected by this.  That's

 4    less than 1 percent of the Brighton customers.

 5         And by the way, it's significant --

 6    JUDGE CLIFTON:  But was so affected they would never

 7    buy from Brighton again?

 8    PETER ROSS, ESQ.:  Yes.

 9    JUDGE CLIFTON:  I got to say, it strikes me as a

10    house of cards.  I just don't understand where the

11    numbers come from.

12         There's no connection between the number of

13    viewings you've identified and the results that are

14    purportedly estimated because of it.

15    PETER ROSS, ESQ.:  Well, the jury in my view was

16    entitled to take these facts and --

17    JUDGE CLIFTON:  Well, they didn't take facts.  They

18    took testimony from an expert who acknowledged it was a

19    convenient assumption but pushed a lot of numbers

20    forward that I simply can't find a logical foundation

21    for.  I mean, I understand the relationship, but even

22    that's not clear.  The fact that something is ubiquitous

23    doesn't mean that it's not popular.  Indeed, "ubiquity"

24    means there's a lot of popularity --

25    PETER ROSS, ESQ.:  Well --

ORAL   ARGUMENT - 1/13/2011

```
 1        JUDGE CLIFTON:  And the fact that things are seen
 2   doesn't mean they're seen as knock-offs.  It may seem
 3   that "Oh, this is the bag that we're supposed to go out
 4   and buy."  So --
 5        PETER ROSS, ESQ.:  Yeah.
 6        JUDGE CLIFTON:  -- I'm just kind of adrift.  I
 7   understand that the fact of damages is -- is -- is the
 8   critical determination, and I'll accept that you've got
 9   that here, but I have a real problem coming up with a
10   number based on what was offered up.
11        PETER ROSS, ESQ.:  Well, what your Honor is
12   suggesting is exactly contrary to what the experts on
13   both sides concluded, which is that if you have cheap
14   knock-offs out there --
15        JUDGE CLIFTON:  But you haven't told us that.
16   You've told us that people have seen things.  That's not
17   the same thing necessarily as having cheap knock-offs
18   out there.
19          I mean, I accept the proposition there are
20   cheap knock-offs out there because there are counterfeit
21   Louie Vuitton bags; Louie Vuitton likely suffers in some
22   fashion.  That's fine.  But the damage award is a
23   precise figure, and I just can't figure out what it's
24   based on.
25        PETER ROSS, ESQ.:  Well, the fact that the cheap
```

ORAL   ARGUMENT - 1/13/2011

1   knock-offs are out there and they are -- these bags were

2   selling for about one-fifth the price of the Brighton

3   bags, the effect, and this is described by the experts,

4   is that women no longer believe that the Brighton bags

5   have any cachet.  That -- that's the effect that was

6   described and that was in evidence.

7       JUDGE McKEOWN, PRESIDING:  The difficulty I have,

8   and maybe you can help me, is I feel like I have this

9   constellation of unconnected numbers or facts, and

10  normally in a damage theory you construct a theory that

11  kind of runs from one presumption through.

12      And as Judge Fletcher said, there's so much

13  mixing and matching here, so I feel like, "Well, yeah,

14  there's definitely damage if it's -- if it's a

15  knock-off.  Lots of people saw it.  Do have damage.  You

16  have this many customers.  We sold this many things."

17  It's like all this is floating around and --

18      PETER ROSS, ESQ.:  Uh-huh.

19      JUDGE McKEOWN, PRESIDING:  -- there's not a coherent

20  damages theory.  And that's where once you have a fact

21  of damages, our cases suggest, you know, it can't be

22  speculative, and that's where we're struggling with is

23  how to move what can't be totally precise from being

24  speculative.

25      JUDGE CLIFTON:  Yeah.

ORAL   ARGUMENT - 1/13/2011

```
 1        PETER ROSS, ESQ.:  Right.

 2        JUDGE McKEOWN, PRESIDING:  And that's kind of a

 3   little bit of a needling feeling I have, and I don't

 4   know yet.  I mean, it's -- it's a complicated thing, as

 5   you've explained, and there's definitely damage.

 6            How do you connect up these almost related

 7   facts?

 8        PETER ROSS, ESQ.:  Well, I think -- you know, I

 9   think that's where one has to give Story Parchment its

10   due saying that an antitrust, copyright and trademark

11   where the fact is proven, and these are the words of the

12   Supreme Court, the defendant assumes the risk that some

13   estimation has to be made --

14        JUDGE McKEOWN, PRESIDING:  Right.

15        PETER ROSS, ESQ.:  -- of what the amount of damage

16   is and --

17        JUDGE McKEOWN, PRESIDING:  But the estimates can't

18   be -- at some point they cross to speculation.

19   Correct?

20        PETER ROSS, ESQ.:  Yes.

21        JUDGE McKEOWN, PRESIDING:  I mean, in other words,

22   what that case is saying, if you've got damage, you

23   don't need absolute precision to get a damages number.

24        PETER ROSS, ESQ.:  Uh-huh.

25        JUDGE McKEOWN, PRESIDING:  But that intersects with
```

ORAL   ARGUMENT – 1/13/2011

```
 1    all our other cases, which also say you can't speculate.
 2         JUDGE FLETCHER:  Do we have evidence in the record,
 3    for example, that shows sales of other Brighton products
 4    going up and the sale of the Brighton handbag at issue
 5    going down after the appearance of the Coldwater
 6    handbag?
 7         PETER ROSS, ESQ.:  Yes.
 8         JUDGE FLETCHER:  And what do those -- what do those
 9    numbers tell us?
10         PETER ROSS, ESQ.:  I don't have those numbers in
11    mind but they're in the record, and that's exactly what
12    happened.
13             And I would point out --
14         JUDGE McKEOWN, PRESIDING:  But would that be -- but
15    that's not the basis for the damages theory, is it?
16         PETER ROSS, ESQ.:  No.  It's just another basis for
17    saying --
18         JUDGE McKEOWN, PRESIDING:  It seems like that would
19    be a good basis.
20         JUDGE FLETCHER:  No.  But it seems to me that's
21    exactly the basis for the theory.  The theory is that as
22    soon as these Coldwater bags come on the market, that
23    diminishes the appeal of the Brighton bags, and that
24    then costs sales.  That's the theory.
25         PETER ROSS, ESQ.:  Yeah.
```

ORAL   ARGUMENT - 1/13/2011

1         JUDGE FLETCHER:  That's always the theory.

2         PETER ROSS, ESQ.:  Yeah.

3         JUDGE FLETCHER:  And the question then is, what data

4    do we have to back it up?

5              And it sounds as though if we have other

6    Brighton products continuing to go up and this

7    particular Brighton product maybe one of not very many

8    Brighton products beginning to have trouble more or less

9    coinciding with the appearance of all these Coldwater

10   bags, that's helpful.

11        PETER ROSS, ESQ.:  Yeah.

12        JUDGE FLETCHER:  And you say there are numbers in

13   the record but you just don't know what they are.

14        PETER ROSS, ESQ.:  I don't know what they are.

15        JUDGE McKEOWN, PRESIDING:  But I guess what I'm

16   saying, just to understand, is I think that that --

17   Judge Fletcher has laid out what would be a logical

18   damages theory.

19             My question is, were those numbers, the

20   following sales numbers or the delta between what used

21   to be, was that part of your damages?

22        PETER ROSS, ESQ.:  That wasn't part of the

23   calculation made.

24        JUDGE McKEOWN, PRESIDING:  It wasn't part of the

25   calculation.  Okay.

ORAL  ARGUMENT - 1/13/2011

1          PETER ROSS, ESQ.:  Now --

2          JUDGE McKEOWN, PRESIDING:  So there's numbers, but

3     they didn't kind of find their way into the big

4     arithmetic.  Right?

5          PETER ROSS, ESQ.:  Yeah.  Let -- let me just make a

6     coup- --

7               Yes.  That's right.

8          JUDGE McKEOWN, PRESIDING:  Okay.

9          PETER ROSS, ESQ.:  -- a couple of quick points on

10    this.

11              The jury did not agree with Mr. Wunderlich's

12    numbers.  The jury found something less than

13    Mr. Wunderlich proposed.

14         JUDGE CLIFTON:  But you've justify that by saying

15    it's the range he offered up, so it's okay.

16         PETER ROSS, ESQ.:  Yes.

17         JUDGE CLIFTON:  And if the range he offered up has

18    no foundation in reality or we find to be purely

19    speculative, the fact that they found a number that's

20    within the range doesn't tell us anything; it doesn't

21    give any confidence in the number the jury came up with.

