UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| BRIGHTON COLLECTIBLES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>RK TEXAS LEATHER MFG.; K & L IMPORTS, INC.; et al.,<br><br>Defendants;<br><br>and related cross claims. | CASE NO. 10-CV-419-GPC (WVG)<br><br>ORDER<br>(1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON TRADE DRESS;<br>(2) GRANTING IN PART DEFENDANTS' MOTION TO EXCLUDE DR. WUNDERLICH'S EXPERT TESTIMONY; AND<br>(3) GRANTING IN PART DEFENDANTS' MOTION TO EXCLUDE DR. FRAZIER'S EXPERT TESTIMONY; AND<br>(4) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON LOST PROFITS<br><br>[Doc. Nos. 144, 163, 184, 187, & 225] |
|---|---|

Plaintiff Brighton Collectibles, Inc. ("Brighton") manufactures and sells women's fashion accessories, including handbags. Brighton filed this copyright infringement action against Defendants RK Texas Leather Manufacturing, Inc., Richard Ohr, K & L Import, Inc., NHW, Inc., YK Trading, Inc., JC NY, Joy Max Trading Inc., and AIF Corporation ("Defendants"). The Court heard oral argument on December 20, 2012. For the reasons stated below, the Court denies both summary judgment motions, and grants in part and

denies in part the motions to exclude two of Brighton's expert witnesses.[1]

## I. Defendants' Motion for Summary Adjudication of Trade Dress Claim

The Lanham Act, 15 U.S.C. § 1125(a), "gives a producer a cause of action for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods. . . .'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000) (children's clothing). The Lanham Act "has been held to embrace not just word marks, such as 'Nike,' and symbol marks, such as Nike's 'swoosh' symbol, but also 'trade dress' – a category that originally including only the packaging, or 'dressing,' of a product, but in recent years has been expanded . . . to encompass the design of a product." *Id*.

In its second claim, Brighton alleges that Defendants infringed its distinctive trade dress in the "Brighton" line of fashion accessories. Brighton describes its trade dress as "a sculpted, silver heart, used in conjunction with any two or more of the following: (i) leather embossed to resemble exotic materials such as crocodile, alligator, snake and lizard; (ii) filigreed, silver ornamentation; (iii) a silver heart dangling from a leather strap; (iv) cowhide or brocaded fabrics; and/or (v) additional sculpted silver hearts." Second Amended Compl. ¶ 36.

To prove trade dress infringement, plaintiff must prove "(1) that its claimed trade dress is nonfunctional; (2) that its claimed trade dress serves as a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product . . . creates a likelihood of consumer confusion." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001) (footnote omitted).[2]

Defendants seek summary adjudication on the first and second elements. Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and

---

[1] The Court considered all of the arguments presented, even those not discussed in this Order. To the extent that the parties sought relief that is not expressly granted in this Order, the Court denies the motion.

[2] As to the second element, the Supreme Court held that a product's design cannot be "inherently distinctive," therefore, plaintiff must prove its trade dress has acquired secondary meaning. *Wal-Mart Stores*, 529 U.S. at 216; *Clicks*, 251 F.3d 1258 n.1.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### A. Nonfunctional Requirement and Aesthetic Functionality Doctrine

The first element of a trade dress claim is that the product design is "not functional." 15 U.S.C. § 1125(a)(3).

Over the years, the Supreme Court has articulated the functionality standard in several ways. In 1982, the Supreme Court held that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982). This is known as the traditional or utilitarian test. *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1067 (9th Cir. 2006) ("'utilitarian' functionality . . . relates to the performance of the product in its intended purpose"); *Clicks*, 251 F.3d at 1260 ("functionality denotes utility").

In 1995, the Court announced another test and explained that a feature is functional if "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995). Under this "competition theory of functionality," courts consider whether trade dress protection would leave a "variety of comparable alternative features that competitors may use to compete in the market." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 418 (6th Cir. 2012). "If the feature is not a likely impediment to market competition, then the feature is nonfunctional." *Id.*; *Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998) (considering whether "commercially feasible alternative configurations exist") (quotations and emphasis omitted).

In 2001, the Supreme Court held that a plaintiff can prove a feature is not functional "by showing that it is merely an ornamental, incidental, or arbitrary aspect" of the product. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 30 (2001).