22         PETER ROSS, ESQ.:  That is a reasonable point.

23              But the number that Dr. Wunderlich came up with

24    and the number the jury came up with is a very small

25    number, making an assumption that some number of people

ORAL   ARGUMENT - 1/13/2011

```
 1     are affected, and the experts on both sides agree that
 2     some --
 3          JUDGE CLIFTON:  And they're so affected they'll
 4     never buy another Brighton product.
 5               That assumption I have additional difficulty
 6     with.
 7               I mean, my mother was a big shopper from these
 8     kinds of products, and some products she liked and some
 9     products she didn't.
10               The notion that there's a bag that's similar to
11     a Brighton bag causes her to never buy another Brighton
12     again is just one that isn't in my radar screen, so --
13          PETER ROSS, ESQ.:  Well, let me -- let me move a
14     little bit away from that -- that exact analogy.
15               There could be some people who never bought
16     again and there could be other people who stopped buying
17     for the next five years because they feel put off and
18     there could be other people who don't buy for the next
19     year because they feel put off.  And we're just trying
20     to come up with an estimate of how many people there
21     would be and --
22          JUDGE McKEOWN, PRESIDING:  Well, but, you know,
23     usually when you do that, the expert actually has some
24     expertise in counterfeiting, and there are studies that
25     show affects of counterfeiting on consumer behavior.  So
```

ORAL   ARGUMENT - 1/13/2011

```
 1   when do you that, you take some percentage, you take the
 2   numbers, you apply it.
 3          I'm still having this trouble where we have all
 4   these -- you have like some great facts, but I'm not
 5   sure how they get glued together it.
 6       PETER ROSS, ESQ.:  Yeah.
 7       JUDGE McKEOWN, PRESIDING:  And so what -- what was
 8   the purpose here, the -- you have a -- in the actual
 9   damages, you also have the alternative of Coldwater's
10   profits?
11       PETER ROSS, ESQ.:  In copyright one can recover the
12   profits and the actual damages.
13       PETER ROSS, ESQ.:  Right.
14          And then you have this -- the -- you have that
15   on the trade dress as well.
16       PETER ROSS, ESQ.:  And in the trade dress, the jury
17   found numbers for the profits and actual damages --
18       JUDGE McKEOWN, PRESIDING:  Correct.
19       PETER ROSS, ESQ.:  -- but we were awarded as part of
20   the judgment just the actual damages.
21       JUDGE McKEOWN, PRESIDING:  Just the actual damages,
22   right, so --
23       JUDGE FLETCHER:  You chose the damages.
24       JUDGE McKEOWN, PRESIDING:  Because obviously it's a
25   much bigger number.
```

ORAL   ARGUMENT - 1/13/2011

Page 49

```
 1        PETER ROSS, ESQ.:  Yes.

 2        JUDGE McKEOWN, PRESIDING:  Right.

 3        PETER ROSS, ESQ.:  Yeah.

 4        JUDGE McKEOWN, PRESIDING:  So I guess the purpose of

 5   that is if they found no actual damages but they found

 6   some significant profits, you could have taken the

 7   profits.

 8        PETER ROSS, ESQ.:  That's right.

 9        JUDGE McKEOWN, PRESIDING:  Okay.

10        PETER ROSS, ESQ.:  Yeah.

11             So on -- on the damages, I think it was enough

12   for the jury that they were given that they could use to

13   make an estimate that was reasonable.

14             I think I'm --

15        JUDGE McKEOWN, PRESIDING:  You are.

16        PETER ROSS, ESQ.:  -- out of time.

17        JUDGE McKEOWN, PRESIDING:  Thank you.  I appreciate

18   your argument.

19             Ms. Stetson, we'll give you a few minutes for

20   rebuttal.

21        PETER ROSS, ESQ.:  Thank you, your Honor.

22        JUDGE McKEOWN, PRESIDING:  Thank you.

23        CATHERINE E. STETSON, ESQ.:  Thank you, your

24   Honors.  A couple quick points.

25             To your questions just now about the -- what
```

ORAL   ARGUMENT - 1/13/2011

1      you've described, Judge McKeown, as "the constellation

2      of data out there," I think it's -- it's correct that

3      there is some data in the record supporting the idea

4      that there may have been a basis for a legitimate and

5      substantiated lost customer field.

6            The problem is the theory at record excerpts

7      274 to 286 that Wunderlich put in front of the jury and

8      the theory at record excerpts -- supplemental record

9      excerpts 1771 that counsel for Brighton reiterated to

10     the jury in his closing argument is that the loss of

11     115,000 transactions under these circumstances seems

12     conservative.

13           But, Judge Clifton, as you pointed out, the

14     fact that, you know, the number of hypothetical lost

15     transactions seems small in comparison to other Brighton

16     transactions is irrelevant if it's not based on some

17     relevant data to the inquiry; if you're starting with a

18     wrong number, the fact that you're ending up with a

19     number that looks reasonable is meaningless.

20           So on the damages point, I would essentially

21     see counsel's Story Parchment and raise him Polar Bear,

22     Murphy Tugboat, Parlor Enterprises, which is the case

23     where Wunderlich's theories were knocked back by the

24     Court of Appeals and a jury verdict overturned.

25           Quickly on generic, if you look at Page 147 of

ORAL   ARGUMENT - 1/13/2011

```
1    our record excerpts, you will find, Judge McKeown, as
2    you pointed out, our argument that the Court had omitted
3    an important instruction, and it was the instruction
4    that the plaintiff in a trade dress infringement case
5    bears the burden of showing non-genericness.
6         Now, to the question about whether in the
7    hypothetical event the jury had been presented with that
8    instruction and had been asked that predicate question,
9    "Has the plaintiff proven non-genericness?" whether the
10   jury could have found these items generic, I would point
11   you to what I think is an instructive quote from the
12   Yurman Designs case, which is a relatively recent case
13   out of the Second Circuit:
14        "Without a specification of the design
15        futures that compose the trade dress, different
16        jurors given the same line of products may
17        conceive the dress in terms of different elements
18        and features so that the verdict may be based on
19        inconsistent findings."
20        Where you have, as in this case, a recitation
21   throughout the trial of a number of different
22   combinations and permutations of trade dress, and you
23   just heard another one today from Brighton's counsel,
24   braiding -- braiding was not part of the trade dress
25   that was claimed in the interrogatory responses -- it's
```

ORAL   ARGUMENT - 1/13/2011

```
 1    going to have to be put to the jury whether that trade

 2    dress in combination or in multiple combinations was so

 3    broad and so overinclusive that it essentially

 4    threatened, as Yurman described it, to 'fence off' a

 5    part of the product market that is incredibly common in

 6    handbag design.

 7            So with those points, if there are no further

 8    questions, I would submit.

 9        JUDGE McKEOWN, PRESIDING:  Thank you.

10            I'd like to thank both counsel for your

11    arguments today.  Very helpful.

12            And we'll now adjourn Brighton Collectibles

13    versus Coldwater Creek and submit it.

14                        ---0---

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2

 3          I, Melanie M. Faulconer, certify

 4   that the foregoing transcript is a true

 5   record of said proceedings, that I am not

 6   connected by blood or marriage with any of

 7   the parties herein, nor interested directly

 8   or indirectly in the matter in controversy,

 9   nor am I in the employ of counsel.

10          I have hereunto subscribed my name

11   this 18th day of September, 2012.

12
             Damian Alonzo
13           Damian Alazo   on behalf of Melanie M. Faulconer

14                          MELANIE M. FAULCONER

15

16

17

18

19

20

21

22

23

24

25
```

ORAL    ARGUMENT – 1/13/2011

| A | Apple | B | |
|---|---|---|---|
| | Apple 3:15 4:4,11 5:13 | | braided 29:23 |

**A**

able 19:9
absence 30:10
absolute 43:23
accept 41:8,19
accessories 35:7 39:25
accurately 28:20
acknowledged 40:18
acquire 15:13 28:1
acquiring 27:17
actual 20:9 30:14 48:8
  48:12,17,20,21 49:5
add 34:23
adding 35:2
addition 11:9,14
additional 26:18 47:5
address 38:12
adjourn 52:12
admits 38:21
adopted 25:8
adrift 41:6
ads 34:15
adults 39:13
aggrieved 17:13
ago 33:4
agree 16:13 38:25
  46:11 47:1
alike 36:20
alternative 48:9
amalgamation 9:13
Americans 39:12
amount 21:7 37:19
  39:6 43:15
analogy 21:6,10 25:11
  34:21 35:15 47:14
analyze 32:16
answer 29:25
antitrust 38:16 43:10
apart 9:9,9
apiece 39:25
appeal 1:12 44:23
Appeals 1:2 50:24
appear 15:8
appearance 44:5 45:9
appeared 39:8
appears 12:13

**Apple** 3:15 4:4,11 5:13
  5:14 11:14
applicable 38:15
apply 33:24 48:2
appreciate 4:24 8:11
  49:17
approach 25:17
appropriate 5:17
approximates 9:12
approximation 3:11
apropos 10:4 11:12
  25:11
argue 17:4 24:19
argued 15:12 16:3
argument 1:16 2:3
  4:24 7:7 20:2,15
  38:5 49:18 50:10
  51:2
arguments 9:5 16:1
  52:11
arithmetic 46:4
aside 2:10 9:1
asked 31:14,22 32:2
  36:12 51:8
asking 17:14 21:8 31:4
  34:3,8
assemblage 11:22 15:3
assembly 4:2
asserted 31:14
assume 16:8,9 17:17
  18:23,24 19:14 22:14
  32:24
assumed 31:22
assumes 43:12
assuming 19:11,11
assumption 21:22
  40:19 46:25 47:5
attempts 16:23
attentive 7:25
authentic 38:24
available 24:10
average 7:25 35:6
  39:25
award 20:19 41:22
awarded 3:10 48:19