In the Ninth Circuit, when the feature also "contributes to the consumer appeal and saleability of the product," the "aesthetic functionality" doctrine "retains some limited

viability." *Au-Tomotive Gold,* 457 F.3d at 1070; *Vuitton et fil S.A. v. J. Young Enters., Inc.*, 644 F.2d 769 (9th Cir. 1981). In that situation, the Ninth Circuit first applies the utilitarian test (supplemented by additional factors) before turning to the competition test. *Au-Tomotive Gold,* 457 F.3d at 1072 & n.8 (citing *Disc Golf*, 158 F.3d at 1006-09).

Defendants invoke the aesthetic functionality doctrine. *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952). They argue Brighton cannot meet its burden of proving that its trade dress is not aesthetically functional because its eye-pleasing quality does not identify the source of the handbags. Defendants contend customers buy Brighton's products simply because they are attractive. The elements are aesthetically functional because "some people will simply wish to purchase a leather purse adorned with silver hearts, regardless of who supplies it." Br. at 18.

Defendants also rely on the competition theory of functionality. They argue that protecting Brighton's monopoly would significantly hinder competition because there are virtually no other alternative designs. Defendants emphasize that Brighton is seeking to prevent others from using a rudimentary shape (heart) and common fabrics (brocade, leather, crocodile) that are basic elements of women's fashion accessories. Granting Brighton the exclusive right to use those characteristics "impoverishes other designers' palettes." *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 860 (7th Cir. 2010).

The Court agrees with Brighton that summary judgment is not appropriate on this record under any of the tests. "The issue of functionality has been consistently treated as a question of fact." *Vuitton*, 644 F.2d at 775. As with the luggage in the *Vuitton* case, Brighton's handbags "carry the same number of items, last just as long, and [are] just as serviceable" without the trade dress features. *Id.* at 776-77. The source-identifying role is discussed in more detail below but it is sufficient to note here that the "Brighton look" can be "aesthetically pleasing and still play a source-identifying role." *Clicks*, 251 F.3d at 1260. Turning to the competition theory, Brighton identified a wide-variety of designs made by other manufacturers as well as by the Defendants that do not infringe even though the handbags contain components of Brighton's trade dress. Wesley Decl., Exs. 88-90;

Opp. Br. at 17.  Two sales representative testified that other manufacturers sell handbags that do not copy the distinctive "Brighton look."  Wesley Decl., Ex. 105 (Bell Depo. at 19-20, 51-52, 58, 66, 70, 82-83); *id.*, Ex. 106 (Lombardi Depo. at 10-13, 48-49).

### B. Source-Identifying Role

A trade dress must be "capable of distinguishing the [plaintiff's] work from the goods of others."  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998).  Plaintiff has the burden of proving that the trade dress "serves a source-identifying role" because it is either distinctive or has acquired a secondary meaning.  *Clicks*, 251 F.3d at 1258.  Defendants charge that Brighton cannot establish this element by either standard; therefore, asks for summary judgment.

#### 1. Genericness versus Distinctiveness

The Lanham Act does not protect generic terms.  *Filipino Yellow Pages, Inc. v. Asian Jrl. Publ'ns., Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999).  In trade dress cases, the distinctiveness inquiry is whether the "definition of a product design is overbroad or too generalized."  *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995); *Big Island Candies, Inc. v. Cookie Corner*, 269 F. Supp. 2d 1236, 1243 (D. Haw. 2003).

Defendants argue Brighton's trade dress definition cannot survive summary judgment because it is generic, overbroad, and vague.  Defendants criticize the reach of Brighton's definition because it combines a sculpted silver heart ornament with any two or more of five other elements (such as embossed leather or brocade fabrics or a dangling silver heart).  This "pick-and- choose" definition results in a "staggering" 26 combinations.  Br. at 21.  "[T]he marketplace is left wondering what are the specific types of elements that are off limits."  *Id.*  Defendants bolster this argument with expert testimony that silver heart ornaments and the named materials have been "the most rudimentary" and "essential building blocks" of women's fashion accessories for centuries.  Heller Decl., Ex. H (Nunes Report).  Defendants repeat their argument that they can envision a very narrow range of leather handbags with a heart that would not infringe Brighton's trade dress.  Brief at 16-

17. Defendants' expert drew several designs that would infringe the trade dress but Defendants contend that none of them look-alike. They argue this exercise in imagination shows that Brighton's definition is overbroad.