**B**

back 12:9 15:5 18:16
  18:24 25:10 33:2
  45:4 50:23
bag 33:5,10 34:9,20,21
  34:25 35:1,20,21,24
  37:3 38:7,9 41:3
  47:10,11
bags 20:11 29:19
  34:16 35:16,19 36:14
  37:3,6,9 41:21 42:1,3
  42:4 44:22,23 45:10
base 25:5,14
baseball 27:18 33:9
based 19:17 21:2
  24:15 25:21,22,23
  41:10,24 50:16 51:18
baseline 31:18
basically 29:4 37:17
basis 20:15 24:14 38:1
  44:15,16,19,21 50:4
bat 27:18,19 33:9
Bear 20:21 21:1 24:22
  50:21
bears 51:5
beginning 45:8
behavior 47:25
believe 30:21 36:12
  37:4,15 42:4
best 9:14 33:19
bet 36:6
big 39:21 46:3 47:7
Bigelow 24:22
bigger 48:25
bit 5:25 11:15 14:8
  22:2 43:3 47:14
black 14:23
blood 53:6
Bolin 34:11
borrowing 23:23
bothers 28:6
bottle 4:17
bottom 14:25 25:4
  27:3
bought 22:16,22,23
  24:9 47:15

braided 29:23
braiding 14:24 15:7
  51:24,24
brand 24:16 38:7,24
breadth 5:11
breast 27:21
brief 20:18 22:11
  23:16 24:20 32:12
briefing 2:16
Brighton 1:6 3:6,23,25
  4:25 5:9 6:13,24
  11:25 12:24 14:17,22
  19:7 20:4,6,8,10,12
  20:12 22:3,5,8,13,19
  23:25 24:9,10,15
  26:2,10 33:15 34:13
  34:14,16,20 35:4,6,7
  36:10 38:1 39:24,25
  40:3,4,7 42:2,4 43:3
  44:4,23 45:6,7,8 47:4
  47:11,11 50:9,15
  52:12
Brightony 34:9
Brighton's 8:11,15
  15:19 19:24 21:17,25
  23:15 25:18,22 26:1
  29:19 32:9 51:23
broad 12:23 52:3
brocade 14:20 15:7
brocaded 29:21
brought 9:25 19:24
brown 14:23
buds 6:18 12:5
burden 31:16 51:5
buttons 27:22
buy 22:19 35:8,11
  39:25 40:7 41:4 47:4
  47:11,18
buying 47:16
buys 22:15

**C**

C 53:1,1
cachet 42:5
calculate 25:12
calculation 21:2 45:23

45:25
**California** 1:12 2:1
  9:16
**call** 20:3
**calls** 3:21 20:10 21:22
**capable** 28:21 31:8
**capture** 7:24
**cards** 40:10
**careful** 12:18 32:7
**carried** 5:23
**case** 1:13 3:9,17 9:11
  9:13,14,16 11:11,15
  11:17 16:16 18:14
  20:21,22,23 23:19
  24:22,23 26:13,16,20
  27:7 30:10 31:9 36:2
  36:13 37:5,9,15,16
  43:22 50:22 51:4,12
  51:12,20
**cases** 4:11,18 5:2 9:10
  17:9 23:14,15 25:25
  29:11 42:21 44:1
**catalog** 39:15
**catalogs** 34:17 39:9
**Cate** 2:9
**category** 11:7 26:22
**CATHERINE** 2:7,14
  5:3,8 6:8 7:10,17,20
  8:3,9,22,25 9:14 10:9
  10:12,19 11:4,8 13:4
  15:15 16:7,11,13
  17:21,25 18:3,7,11
  19:4,11 21:13,17,19
  21:24 23:1,7,10 24:4
  24:12,17 25:6,9 26:6
  49:23
**causes** 47:11
**cer** 25:12
**certain** 4:5 9:8 20:12
  25:13
**certainly** 3:22 6:9
  11:18 18:11 20:23
  22:6 33:6 35:17
**certainty** 20:25 37:18
**certify** 53:3
**chain** 35:2

**Chanel** 34:25 35:1
**chase** 22:9
**cheap** 38:23,24 41:13
  41:17,20,25
**cheaply** 22:22
**chevron** 7:21 12:5
**chevrons** 6:23
**chief** 8:12,15
**choice** 35:22
**choosing** 9:17
**chose** 48:23
**Circuit** 1:2 11:11,16
  12:13 15:24 51:13
**circumstances** 5:19
  50:11
**cited** 17:9 23:15
**civil** 9:3 17:11
**claim** 13:17 14:11 24:1
**claimed** 15:5 51:25
**claiming** 14:17
**clarity** 3:9
**clear** 40:22
**clearly** 29:19 35:1
**Clifton** 1:22 40:6,9,17
  41:1,6,15 42:25
  46:14,17 47:3 50:13
**clock** 2:12
**close** 15:3
**closely** 9:12
**closing** 16:1 20:15
  50:10
**coherent** 42:19
**coincidence** 38:11
**coinciding** 45:9
**Coldwat** 23:25
**Coldwater** 1:9 2:9
  13:22 20:4,11,16,17
  21:14,15,25 22:14,15
  22:16 23:11,25 24:8
  24:10 25:19 29:17
  30:7,12,19 31:13
  32:13 34:3,8,17 38:8
  44:5,22 45:9 52:13
**Coldwater's** 6:12
  16:23 26:2,3 32:10
  39:11 48:9

**collar** 27:21
**collect** 35:6
**Collectibles** 1:6 52:12
**collection** 15:2
**colloquy** 32:9
**colors** 15:7,12
**combination** 5:23 52:2
**combinations** 51:22
  52:2
**come** 34:4,9 35:9,10
  40:11 44:22 47:20
**comes** 5:10 7:3 14:1
  16:14 27:6
**coming** 41:9
**commend** 5:13
**comment** 8:4
**committed** 2:24
**common** 6:20 10:1
  12:22,22 13:16 15:6
  52:5
**company** 39:21
**comparable** 23:18
  25:23
**comparison** 10:4 33:8
  33:8,9 50:15
**competition** 12:19
**compilation** 4:14,15
  11:13,22 33:15
**complicated** 43:4
**component** 3:19
**compose** 51:15
**conceded** 8:12
**concededly** 3:19
**conceive** 51:17
**concession** 8:14
**concluded** 9:21 11:16
  26:16 41:13
**concluding** 18:19
**conference** 31:12
**conferred** 3:24
**confidence** 46:21
**confronting** 11:13
**confused** 8:2 22:22
**confusing** 28:18
**confusion** 17:6
**conjunction** 14:19

**connect** 43:6
**connected** 53:6
**connection** 40:12
**conservative** 50:12
**Consolidated** 1:4
**constellation** 42:9
  50:1
**constraint** 12:11
**construct** 42:10
**consumer** 23:20 47:25
**context** 7:13
**continuing** 45:6
**contours** 16:25 19:14
**contrary** 41:12
**controversy** 53:8
**convenient** 21:22
  40:19
**conversation** 6:12
**copied** 11:1
**copy** 10:11
**copying** 5:17
**copyright** 2:20 3:13,21
  3:22,24 4:3,9 7:4 9:5
  9:10,21,22,23 10:2,7
  10:18 11:19 12:14,17
  18:19 38:16 43:10
  48:11
**copyrightable** 7:2
**copyrighted** 12:6,8
**core** 12:20
**correct** 10:19 43:19
  48:18 50:2
**correctly** 3:6
**correspondence** 21:25
**cost** 38:8
**costs** 44:24
**counsel** 6:12 15:19
  16:23 32:10,10 50:9
  51:23 52:10 53:9
**counsel's** 20:15 50:21
**counterfeit** 41:20
**counterfeiting** 47:24
  47:25
**country** 39:11,13,23
**coup** 46:6
**couple** 15:9 46:9 49:24

course 2:19 3:5 8:17
    8:17 10:6 13:13
    15:12 17:8 19:13
court 1:2,12 2:8,20,24
    3:14,21 4:18 5:14
    9:1 13:21 14:4 15:24
    16:15,15 17:18 18:15
    18:17 20:20 24:22
    26:14,16,17 27:12
    30:7,8,11,17 31:10
    31:21 32:8,21 37:16
    37:21 38:14 43:12
    50:24 51:2
courts 14:9
Court's 9:18 12:12
    24:22 25:18 28:17
cowhide 14:20
crafted 30:11,12 32:19
created 12:1 34:25
Creek 1:9 2:9 13:22
    52:13
Creek's 34:17
critical 28:13 41:8
cross 43:18
crosshatching 34:23
crosswise 31:9
CSR 1:25
cuffs 27:21
customer 17:5 20:10
    22:3 23:4,8,12 24:8,9
    35:7 50:5
customers 20:12 22:5
    22:7 39:24 40:3,4
    42:16
cut 7:12 22:9
cutoff 17:4

                D
damage 18:23 37:18
    37:19 38:6 39:3
    41:22 42:10,14,15
    43:5,15,22
damages 3:5,8,10,12
    19:8,10,10,17,21,23
    20:9,19 23:14 37:1,14
    37:8,12,14 38:16,20

39:6 41:7 42:20,21
    43:23 44:15 45:18,21
    48:9,12,17,20,21,23
    49:5,11 50:20
data 3:7 20:8 21:3,5
    23:2,18,21,23 24:23
    24:24 25:5,22 35:10
    45:3 50:2,3,17
day 53:11
dealing 8:7,8
dealt 17:10
decades 6:19
decides 37:3
decorative 4:7
defendant 3:1 43:12
Defendant-Appellant
    1:10
definitely 42:14 43:5
definition 27:16
degree 11:2
delta 45:20
demand 25:18
demonstrate 25:25
depend 37:14
depending 23:19
depends 4:11
depictions 10:23
describe 28:20 32:12
described 14:10 42:3,6
    50:1 52:4
describes 21:21
describing 20:9 23:8
description 14:15
descriptive 15:13 19:3
    33:19,25
design 3:18 6:18,20
    10:1,5 11:9 12:1,2,6
    12:7,11,16 13:15,18
    26:15,21 29:2,4
    35:22 51:14 52:6
designed 3:23 6:16
    12:25
designer 3:23 6:13,24
    8:11 11:25
designers 34:4,8
designs 9:24 11:6,10