The Court holds that there are factual issues as to whether Brighton's trade dress is generic because Brighton offers testimony from two independent sales representatives that the Brighton "look" is distinctive and that customers associate the overall look with Brighton. *E.g.*, Wesley Decl., Exs. 105 & 106 (Bell and Lombardi Depos.).

### 2. Secondary or Acquired Meaning

Defendants also argue they are entitled to summary judgment because Brighton does not have evidence that its trade dress has a "secondary" or "acquired" meaning.

Secondary meaning is "a term of art for identification of source." *Clicks*, 251 F.3d at 1262. A trade dress acquires secondary meaning "when, in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." *Wal-Mart Stores*, 529 U.S. at 211. "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner and length of use . . . , amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages*, 198 F.3d at 1151.

The Court finds that Brighton has come forward with evidence that raises a material question of fact as to whether its trade dress has acquired secondary meaning. *Clicks*, 251 F.3d at 1262. Industry participants, including Brighton employees and neutral sales representatives, testified they recognize a Brighton bag when they see one. Br. at 23 (collecting citations). Brighton submitted examples of ads that marketed the image of its trade dress. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987). Brighton submitted evidence that it owns 160 stores, sells its handbags at 5,000 other stores, has sold its line for almost 20 years, and has wholesale sales exceeding $100 million. *Clamp Mfg. Co. Inc. v. Enco Mfg. Co., Inc.*, 870 F.2d 512, 517 (9th Cir. 1989); Br. at 23-24 (collecting citations). The Court also credits Brighton's argument that the

similarity of the allegedly infringing designs suggests Defendants intentionally copied Brighton's trade dress. *Clicks*, 251 F.3d at 1264; Br. at 24 (collecting citations). This evidence bears on the relevant factors and defeats the summary judgment motion.

## II. *Daubert* Motions to Exclude Expert Witnesses

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence 702 to ensure specialized and technical evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 & n.7 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposed a special "gatekeeping obligation" on trial judge).

An expert witness may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007).

### A. Plaintiff's Accounting Expert Witness Robert Wunderlich

Defendants move to exclude Dr. Robert Wunderlich's expert testimony on Brighton's actual damages. In particular, Defendants focus on the expert's assumption that one infringing sale correlates with one lost transaction in which the Brighton customer would have purchased 2.06 authentic items (including handbags, wallets, jewelry, and watches). In brief, Defendants contend Wunderlich's opinion is (1) not relevant because it is not tied to the facts; (2) unreliable because he did not use a scientific methodology that can be replicated by others, but instead offers an ipse dixit conclusion; and (3) unhelpful because Wunderlich's impermissible assumptions are non-committal and evasive. Defendants claim Brighton seeks a windfall because Wunderlich's math awards Brighton $115 million in lost sales even though Defendants collectively had sales of only $8 million. After careful consideration, the Court agrees with Defendants that the lost profits part of

Wunderlich's opinion is not admissible.[3]

The current copyright statute allows a plaintiff to recover "*either* (1) the copyright owner's actual damages *and* additional profits of the infringer"[4] or instead (2) statutory damages. 17 U.S.C. § 504 (emphasis added). Brighton seeks to recover damages under the first measure, which has two distinct elements: (1) Brighton's "actual damages," including lost profits and damage to goodwill; and (2) Defendants' profits from the sales of infringing products.

"[P]roof of actual damage is often difficult." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993). A plaintiff must establish with "reasonable probability the existence of a causal connection between the infringement and a loss of revenue." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 567 (1985). This includes "both the fact of damage and the amount of damage." *Lindy Pen*, 982 F.2d at 1407. Plaintiff must have "a reasonable bases for the computation" even though lost profits cannot be calculated with "absolute exactness." *Id.*; *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996) (plaintiff must show existence of lost profits with "reasonable certainty" not "speculation or guesswork"). For example, lost profits can sometimes be quantified with confidence by comparing the plaintiff's actual sales *before* infringement to sales figures *during* the time defendant improperly competed. *Ziegelheim v. Flohr*, 119 F. Supp. 324, 325, 329 (E.D.N.Y. 1954) (four years of plaintiff's sales data showed loses when defendants copied a Hebrew prayer book that was not readily available from a source other than plaintiff).