12:19 51:12
detailed 9:18
determination 36:13
    41:8
determine 17:18 33:2
determined 37:8
determines 37:6
difference 27:5,6
differences 8:13
different 4:16 5:22 6:6
    6:9 7:22 8:21,21
    11:19 14:1,9 17:7
    22:25 28:5 29:17
    51:15,17,21
difficult 8:10 19:14
difficulty 42:7 47:5
diminishes 44:23
diminution 24:16 26:1
directly 11:1 53:7
disappears 22:24
discuss 9:6 15:19
    20:18 26:18
discussed 11:14 26:14
discussing 9:2
discussion 17:5 28:14
distinctive 29:21 33:7
    34:2,19 35:13
distributed 39:9
District 1:12,12,13
    9:16
divide 22:4
doll 6:6
domain 10:1
doodads 5:6
dots 7:19 12:5
Dr 23:2 46:23
draft 32:9
drafting 30:14
draw 24:24
drawn 21:5
dreamed 10:15,16
dress 2:23 3:1,3 9:6,22
    12:17 13:2,9,17,23
    14:2,8,11,17,18,23
    15:4,9,22 16:18,20
    16:25 17:1,19 18:19

19:1,2,13,15 26:3,15
    27:8 28:23 29:3,9,19
    31:16 34:19 36:24
    37:5 48:15,16 51:4
    51:15,17,22,24 52:2
due 43:10

                E
E 2:7,14 5:3,8 6:8 7:10
    7:17,20 8:3,9,22,25
    9:14 10:9,12,19 11:4
    11:8 13:4 15:15 16:7
    16:11,13 17:21,25
    18:3,7,11 19:4,11
    21:13,17,19,24 23:1
    23:7,10 24:4,12,17
    25:6,9 26:6 49:23
    53:1,1
earlier 9:20 12:12
    36:12
easily 22:22
easy 14:4
effect 31:18 42:3,5
either 9:4,5 18:16 37:9
    39:14
element 25:13
elements 3:15 4:2,13
    4:21 6:17,20,25
    11:18,21,22 12:20,22
    14:11,16,18,20 15:3
    15:5 51:17
elicit 5:17
Ellen 38:22
embellished 29:21
    33:5 35:3
embellishment 27:24
    35:21
embossed 29:22
emphasize 8:10
employ 53:9
ended 26:7
Enterprises 50:22
entire 39:22
entitled 40:16
erred 2:20
error 2:24 9:2,7 13:20

16:5,12,19 17:11,17
19:9 28:16 29:10,13
32:25
**ESQ** 2:7,14 5:3,8 6:8
7:10,17,20 8:3,9,22
8:25 9:14 10:9,12,19
11:4,8 13:4 15:15
16:7,11,13 17:21,25
18:3,7,11 19:4,11
21:13,17,19,24 23:1
23:7,10 24:4,12,17
25:6,9 26:6,9,24
27:10 28:17 29:7
30:3,6,17,20 31:25
32:4,21 33:3,12,16
33:20,24 34:7 35:10
36:1,7,9,11,18,22,25
37:13,24 38:3,12,19
39:3,5,16,19 40:8,15
40:25 41:5,11,25
42:18 43:1,8,15,20
43:24 44:7,10,16,25
45:2,11,14,22 46:1,5
46:9,16,22 47:13
48:6,11,13,16,19
49:1,3,8,10,16,21,23
**essence** 21:9 23:16
**essentially** 21:4 38:24
50:20 52:3
**establish** 16:24 23:17
**estimate** 22:6 25:17,20
38:2 39:6,11 47:20
49:13
**estimated** 40:14
**estimates** 43:17
**estimating** 25:19
**estimation** 37:20,25
43:13
**event** 51:7
**everyday** 34:12
**evidence** 3:8 17:12
21:3 39:8 42:6 44:2
**exact** 19:12 47:14
**exactly** 14:16 15:4
16:25 18:7 21:20
23:3 24:17 25:20

41:12 44:11,21
**examined** 23:22
**example** 6:7 10:8
13:12 44:3
**excerpt** 13:7
**excerpts** 6:11 8:14
14:14 19:25 20:5
50:6,8,9 51:1
**exist** 37:5
**exists** 3:22
**expensive** 20:11 22:23
**expert** 3:6 19:24 20:14
21:4 26:1 35:19 36:3
38:1,21,21,22 40:18
47:23
**expertise** 47:24
**experts** 38:25 41:12
42:3 47:1
**explain** 14:4
**explained** 14:5 43:5
**explored** 14:9
**expression** 5:16,20,22
**extend** 4:3
**extends** 10:2
**extent** 4:5 7:2,11
**extra** 27:14

_____
                F
_____
**F** 53:1
**fabric** 29:21
**face** 6:7
**faced** 28:22
**fact** 6:19 7:9 12:4,21
18:4,6,12 35:22,25
37:17,19 38:19 39:3
40:22 41:1,7,25
42:20 43:11 46:19
50:14,18
**facts** 18:9 40:16,17
42:9 43:7 48:4
**factual** 32:23 33:1
**failure** 29:12
**fairly** 28:13
**fall** 11:6 22:24
**fanciful** 5:5
**far** 4:2 8:23

**fashion** 41:22
**Faulconer** 1:24 53:3
53:14
**faulty** 13:6
**favor** 19:7
**features** 51:18
**feel** 42:8,13 47:17,19
**feeling** 43:3
**fence** 12:18,24 14:12
52:4
**field** 50:5
**figure** 4:15 30:4 31:11
38:6 41:23,23
**figuring** 24:14
**find** 2:21,25 16:17
19:25 20:5 21:6
23:16 37:4 40:20
46:3,18 51:1
**finding** 28:21
**findings** 51:19
**fine** 41:22
**first** 15:1 18:17
**five** 2:10 39:13 47:17
**flesh** 39:15
**Fletcher** 1:21 6:1 7:6
7:11,18,21 8:7,17
12:10 13:14 21:10,16
21:18,23 22:9 23:5,9
24:3,6,13 25:21
30:14,18,23,25 31:2
33:11 35:18 36:12,15
36:17,19,21 37:22,25
38:4,18 39:2,4,14,17
42:12 44:2,8,20 45:1
45:3,12,17 48:23
**flip** 12:7
**floating** 42:17
**flower** 6:17 12:5
**focus** 2:17 9:5 20:1
**following** 14:19 39:8
45:20
**forecasts** 23:20
**foregoing** 53:4
**forever** 12:18
**forward** 19:24 40:20
**found** 3:1 17:13 28:12

29:8,9,14,17 40:2
46:12,19 48:17 49:5
49:5 51:10
**foundation** 40:20
46:18
**front** 3:7 50:7
**full** 3:4 13:24
**fun** 22:22
**function** 8:5
**funny** 36:3
**further** 17:5 52:7
**futures** 51:15

_____
                G
_____
**Gambini** 17:10 29:11
**gazillion** 5:1,4,9
**general** 9:10
**generally** 6:20
**generic** 3:3 13:3,5,9,12
13:15,23 14:2,5,7
15:6,21,21 16:4,17
16:18,21 17:19,22
18:25 19:2 27:4,8,16
27:25 28:7,10,22,23
29:1,2,9,20,24 30:10
30:15 31:6,14 33:6
33:12 34:22 35:1,17
35:21,25 36:14,19,24
37:3,7 50:25 51:10
**genericness** 17:3,4
26:11,18 27:14,15
28:20 29:18 30:8
31:15 32:6,14,23
33:1
**generic/generic** 33:23
**getting** 15:5
**give** 29:12 31:20 34:21
43:9 46:21 49:19
**given** 6:3 27:12 29:13
29:15,18 32:2,11,15
33:16 39:7 40:2
49:12 51:16
**giving** 32:17
**glued** 48:5
**go** 5:6 15:11 16:4 29:5
31:10 33:2 39:5 41:3

45:6
goes 25:9 28:20
going 8:2 12:9 19:7
    26:11 34:24 38:13
    44:4,5 52:1
Goldstein-Lynch
    38:22
good 2:8 22:6 26:6,9
    32:7 35:15 39:23
    44:19
granted 18:13,18
great 48:4
grew 10:13
guess 11:5 15:18 18:25
    30:23 31:3,21 45:15
    49:4

_____

**H**
hamburger 14:6
handbag 27:23 36:3
    36:10 44:4,6 52:6
handle 34:24 35:2
handles 29:23 33:10
    34:22
happened 44:12
happening 31:12
happens 40:1
hard 13:13 30:9 35:19
    38:6,17
harm 38:23
harmless 9:2,7 16:5,19
    17:11,20 29:10,13
Harper 3:14 4:4 11:13
    11:15
head 6:22
hear 26:5 31:2
heard 51:23
heart 3:18,19,24,25
    4:7,7,8 6:3,5,6,10,13
    6:15,24 7:3,4,14,15
    7:22 8:11 9:13 11:25
    12:3,21,24 14:19
hearts 5:5 8:13,15
    12:5 14:21 29:23
HELD 1:19
help 2:13 42:8

helpful 45:10 52:11
hereunto 53:10
Hey 34:20
hierarchy 26:23 33:14
    33:17 34:1
highly 29:20 33:5
holding 38:15
Honor 9:15,20 15:2
    17:21 24:18 25:20
    27:10 41:11 49:21
Honors 2:8 26:9 49:24
hotbed 12:14
house 3:14 4:4 11:14
    11:15 40:10
Huff 1:13 31:7 32:7
huge 39:20
hundreds 6:19 39:10
hypothetical 50:14
    51:7