---

[3] District courts presiding over prior Brighton trials have reached conflicting decisions about whether to admit similar expert testimony on actual damages. *Brighton Collectibles, Inc. v. Coldwater Creek, Inc.*, 2010 U.S. Dist. LEXIS 98224 (Case No. 08-cv-2307-H) (Order filed Sept. 20, 2010); Monagle Decl., Exs. L, O, & R. And while a judge's questions during argument are simply food for thought, a Ninth Circuit panel pointedly criticized Wunderlich's theory in a prior appeal. Swift Supp. Decl., Ex. B at 38, 40-43, 45-48.

[4] The statute prevents double recovery in that it allows plaintiff to recover *both* (1) its actual damages *and* (2) defendant's wrongful gains *only to the extent that* "any profits of the infringer . . . are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). As to defendant's wrongful gain, the statute requires the copyright owner "to present proof only of the infringer's gross revenue." *Id.* The burden then shifts to defendant to establish deductions for other factors. *Id.*

Brighton is not attempting to prove lost profits by a tried and true method that is grounded on *plaintiff's sales data*, whether actual sales or forecasts of future sales; instead, Brighton's expert proposes a theory that plaintiff's lost profits can be based solely upon the number of the *Defendants' sales*. But the number of sales by Defendants is relevant to the alternative measure of Defendant's wrongful gain. Wunderlich fails to demonstrate a rational connection between the separate measures.[5] The Court finds that Brighton has not carried its burden to prove that Wunderlich's opinion satisfies Rule 702.

Wunderlich improperly equates Defendants' infringing sales with Brighton's own lost profits on a scale of 1:1. Following Defendants' persuasive remarks at the hearing, the Court conducted a thorough search of case law to determine if that is an accepted theory. There are cases where the evidence suggested a customer bought a defendant's counterfeit product in place of and instead of the plaintiff's product. *E.g.*, *Stevens Linen Assocs., Inc. v. Mastercraft Corp.*, 656 F.2d 11, 15 (2d Cir. 1981) (remanding damages calculation to district court when plaintiff introduced evidence it sent samples to 22 customers, who instead bought similar, cheaper design from defendant because it was defendant's burden to show that its infringement did not cause every one of these regular customers to switch to defendant); *Mfrs. Techs., Inc. v. Cams, Inc.*, 728 F. Supp. 75, 80-81 (D. Conn. 1989) ("very compelling" customer testimony); *Dolori Fabrics, Inc. v. The Limited, Inc.*, 662 F. Supp. 1347, 1355 (S.D.N.Y. 1987) (awarding lost profits of actual, shared customer); *Key West Hand Print Fabrics, Inc. v. Serbin, Inc.*, 269 F. Supp. 605, 613 (S.D. Fla. 1966) (awarding lost profits when customer testified she cancelled large order because defendant flooded market with cheap counterfeit), *aff'd* 381 F.2d 735 (5th Cir. 1967) (per curiam); *see also RSO Records, Inc. v. Peri*, 596 F. Supp. 849, 860 (S.D.N.Y. 1984) (when defendants made exact copies of stolen musical recordings and sold the records at the same price, "[i]t would

---

[5] "A damage theory based upon a copyright owner's lost profits must be distinguished from a claim based upon the infringer's profits." *Law Bulletin Publ'g Co. v. Rodgers*, 1988 WL 130024 (N.D. Ill., filed Nov. 28, 1988); Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §14.02[A][1] (2012) (cautioning courts not to confuse defendant's profits with plaintiff's lost revenue); *e.g.*, *Orgel v. Clark Boardman Co. Ltd.*, 128 U.S.P.Q. 531 (S.D.N.Y. 1960) (rejecting expert testimony that every sale to defendant would have gone to plaintiff if defendant's book had not been in the market).

1  be reasonable to assume that for every counterfeit copy of plaintiffs' copyrighted records
2  and tapes sold by defendants plaintiffs lost a corresponding sale," but plaintiffs did not seek
3  that measure).  Those cases are distinguishable because each plaintiff had convincing
4  evidence from a customer to support the calculation of lost profits by referencing the
5  defendant's infringing sales.