_____

**I**
idea 10:13 12:23 50:3
ideas 25:24
identical 4:8,22 7:4,24
    8:16,18,24
identicality 9:11
identified 13:16 40:13
identity 4:22 5:18,24
ill-defined 19:15
immediately 8:1
important 18:16 51:3
importing 21:14 24:25
impossible 37:4
incapable 27:17
including 14:20
inconsistent 51:19
incredibly 52:5
increment 19:17
indirectly 53:8
individual 3:18
industries 25:23
industry 12:20,22
    15:7
informed 38:2
infringe 4:7
infringed 7:5

infringement 26:3
    51:4
inherently 34:1
innovations 12:19
inquiry 50:17
inserting 30:14
instance 18:17
instructed 2:21,25
    13:8,21,23 16:20
    17:2
instructing 3:2
instruction 9:4 13:2,5
    13:7 15:2,4,20 16:15
    17:14,20 28:6,19
    29:12,13,15,18 30:6
    30:11,15 31:12,17,18
    32:7,11,18,24,25
    51:3,3,8
instructions 9:3 16:9
    17:11 18:15 28:13
    29:6 31:22 32:15,17
instructive 6:14 9:22
    51:11
intellectual 14:13
interested 9:2 53:7
interrogatories 14:16
interrogatory 51:25
intersects 43:25
involving 11:15
irrelevant 12:6 50:16
issue 2:19,23 3:5,14
    6:15 9:21,23 13:2
    14:10 18:16 19:21,23
    24:24 26:12 32:23
    33:1 44:4
issues 2:15,18 15:1
    18:19
item 27:9 29:24 39:18
items 51:10

_____

**J**
JANUARY 1:17 2:2
job 39:23
judge 1:13,20,21,22
    2:12 4:10 5:4 6:1 7:6
    7:11,18,21 8:7,17,19

8:23 9:9 10:6,10,14
    10:20 11:5,18 12:10
    13:1,8,13 15:11,16
    16:8,12,14 17:16,24
    18:1,4,8,21 19:5
    21:10,16,18,23 22:9
    23:5,9 24:3,6,13 25:3
    25:7,20 26:4,7,19,25
    28:3,24 30:1,4,14,16
    30:17,18,23,24,25
    31:1,2,3,7,8 32:1,7,8
    32:10,20,22 33:11,13
    33:18,22 34:5 35:8
    35:18 36:6,8,10,12
    36:15,16,17,19,20,21
    36:23 37:11,22,25
    38:4,18 39:2,4,14,17
    40:6,9,17 41:1,6,15
    42:7,12,19,25 43:2
    43:14,17,21,25 44:2
    44:8,14,18,20 45:1,3
    45:12,15,17,24 46:2
    46:8,14,17 47:3,22
    48:7,18,21,23,24
    49:2,4,9,15,17,22
    50:1,13 51:1 52:9
judgment 18:5,10,13
    18:18 35:15 36:19
    48:20
jurors 51:16
jury 2:21,21,25 3:3,7,9
    9:3,4 13:2,5,21,22
    14:5 15:1,3,20 16:4,9
    16:19 17:2,11,13,23
    18:15,20 19:1,7 28:6
    28:13,21 29:8,14,16
    31:5,12 33:2 37:3,6
    37:20 38:2 39:5 40:2
    40:15 46:11,12,21,24
    48:16 49:12 50:7,10
    50:24 51:7,10 52:1
justify 46:14

_____

**K**
keep 19:6
Kennedy 17:10,15

29:11
**kind** 7:11 10:17 12:11
38:7 41:6 42:11 43:2
46:3
**kinds** 47:8
**knocked** 50:23
**knock-off** 22:19 34:12
42:15
**knock-offs** 38:23,25
39:8,12,14,20,22
41:2,14,17,20 42:1
**know** 6:19,20 9:1 11:2
12:13 15:12 16:19
19:2,21 21:7 23:16
23:24 25:10 27:5,25
28:14 29:1,5 31:8
32:23 33:22 39:19
42:21 43:4,8 45:13
45:14 47:22 50:14

_____
**L**
**L** 1:13
**laid** 19:18 45:17
**Laughter** 36:5
**law** 2:23 3:14 10:7,8
11:20 15:23 17:19
29:24
**lawyer** 17:3
**le** 18:9
**leapfrog** 16:16
**leather** 14:20,23 15:7
27:23 33:10,10 34:21
34:22
**led** 20:17,18
**left** 6:21 37:20
**legal** 2:17 6:15 13:20
18:9 28:16 32:25
**legally** 16:9
**legitimate** 50:4
**lessons** 29:11
**letter** 29:22
**let's** 16:8 17:17 18:23
18:24 19:1
**life** 36:4
**liked** 47:8
**limited** 6:2 8:5 17:1

**line** 25:4 27:3 34:12
51:16
**link** 34:24 35:2
**litigation** 12:14
**little** 5:25 7:19,22
11:15 14:8 22:1 43:3
47:14
**logic** 29:7
**logical** 40:20 45:17
**logically** 27:13
**longer** 26:21 42:4
**look** 2:13 4:8 6:11,21
6:22,23 7:16 14:14
16:3 21:19 23:14,17
23:18,18,20,20 29:20
33:4 34:9,20 35:15
36:20 50:25
**looked** 4:19
**looking** 7:14,15 11:5
16:1
**looks** 50:19
**loss** 50:10
**lost** 3:9 20:3,4,6,10,23
22:3 23:4,8,11,15,17
23:24,25,25 24:4,7
24:15,24 25:18,24
50:5,14
**lot** 23:14 40:19,24
**lots** 6:4 42:15
**Louie** 41:21,21
**love** 35:5
**Lowry** 4:5

_____
**M**
**M** 1:20,24 53:3,14
**main** 9:5
**making** 46:25
**MARGARET** 1:20
**Marilyn** 1:13
**mark** 13:9 15:21 27:8
28:7,10 29:2 30:15
**market** 23:17 25:22
35:4,20,23 44:22
52:5
**marketing** 8:12,15
39:22

**markings** 27:18
**marriage** 53:6
**massaging** 24:25
**matching** 42:13
**mathematical** 20:24
**Mattel** 3:15 5:9,10,11
**matter** 17:19 29:7,24
53:8
**McKEOWN** 1:20 2:12
4:10 5:4 8:19,23 9:9
10:6,10,14,20 11:5
11:18 13:1 15:11,16
16:8,12,14 17:16,24
18:1,4,8,21 19:5 25:3
25:7 26:4,7,19,25
28:3,24 30:1,4,24
31:1,3 32:1,20,22
33:13,18,22 34:5
35:8 36:6,8,10,15,16
36:20,23 37:11 42:7
42:19 43:2,14,17,21
43:25 44:14,18 45:15
45:24 46:2,8 47:22
48:7,18,21,24 49:2,4
49:9,15,17,22 50:1
51:1 52:9
**mean** 4:22 6:3 7:7,8
10:17 17:24 21:16,18
25:9 30:4 31:21,23
33:25 35:18,23 38:9
40:21,23 41:2,19
43:4,21 47:7
**meaning** 3:2 10:7
13:10,19 15:14,21
16:17 17:5 19:6
26:17 27:1,7,17 28:1
28:7,10,22 29:1,4,5,8
31:19 34:6
**meaningless** 50:19
**means** 10:10 11:19
40:24
**Melanie** 1:24 53:3,14
**mentioned** 9:20
**merging** 34:6
**metal** 34:24
**metallic** 35:2

**Michigan** 34:11
**middle** 7:21
**million** 35:5 39:9,12
39:24
**mind** 44:11
**minutes** 2:10 49:19
**misdetermination**
16:17
**misstate** 16:9
**misstates** 15:23
**mistake** 21:11,14
**mixing** 42:13
**modicum** 9:25
**moment** 33:4
**monetize** 25:12,16
**Monica** 34:10
**morning** 2:8,16 26:9
**mother** 47:7
**move** 4:22 13:1 42:23
47:13
**multiple** 4:19 52:2
**multiplier** 20:17
**Murphy** 20:21 50:22

_____
**N**
**name** 2:9 53:10
**narrow** 5:16,21 21:10
**narrowness** 5:12
**necessarily** 39:17
41:17
**need** 2:21 10:17 19:8
20:23 21:1 24:23
27:14 28:2 29:1,4
43:23
**needed** 18:20
**needling** 43:3
**never** 20:13 30:12
37:16 40:6 47:4,11
47:15
**new** 11:20
**Ninth** 1:2 11:16 15:24
**nomenclature** 14:1
**non-generic** 31:17
**non-genericness** 51:5
51:9
**normally** 33:1 42:10