6  By contrast, Brighton's expert has not grounded his assumption with the real world
7  facts of this case.  As Defendants correctly observe, it is not plausible that every woman
8  who bought a $20 or $50 knockoff would have paid over $200 for an authentic handbag.
9  While it is not for the Court to challenge the *correctness* of Wunderlich's conclusion, the
10 Court has a duty to ensure that his methodology is sound and that his testimony is
11 supported by the underlying facts.  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311,
12 1318 (9th Cir. 1995) (*Daubert II*).  Yet, Wunderlich has no data to demonstrate that the 1:1
13 scale corresponds with Defendants' cheap handbags and Brighton's expensive products.
14 *See Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92, 107-08 (2d Cir. 1999) (affirming district
15 court's finding that shared customers who obtained samples from plaintiff would not
16 necessarily have purchased expensive product but for the infringement); *Peter Pan Fabrics,*
17 *Inc. v. Jobela Fabrics, Inc.*, 329 F.2d 194, 195-96 (2d Cir. 1964) (conclusion that plaintiff
18 would make "identical sales" "was merely an assumption and was not supported by any
19 proof whatsoever"); *Alouf v. Expansion Prods., Inc.*, 417 F.2d 767, 768 (2d Cir. 1969) (per
20 curiam) ("in light of plaintiff's high price policy, it was not clear that she would have made
21 all the sales that defendant did."); *L & L White Metal Casting Corp. v. Cornell Metal*
22 *Specialties Corp.*, 353 F. Supp. 1170, 1176 (E.D.N.Y. 1972) (plaintiff's castings were one
23 third more expensive), *aff'd* 177 U.S.P.Q. 673 (2d Cir. 1973).[6]  His speculation would not

---

[6] By comparison, the plaintiff's lost sales is one relevant factor when awarding the alternative measure of statutory damages. Yet courts often reject estimates of alleged lost sales when there is a price difference. *Pret-A-Printee, Ltd. v. Allton Knitting Mills, Inc.*, 218 U.S.P.Q. 150, 153 (S.D.N.Y. 1982) ("defendants' lower price might have resulted in greater sales than plaintiff could have obtained at its higher price"); *see Original Appalachian Artworks, Inc. v. J.F. Reichert, Inc.*, 658 F. Supp. 458, 465 (E.D. Penn. 1987) (noting that courts awarding statutory damages often "do not attach great weight" to income lost because amount is difficult to monetize).

help the jury but could mislead them.

Wunderlich's report lacks any indication that he considered that this case involves the highly competitive fashion marketplace. His opinion is not based on any evidence of direct competition between the retail Defendant, which operates small, Western-style stores, and Brighton, which owns upscale boutiques and sells to high-end department stores. *Peter Pan Fabrics*, 329 F.2d at 196 (maker of expensive fabric "cannot reasonably expect to sell the same number of yards as the infringer who caters to the bargain basement market" by selling inferior quality). The expert has not provided a nexus from the knockoff customer to the typical Brighton customer who would spend $240 or $400 on one handbag. *Daubert*, 509 U.S. at 590 (in Rule 702, "the word 'knowledge' connotes more than subjective belief or unsupported speculation").

Brighton defends its expert by arguing that the amount of lost profits is inherently imprecise and that Wunderlich offers a "framework" the jury could – but is not required to – use to determine a reasonable award. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931); *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) ("Upon proving causation, the plaintiff's evidentiary burden relaxes considerably."); *e.g.*, *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 305 (S.D.N.Y. 2002) (after bench trial, court estimated plaintiff would have sold one-third of the garments that defendant sold).

The Court is not persuaded by this argument because the Court must ensure that Wunderlich's methodology is sound before the jury can consider his expert opinion. *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002) ("Maintaining *Daubert*'s standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony") (footnote omitted), *amended* 319 F.3d 1073 (9th Cir. 2003). The gatekeeping requirement ensures that "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