**Northern** 9:16
**Nos** 1:4
**notes** 37:21
**notion** 5:11 7:25 12:15
  17:12 47:10
**novel** 11:21
**number** 2:15,19,23
  6:2,9 19:16 21:21
  22:1,4 24:15 39:20
  40:12 41:10 43:23
  46:19,21,23,24,25,25
  48:25 50:14,18,19
  51:21
**numbers** 40:11,19
  42:9 44:9,10 45:12
  45:19,20 46:2,12
  48:2,17

**O**

**object** 32:1,11
**objected** 32:14
**objection** 30:18 32:3
  32:18
**objections** 31:23 32:16
**obviously** 48:24
**offense** 31:15
**offered** 41:10 46:15,17
**offers** 20:2
**officer** 8:12,15
**Oh** 33:16 36:18 37:10
  41:3
**okay** 2:14 7:19 36:18
  37:13,23 38:3,12
  45:25 46:8,15 49:9
**old** 24:21
**omitted** 51:2
**once** 42:20
**one-fifth** 42:2
**open** 30:17 32:8
**opportunities** 20:6
**opposed** 10:14
**ORAL** 1:16 2:3
**order** 4:6 17:9 23:2
**organizer** 11:16
**original** 3:20 10:24
**originality** 9:25 10:3,7

10:10,17
**outcome** 17:7
**outside** 4:1
**overinclusive** 52:3
**overreading** 5:9
**overturned** 37:17
  50:24
**owner** 34:11
**owns** 35:7

**P**

**Page** 5:12 21:19 50:25
**paid** 21:7
**pan** 29:6
**panel** 15:23
**paper** 8:10
**papers** 30:22
**Parchment** 37:15
  38:14 43:9 50:21
**Parlor** 50:22
**parse** 16:2
**part** 9:7 15:8 18:18
  22:20 45:21,22,24
  48:19 51:24 52:5
**particular** 4:1 12:20
  13:17 20:1 45:7
**particularly** 12:15
  38:15
**parties** 53:7
**party** 17:14
**PASADENA** 2:1
**passed** 7:12
**patent** 10:8 11:20
**path** 17:18 19:12
**pattern** 34:23
**Pause** 26:8
**people** 12:4 22:19,20
  34:2,10,12,15,19,24
  35:3,5 39:20 41:16
  42:15 46:25 47:15,16
  47:18,20
**percent** 40:4
**percentage** 48:1
**permitted** 17:3
**permutations** 51:22
**persistent** 16:23

**person** 22:15
**Peter** 26:9,9,24 27:10
  28:17 29:7 30:3,6,17
  30:20 31:25 32:4,21
  33:3,12,16,20,24
  34:7 35:10 36:1,7,9
  36:11,18,22,25 37:13
  37:24 38:3,12,19
  39:3,5,16,19 40:8,15
  40:25 41:5,11,25
  42:18 43:1,8,15,20
  43:24 44:7,10,16,25
  45:2,11,14,22 46:1,5
  46:9,16,22 47:13
  48:6,11,13,16,19
  49:1,3,8,10,16,21
**phrase** 5:10 14:12
**pieces** 31:9
**pin** 38:17
**pink** 19:6
**place** 33:13,15
**plain** 27:18 33:10
  34:21
**plainly** 9:7 19:23 20:5
**plaintiff** 26:16 51:4,9
**Plaintiff-Appellee** 1:7
**plaster** 6:22
**play** 19:13,16
**playing** 22:1
**please** 2:8,11
**pleasure** 22:23
**pocket** 27:21
**point** 15:6 19:20 24:2
  24:21 28:17 36:4
  43:18 44:13 46:22
  50:20 51:10
**pointed** 20:20 50:13
  51:2
**points** 14:21 46:9
  49:24 52:7
**Polar** 20:21 21:1 24:22
  50:21
**popular** 40:23
**popularity** 40:24
**possibly** 28:1
**power** 39:22

**powerful** 39:21
**precedence** 9:18 12:12
  25:18
**precise** 41:23 42:23
**precisely** 21:11
**precision** 43:23
**predicate** 20:8 21:15
  21:18 23:11 51:8
**predominant** 2:17
**presented** 51:7
**PRESIDING** 1:20
  2:12 4:10 5:4 8:19
  8:23 9:9 10:6,10,14
  10:20 11:5 13:1
  15:11,16 16:8,12
  17:16,24 18:1,4,8,21
  19:5 25:3,7 26:4,7,19
  26:25 28:3,24 30:1,4
  30:24 31:1,3 32:1,20
  32:22 33:13,18,22
  34:5 35:8 36:6,8,10
  36:16,20,23 37:11
  42:7,19 43:2,14,17
  43:21,25 44:14,18
  45:15,24 46:2,8
  47:22 48:7,18,21,24
  49:2,4,9,15,17,22
  52:9
**presumption** 42:11
**price** 22:12,13 42:2
**probably** 11:12 19:16
**problem** 15:18 20:14
  20:20 21:4,9 23:2,22
  28:24 30:24 31:7
  41:9 50:6
**problems** 10:21
**proceeding** 26:8
**proceedings** 53:5
**product** 10:5 13:15,18
  22:13,14,15,23 24:8
  26:15,21 27:16 28:22
  35:5 45:7 47:4 52:5
**Productions** 20:21
  21:2 24:23
**products** 11:6 12:16
  19:16 20:7 22:19

23:18 25:23 44:3
  45:6,8 47:8,8,9 51:16
**profits** 3:9 20:24
  23:15,17 24:5,24
  25:18,24 48:10,12,17
  49:6,7
**proof** 13:18
**properly** 29:15
**property** 14:13
**proposed** 32:14 46:13
**proposition** 41:19
**protect** 10:2
**protectability** 5:12
**protectable** 3:16,20,23
  5:15,20 11:23,24
  12:1,2 26:15 27:9
**protection** 3:4 4:9
  11:2 13:11,14,24
  14:13 28:8,11
**prove** 26:17 27:1
**proven** 37:18,19 43:11
  51:9
**proving** 26:14
**public** 10:1
**pulling** 25:24
**purchasing** 23:21
**purely** 46:18
**purportedly** 40:14
**purpose** 7:12 48:8
  49:4
**purposes** 32:25
**purse** 22:15,16
**purses** 22:21 35:19
**pushed** 40:19
**put** 3:6 4:13,21 6:25
  7:18 10:25 12:3,11
  17:23 27:7 47:17,19
  50:7 52:1

**Q**

**question** 2:20,24 3:1
  3:17 4:1,12 9:2
  10:25 11:1,13 12:9
  14:2,8,9 15:25 17:11
  17:22 18:1,12,22,25
  19:1,14 24:13,13,18

25:3 35:14 36:11
  45:3,19 51:6,8
**questioned** 37:16
**questions** 18:5 32:22
  49:25 52:8
**quick** 46:9 49:24
**quickly** 19:20 50:25
**quilt** 34:23
**quilting** 35:2
**quite** 7:24 22:17
**quote** 51:11

**R**

**R** 1:22 53:1
**radar** 47:12
**rails** 18:15
**raise** 50:21
**raised** 2:15 32:18
**range** 5:15,20 46:15
  46:17,20
**read** 4:11,12 22:11
  24:6 31:3,7,24
**reading** 27:6
**real** 29:13 34:1 39:17
  41:9
**reality** 46:18
**really** 4:10 7:13,15
  10:22 16:3,3 28:1
  29:9 31:11 33:17,25
  34:19 37:15
**reason** 12:9,14 13:6
  36:25 37:2
**reasonable** 3:11 25:17
  29:14,16 37:18,20,25
  38:1 46:22 49:13
  50:19
**reasonably** 39:6
**reasons** 12:10
**rebuttal** 2:10 49:20
**receive** 13:10,24 28:8
**recipe** 23:16
**recitation** 9:18 51:20
**recognize** 34:2,25 35:3
**recollection** 30:21,25
**reconciling** 30:9
**record** 6:11 8:11,14

13:7 14:14 16:22
  19:25 20:5 28:15
  44:2,11 45:13 50:3,6
  50:8,8 51:1 53:5
**recover** 48:11
**referencing** 13:2,5
**reiterated** 50:9
**related** 18:22 43:6
**relationship** 40:21
**relatively** 9:19 14:4
  25:10 51:12
**relevant** 3:7 21:3
  24:23 50:17
**relied** 5:11
**remanded** 36:13
**remember** 18:18
**reply** 32:13
**representing** 2:9
**request** 30:9
**requesting** 30:7 32:6
**requirement** 26:18
  27:15 30:10
**requirements** 26:14
**requires** 13:18
**rescue** 16:18
**respect** 9:3,24
**Respondent** 26:10
**Respondent's** 32:12
**response** 4:24 5:7,8
  14:15 27:11
**responses** 51:25
**rest** 18:20 28:19,19
**result** 8:21 37:7
**results** 40:13
**retail** 34:11 39:10
**retry** 37:1,9
**return** 20:13
**RICHARD** 1:22
**ridiculous** 22:16
**right** 5:3,3 6:23 7:10
  7:10,20,20 8:25 9:21
  9:23 10:12 11:4,18
  18:3,11 19:4 22:17
  23:3,9 26:4 31:23
  36:21 38:10,10 39:19
  43:1,14 46:4,7 48:13