1  Wunderlich's flimsy assertion is no more convincing than a copyright owner's speculation
2  about a 1:1 scale. *Cf. L & L White Metal Casting*, 353 F. Supp. at 1176 (rejecting owner's
3  testimony that it "would have made every one the sales" as too speculative). The report on
4  its face does not articulate a reliable principle or method that could be explained or tested.[7]
5  *Daubert*, 509 U.S. at 593-94. When deposed, Wunderlich could not identify the factual
6  basis for his assumptions or provide any assurance that his conclusion is based upon a
7  method that is generally accepted in the field or that has a known margin of error that could
8  be tested by other professionals. Monagle Decl., Ex. B; Br. at 3-6, 8-9, 13-14, 18-25
9  (collecting citations). He did not perform any economic analysis to reach his conclusion.
10 He does not provide the jury with any guidance on the factors to consider in selecting an
11 appropriate ratio. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (excluding
12 expert opinion that relied on a source "of such little weight" that it "would not actually
13 assist the jury in arriving at an intelligent and sound verdict"); *Rambus Inc. v. Hynix
14 Semiconductor Inc.*, 254 F.R.D. 597, 606 (N.D. Cal. 2008) (excluding expert report that did
15 not "apply a reliable methodology to reach a helpful conclusion").
16     In sum, "there is simply too great an analytical gap between the data and the opinion
17 proffered." *G.E. Co. v. Joiner*, 522 U.S. 136, 146 (1997).
18     **B. Plaintiff's Marketing Expert Witness Gary Frazier**
19     Brighton hired Dr. Gary Frazier to give his expert opinion whether (1) customers
20 would likely confuse the source of Defendant RK Texas Leather's allegedly infringing
21 handbags with Brighton's designs and (2) knockoffs harm Brighton's reputation.
22 Defendants challenge his opinions as unreliable due to the flawed methodology of Frazier's

---

[7] Two telling examples illustrate the unreliability of the correlation between Defendants' sales and Brighton's profits. Wunderlich states that for every product the Defendants sold, Brighton lost the sale of 2.06 products. Yet the sales data shows that a Brighton customer spent on average $84 per transaction and that Brighton's handbags sell for an average of $240. Second, most of the Defendants are wholesale importers and distributors, while one, RK Texas Leather, operates a retail store. Yet Wunderlich counts each transaction in the chain of distribution as a separate sale without regard to the number of handbags ultimately sold to consumers. These simple mathematical exercises seriously undermine Brigthon's argument that Wunderlich's opinion is a helpful framework for the jury to determine reasonable damages.

marketing surveys. The Court grants the motion to the extent discussed, but denies it in all other respects.

### 1. First Survey: Likelihood of Confusion of Trade Dress

The Court agrees that Defendants identify a fatal flaw in Dr. Frazier's first survey, which renders inadmissible his opinion on the likelihood of confusion. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806-07 (9th Cir. 1988) (affirming exclusion of "hopelessly flawed" expert report on damages when lost profit analysis "rests on unsupported assumptions and ignores distinctions crucial to arriving at a valid conclusion"). The survey's design was so blatantly biased that the results are unreliable. *Daubert*, 509 U.S. at 589; *cf. Clicks*, 251 F.3d at 1262-63 (court can exclude a survey that is undermined by a fatal flaw).[8]

Participants were first shown four authentic products. In that display, two of Brighton's products were black and red, and all four had large heart ornaments. Carswell Decl. at 63-70 (A-1 to A-4). Next, Frazier showed participants four similar handbags made by other manufacturers. Yet, only the Defendants' handbag was two-color (black and brownish-red) with heart decorations. *Id.* at 71-102 (B-1 to B-4). Participants were then asked which, if any, item was "made, sponsored, or endorsed" by the same company that made the first set of handbags.

A line-up in which only one bag shares the most prominent and eye-catching features – two colors and silver hearts – improperly suggested to the participants that Defendants' bag was the "correct" answer. Consequently, the survey does not prove actual consumer confusion about Brighton's brand, but instead tested the ability of participants to pick the most obvious match. The flaw is readily apparent because color is not an element of Brighton's definition of trade dress; rather, Brighton defines its trade dress based first

---

[8] In *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1156 (9th Cir. 1982), the Ninth Circuit stated that "[t]echnical unreliability goes to the weight accorded a survey, not its admissibility." That case predates the Supreme Court's *Daubert* decision and that broad statement must be construed in light of Court's gatekeeping obligation.

upon the use of a sculpted, silver heart in combination with two or more other features such as filigreed ornamentation and embossed leather material. SAC ¶ 36. The high number of participants who selected the Defendants' two-color handbag with the heart ornaments – 89% – shows that it stood out as the best match, regardless of whether participants were actually confused by features in Brighton's trade dress. The Court excludes Dr. Frazier's expert opinion that this survey shows consumers are likely to be confused by Defendants' products. *See Sunbeam Corp. v. Equity Indus. Corp.,* 635 F. Supp. 625, 634 (E.D. Va. 1986) (rejecting survey when defendant's product "stood out like a bearded man in a lineup with four clean-shaven men"; "When a survey question begs its answer it is not a true indicator of the likelihood of consumer confusion."), *aff'd* 811 F.2d 1505 (4th Cir. 1987); *see also Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1051 (S.D. Ind. 2000) (rejecting survey when format tested "nothing more than the memory and common sense of a respondent" but nothing relevant about consumer confusion).