48:22 49:2,8
**risk** 43:12
**ropes** 7:19
**roping** 6:17,21 12:4
**Ross** 26:5,9,10,24
  27:10 28:17 29:7
  30:3,6,17,20 31:25
  32:4,21 33:3,12,16
  33:20,24 34:7 35:10
  36:1,7,9,11,18,22,25
  37:13,24 38:3,12,19
  39:3,5,16,19 40:8,15
  40:25 41:5,11,25
  42:18 43:1,8,15,20
  43:24 44:7,10,16,25
  45:2,11,14,22 46:1,5
  46:9,16,22 47:13
  48:6,11,13,16,19
  49:1,3,8,10,16,21
**rug** 11:10
**run** 10:21 13:25
**running** 19:21
**runs** 42:11

**S**

**sale** 20:3,4,4 23:25
  24:1,7 38:8,23 44:4
**sales** 20:16,17 21:15
  21:15,25 22:24 23:11
  23:24 24:7,15 25:19
  25:22 26:1 38:23
  44:3,24 45:20
**Satava** 4:5
**satisfaction** 3:10
**saw** 34:15 39:12,14,20
  42:15
**saying** 22:11 24:7,11
  24:19 27:11 28:4,4
  33:3 43:10,22 44:17
  45:16 46:14
**says** 5:14 6:14 12:2
  22:2,4 27:7 28:9,25
  28:25 32:13 37:17
  38:21
**scheme** 16:5
**screen** 47:12

ORAL   ARGUMENT − 1/13/2011

scrolls 6:18,23 12:5
sculpted 29:23
Second 11:11 12:13
   51:13
secondary 3:2 13:10
   13:18 15:14,20 16:17
   17:5 19:5 26:17 27:1
   27:7,17 28:1,7,10,21
   29:1,4,5,8 31:19 34:6
see 6:21,22,23 22:20
   28:3,15 29:6,20
   35:20 39:17 50:21
seeing 8:1
seen 41:1,2,16
selection 4:2
sell 20:6
selling 20:11 34:12,14
   34:16 42:2
sells 35:4
send 18:16
sense 22:12 24:8
sent 18:20 31:21
sentence 38:14
separate 15:1
separately 3:2
September 53:11
set 2:10 19:12
settled 32:11
shape 6:3,5,6,10 7:21
shirt 27:20,22 33:8
shopper 47:7
show 19:3 20:23 21:1
   34:18 39:22 47:25
showing 31:16 51:5
shows 35:11 44:3
side 7:18,18 8:2 12:7
   22:2 24:10,10 29:14
   38:6
sides 38:25 41:13 47:1
significant 40:5 49:6
silver 3:18 4:6,7 6:18
   11:25 14:18,21 15:10
   29:23
silversmithing 12:23
similar 22:21 47:10
similarity 2:22

simple 25:10 35:21
simply 4:20 16:16 29:8
   40:20
single 27:21,23
sitting 32:8
situation 28:14
Skye 4:17
small 46:24 50:15
sold 35:25 38:7,25
   42:16
somewhat 38:5
soon 44:22
sorry 36:22
sort 8:5 10:1 23:19
   31:18
sought 13:22
sounds 45:5
source 11:1 13:17
Southern 1:12
speaking 15:22
special 22:20
specific 28:12
specifically 5:13
specification 51:14
speculate 44:1
speculation 43:18
speculative 42:22,24
   46:19
spoke 16:24 30:12
stand 35:23
standard 4:23 5:17,23
   8:20 17:8
standing 11:17
start 21:8 24:25 25:13
   25:19 26:11
started 28:5 32:8
   37:23
starting 8:4 24:2,21
   50:17
starts 22:1
stated 38:15
statement 28:12,18
   31:4
States 1:2,12 39:10
statistics 25:22
Stetson 2:7,9,14 5:3,8

6:8 7:10,17,20 8:3,9
   8:22,25 9:14 10:9,12
   10:19 11:4,8 13:4
   15:15 16:7,11,13
   17:21,25 18:3,7,11
   19:4,11 21:13,17,19
   21:24 23:1,7,10 24:4
   24:12,17 25:6,9 26:6
   49:19,23
stick 19:10
stop 3:4 13:24
stopped 47:16
store 34:11 35:10
stores 39:10
Story 37:15 38:14 43:9
   50:21
strains 14:1 20:2
strikes 40:9
struggling 42:22
student 25:14
students 21:8
studies 47:24
submit 18:14 52:8,13
subscribed 53:10
subsequent 19:18
substantial 2:22 3:8
   11:3 21:3
substantiated 50:5
suffers 41:21
suggest 42:21
suggesting 24:20
   41:12
suggestion 15:19
summary 18:5,12,18
   35:14
superfluous 27:15
supplemental 50:8
support 17:12 23:3
   24:23
supported 3:7 21:3
supporting 21:5 50:3
supposed 41:3
Supreme 15:24 16:15
   24:22 26:14,17 27:12
   37:16,21 43:12
sure 7:17 11:8 13:4

16:11 21:12,13 31:5
   38:18 39:2,4,4 48:5
symbol 8:19
sympathetic 7:7 38:5

─────────────

**T**

T 53:1,1
take 6:25 19:17 22:3
   23:11 24:21 27:1
   40:16,17 48:1,1
taken 49:6
talk 9:10 29:10 37:11
talking 5:19 7:9 10:22
   12:16,17 14:22 23:19
   25:21 32:24
taste 35:17
teach 4:5
teaches 4:5
tell 44:9 46:20
telling 6:14 21:11
tells 28:25 29:2,3,4
tend 9:17
terms 10:24 51:17
testimony 9:8 12:3
   15:9 16:2 19:25
   20:15 23:23 24:6
   34:10,15 35:6 40:18
tests 7:13
thank 2:7,14 26:6
   49:17,21,22,23 52:9
   52:10
theories 3:8 22:25
   50:23
theory 20:3,9,10,16
   21:5,20 22:2,3,12,18
   22:18 23:3,4,6,7,8,12
   23:24 24:5,25 25:1,7
   42:10,10,20 44:15,21
   44:21,24 45:1,18
   50:6,8
thin 2:19 3:21 9:5,10
   10:2
thing 11:23 32:9 41:17
   43:4
things 5:6 6:4,10 7:8
   7:18 14:12 16:6 18:5

34:18 35:9,11 39:7
41:1,16 42:16
**think** 2:17 4:10 5:9
6:14 7:13,14 8:5,25
9:12,14,17 10:4
11:12 12:12 15:16,22
15:23 17:6,21 19:23
22:17 24:11,12 25:4
25:10 26:4,20 27:12
28:4,21 29:7,16 30:6
33:4,6,20 35:13,14
37:2 43:8,9 45:16
49:11,14 50:2 51:11
**thinking** 27:13
**third** 3:5
**thorough** 9:15
**thought** 31:4 34:16
**threatened** 52:4
**three** 2:17
**threshold** 17:4
**throw** 15:8
**tile** 4:18 9:20,24 10:1
11:9
**time** 2:16 19:22 26:7
30:9 35:11 49:16
**today** 51:23 52:11
**told** 41:15,16
**top** 3:13 15:21 27:8
**total** 21:7
**totally** 10:15 42:23
**trade** 2:23 3:1,3 9:6,22
12:17,20 13:2,9,17
13:23 14:2,8,11,17
14:18,22 15:4,9,21
16:18,20,25,25 17:19
18:19,25 19:2,13,15
26:3,15 27:8 28:23
29:3,9,19 31:16
34:18 37:5 48:15,16
51:4,15,22,24 52:1
**trademark** 13:10 14:3
14:6 15:17 26:22
27:3 28:8,11 33:14
38:16 43:10
**transaction** 35:12
**transactions** 50:11,15

50:16
**TRANSCRIBED** 1:24
**transcript** 31:11,24
53:4
**translate** 13:14
**trial** 14:21 19:8 51:21
**tried** 30:4
**trim** 29:22
**trouble** 35:23 45:8
48:3
**true** 8:4,9 10:9 15:15
53:4
**try** 2:13
**trying** 14:10 16:2
31:10,11 47:19
**Tufenkian** 11:11
**Tugboat** 20:22 50:22
**tuition** 21:7 25:13
**turn** 20:17,18 40:1
**two** 2:23 8:13,15 14:19
14:25 17:9 20:1
22:25 33:10 34:22
**types** 23:20

**U**

**ubiquitous** 40:22
**ubiquity** 40:23
**UCLA** 21:9
**UCLA's** 25:13
**UCLA/USC** 25:11
**Uh-huh** 6:8 8:3 42:18
43:24
**unauthorized** 5:16
**unconnected** 42:9
**undergraduate** 25:14
**underlying** 7:12
**understand** 7:23
21:12 27:10 28:17
40:10,21 41:7 45:16
**understanding** 32:5
35:24
**understood** 27:2
**unintelligible** 5:10
24:1 36:8
**United** 1:2,12 39:10
**unoriginal** 3:15 11:17

11:19,21
**unprotectable** 4:13,21
5:21 15:17
**unusual** 10:15
**upheld** 18:23
**upper** 26:22
**USC** 21:7
**USC's** 25:14
**use** 4:25 14:11 49:12
**usually** 17:24 18:1
32:23 47:23
**utterly** 15:6
**U.S** 26:13,17 27:12
37:21

**V**

**v** 1:8
**value** 24:16
**various** 14:21
**verdict** 19:18 50:24
51:18
**versus** 4:5 52:13
**view** 27:5 33:14 37:14
40:15
**viewer** 7:25
**viewings** 40:13
**violation** 38:8
**vir** 7:6
**virtual** 4:22 5:18,24
9:11 11:3
**virtually** 4:8 7:4,24
**visual** 7:9 8:8 10:22
12:11 13:14
**vodka** 4:17
**Vuitton** 41:21,21