The problem was exacerbated because Frazier did not use a control to test the accuracy of his survey. Br. at 12-13 (collecting citations).

### 2. Second Survey:  Knockoffs Harm Brighton's Reputation

Frazier conducted a second survey to prove that knockoffs harmed Brighton's brand and sales. He conducted an internet survey of 408 customers with high incomes who had purchased Brighton products in the past. Carswell Decl., Ex. A (¶¶ 34-37). They were shown pictures of products made by Brighton and by Defendants. Participants were first asked: "If you knew that less expensive handbags, such as the ones pictured here, were being sold, would you be any less likely to buy an authentic Brighton product?" *Id.* at 121. Frazier reported that 23% (93) responded "yes." He concludes this confirmed his expert opinion that "the proliferation of lower-priced, lower-quality knockoffs harms the authentic brand." *Id.* (¶ 41).

If the answer was "yes," the second question asked participants to rank their "feelings" into one of these categories:   I wouldn't buy Brighton; I would reduce my buying of Brighton by 1 to 25% per year; by 26 to 50% per year; by 51 to 75% per year; by

1  more than 75% per year; or I don't know. *Id.* Of the 93 women had answered "yes" to the
2  first question, Frazier found that 12% would not buy Brighton; 19% would reduce
3  purchases by 1 to 25% per year; 25% by 26 to 50%; 17% by 51 to 75%; 11% would reduce
4  purchases by more than 75% per year; and 16% did not know. *Id.* (¶ 42). These results
5  support Frazier's opinion that "[f]or an appreciable percentage of consumers, the sale of
6  knockoffs causes such negative feelings that they will stop buying the authentic brand
7  altogether, or severely reduce future purchases of the authentic brand." *Id.*
8      The third question asked all participants: "Do you believe you have seen Brighton
9  knockoffs in public?" *Id.* (¶ 43). Frazier found that 41% (167) responded "yes," which is
10 consistent with his opinion that "the sale of knockoffs such as Texas Leather bags in issue
11 in this case caused actual harm to Brighton." *Id*.
12     The Court shares Defendants' concern that the sloppy questions are problematic and
13 the sweeping conclusions are careless. Nonetheless, the Court concludes that Defendants
14 can explore the weaknesses in Frazier's second marketing survey through the traditional
15 methods such as vigorous cross examination and by presenting their own expert testimony.
16 *Daubert*, 509 U.S. at 596.
17 **III.  Defendants' Summary Judgement Motion on Lost Profit Damages**
18     Brighton claims that Defendants' infringement caused it to suffer actual damages in
19 the form of lost profits and injury to its goodwill. Defendants' summary judgment
20 arguments are similar to the arguments in their *Daubert* motion to exclude the expert
21 testimony of Wunderlich and Frazier. Because the Court granted those motions in part, the
22 scope of the summary judgment motion is narrowed.
23     Defendants are not entitled to summary judgment. Brighton has presented evidence
24 that Defendants' sales of cheap, low quality imitations damaged Brighton's reputation and
25 goodwill. For example, Brighton's owner, several Brighton employees, and some
26 independent sales representatives will testify based upon their knowledge of sales data,
27 press reports, and photographs that Brighton sells distinctive products and that Defendants'
28 intentional copies caused Brighton to lose sales and customers. Opp. Br. at 9-12 (collecting

citations to record).  In addition, Dr. Frazier's second survey is relevant.  This evidence raises a question of fact for the jury to decide.

## Conclusion

Upon due consideration of the memoranda and exhibits, the arguments of counsel, and for the reasons set forth above, the Court (1) DENIES Defendants' Motion for Summary Judgment on Trade Dress Infringement [# 144]; (2) GRANTS IN PART AND DENIES IN PART Defendants' Motion to Exclude Expert Testimony of Dr. Wunderlich [# 187 & 225]; (3) GRANTS IN PART AND DENIES IN PART Defendants' Motion to Exclude the Surveys and Expert Testimony of Dr. Frazier. [# 163]; and (4) DENIES Defendants' Motion for Summary Judgment on Lost Profits [# 184].

**IT IS SO ORDERED**.

DATED:  February 12, 2013

_____
HON. GONZALO P. CURIEL
United States District Judge