**W**

**walked** 20:12 22:7
**Walker** 9:15 11:10
**walking** 17:18 22:21
**Wal-Mart** 26:13,13,20
27:6,13 30:10 31:9
33:16
**want** 12:18 15:8 20:1
21:6 31:5 33:22
37:11

**wanted** 31:17
**wasn't** 22:18 45:22,24
**way** 4:17 17:13 19:18
21:6 28:12 30:13
31:9 32:4 40:5 46:3
**ways** 4:16,19 5:5,22
6:2 23:13 25:2
**wear** 36:23
**wearing** 27:20
**went** 18:15,24,24
**we'll** 26:4 31:2 49:19
52:12
**we're** 5:19 7:8,8,9 8:7
8:8 10:22 11:13
24:19 41:3 42:22
47:19
**we've** 2:15 11:14
**white** 27:20 33:8
**WILLIAM** 1:21
**wiped** 37:5
**witness** 15:9
**witnesses** 14:22 16:24
**women** 42:4
**wondering** 16:5
**word** 13:13 14:4,5,6
**words** 7:8,12 8:5
10:21,22 43:11,21
**work** 3:15,22 4:6 7:1
**worked** 32:4
**world** 15:17
**wouldn't** 15:11 33:1
**wrong** 25:5 30:25
32:24 50:18
**Wunderlich** 20:2
23:10 46:13,23 50:7
**Wunderlich's** 19:24
23:2,23 46:11 50:23

**Y**

**yeah** 8:8 21:23 30:23
31:1 32:4 35:18
36:16,17,21 37:22,24
39:16 41:5 42:13,25
44:25 45:2,11 46:5
48:6 49:3,10
**year** 35:5 47:19

**years** 6:19 27:2 47:17
**Yurman** 51:12 52:4

**Z**
**Zanger** 9:16 11:10

**$**
**$400** 35:4

**0**
**0** 2:5 52:14
**06-CV-1848-H(POR)**
  1:13
**09-55624** 1:4
**09-56038** 1:4

**1**
**1** 40:4
**1-to-1** 21:24 22:12
  38:7
**1.7** 20:17 35:8,11
**10** 35:7 39:25
**1139** 5:12
**115,000** 20:6,16 21:15
  50:11
**117** 13:8
**12** 35:7 39:25
**120** 39:9
**13** 1:17 2:2
**13,000** 40:2
**147** 50:25
**1771** 50:9
**18th** 53:11
**19** 30:15
**1931** 37:15

**2**
**2** 39:24
**20,000** 22:5
**2007** 9:19
**2011** 1:17 2:2
**2012** 53:11
**236** 6:11
**237** 6:11
**271** 8:14
**274** 19:25 50:7
**276** 20:6 21:19

**278** 20:6 21:20
**286** 20:1 50:7

**3**
**300** 35:4

**5**
**50** 39:11

**6**
**6** 22:4
**6420** 1:25

**7**
**7** 22:4

1

## PROOF OF SERVICE

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

        At the time of service, I was over 18 years of age and **not a party to this action**.  I am
employed in the County of Los Angeles, State of California.  My business address is 808 Wilshire
Boulevard, 3rd Floor, Santa Monica, CA 90401.

4

5

        On September 28, 2012, I served true copies of the following document(s) described as
**SUPPLEMENTAL DECLARATION OF DAVID W. SWIFT IN SUPPORT OF
DEFENDANT NHW'S MOTION FOR SUMMARY ADJUDICATION AS TO
PLAINTIFF'S LOST PROFIT DAMAGES** on the interested parties in this action as follows:

6

7

### SEE ATTACHED SERVICE LIST

8

        **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the
document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case
who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case
who are not registered CM/ECF users will be served by mail or by other means permitted by the
court rules.

9

10

11

        I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct and that I am employed in the office of a member of the bar of this
Court at whose direction the service was made.

12

13

        Executed on September 28, 2012, at Santa Monica, California.

14

15

16

                                        */s/ Nikki R. Shlosser*
                                        Nikki R. Shlosser

17

18

19

20

21

22

23

24

25

26

27

28

*KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP*
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

10618.00002/140716.1                                        10-CV-00419-CAB-WVG

**SUPPLEMENTAL DECLARATION OF DAVID SWIFT**

**SERVICE LIST**
**Brighton Collectibles**
**10618**

| | |
|---|---|
| Peter W. Ross<br>    pross@bwgfirm.com<br>Keith J. Wesley<br>    kwesley@bwgfirm.com<br>BROWNE GEORGE ROSS LLP<br>2121 Avenue of the Stars, Suite 2400<br>Los Angeles, California 90067<br>Telephone:  (310) 274-7100<br>Facsimile:   (310) 275-5697 | Attorneys for Plaintiff<br>BRIGHTON COLLECTIBLES, INC. |
| Gary Freedman<br>    goromans@aol.com<br>LAW OFFICES OF GARY FREEDMAN<br>1149 Third Street, Suite 200<br>Santa Monica, California 90403<br>Telephone:  (310) 576-2444<br>Facsimile:   (3100 576-2440 | Attorneys for Plaintiff<br>BRIGHTON COLLECTIBLES, INC. |
| Dan MacLemore<br>    dmaclemore@fulbrightlaw.com<br>FULBRIGHT WINNIFORD, APC<br>425 Austin Avenue, 22$^{nd}$ Fl.<br>P.O. Box 445<br>Waco, Texas 76701<br>Telephone:  (254) 776-6000<br>Facsimile:   (254) 776-8555 | Co-Counsel for Defendant and Third-Party<br>Defendant<br>RK TEXAS LEATHER MFG, INC. d/b/a<br>TEXAS LEATHER MANUFACTURING |
| James C. Potepan<br>    jpoteman@rmkb.com<br>Thomas M. O'Leary<br>    toleary@rmkb.com<br>Brian C. Vanderhoff<br>    bvanderhoof@rmkb.com<br>ROPERS, MAJESKI, KOHN & BENTLEY<br>515 South Flower Street, Suite 1100<br>Los Angeles, California 90071-2213<br>Telephone:  (213) 312-2000<br>Facsimile:   (213) 312-2001 | Co-Counsel for Third-Party Defendant<br>JOY MAX TRADING, INC. |
| Mark B. Mizrahi<br>    mmizrahi@brookskushman.com<br>Lance M. Pritikin<br>    lpritikin@brookskushman.com<br>BROOKS KUSHMAN P.C.<br>601 S. Figueroa Street, Suite 2080<br>Los Angeles, California 90045<br>Telephone:  (310) 348-8200<br>Facsimile:   (310) 846-4799 | Co-Counsel for Third-Party Defendant<br>JOY MAX TRADING, INC. |

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**SUPPLEMENTAL DECLARATION OF DAVID SWIFT**

**Kinsella Weitzman Iser Kump & Aldisert LLP**
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

| | |
|---|---|
| Mark A. Canter | Co-Counsel for Third-Party Defendant |
| Chanille Carswell | JOY MAX TRADING, INC. |
| BROOKS KUSHMAN P.C. | |
| 1000 Town Center, Twenty-Second Floor | |
| Southfield, MI 48075 | |
| Telephone:  (248) 358-4400 | |
| | |
| Kent M. Walker | Counsel for Third-Party Defendants |
|  kent@kentwalker.com | AIF CORPORATION d/b/a GLOBAL TIME |
| WALKER, PENDERGRASS | INTERNATIONAL, LUCKY-7 |
|  & TIETSWORTH LLP | INTERNATIONAL and TIME WORLD |
| 402 W. Broadway, Suite 400 | |
| San Diego, California 92101-3504 | |
| Telephone:  (619) 446-5603 | |
| Facsimile:   (619) 595-3150 | |
| | |
| Chong H. Roh, Esq. | Counsel for Third-Party Defendants |
|  chroh@parklaw.com | K&L IMPORTS, INC., YK TRADING, INC. |
| John K. Park, Esq. | and JCNY |
|  firm@parklaw.com | |
| PARK LAW FIRM | |
| 3255 Wilshire Boulevard, Suite 1110 | |
| Los Angeles, California 90010 | |
| Telephone:  (213) 398-3777 | |
| Facsimile:   (213) 389-3377 | |
| | |
| Lawrence Heller, Esq. | Counsel for Defendant |
|  lheller@helleredwards.com | K&L IMPORTS, INC. |
| HELLER & EDWARDS | |
| 9494 Wilshire Boulevard, Suite 500 | |
| Beverly Hills, California 90212 | |
| | |
| Morgan E. Pietz | Counsel for Defendant |
| The Pietz Law Firm | K&L IMPORTS, INC. |
| 3770 Highland Ave., Ste. 206 | |
| Manhattan Beach, CA 90266 | |
|  mpietz@pietzlawfirm.com | |
| Ph: (310) 424-5557 | |
| Fx: (310) 546-5301 | |
| | |
| Timothy J. Halloran, Esq. | Counsel for YK TRADING, INC. |
| James F. Mongale, Esq. | |
| Jeff C. Hsu, Esq. | |
| MURPHY, PEARSON, BRADLEY & | |
| FEENEY | |
| 88 Kearny Street, 10th Floor | |
| San Francisco, CA  94108 | |
| 415-788-1900 | |
| Fax 415-393-8087 | |
| thalloran@mpbf.com | |
| jmonagle@mpbf.com | |
| jhsu@mpbf.com | |